# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

SOUTH WIND WOMEN'S CENTER LLC, d/b/a TRUST WOMEN OKLAHOMA CITY, on behalf of itself, its physicians and staff, and its patients; LARRY A. BURNS, D.O., on behalf of himself, his staff, and his patients; and COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, INC., on behalf of itself, its physicians and staff, and its patients,

Plaintiffs,

v.

J. KEVIN STITT in his official capacity as Governor of Oklahoma; MICHAEL HUNTER in his official capacity as Attorney General of Oklahoma; DAVID PRATER in his official capacity as District Attorney for Oklahoma County; GREG MASHBURN in his official capacity as District Attorney for Cleveland County; GARY COX in his official capacity as Oklahoma Commissioner of Health; and MARK GOWER in his official capacity as Director of the Oklahoma Department of Emergency Management,

Defendants.

No. CIV-20-277-G

## MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

   A.  The Executive Order and March 27 Statement........................................... 4

   B.  Abortion in Oklahoma .................................................................................. 8

   C.  Plaintiffs' Response to COVID-19 ............................................................. 12

   D.  Oklahoma's Ban on Abortion Access and the Resulting Impact ............... 15

ARGUMENT .................................................................................................................. 17

   A.  Plaintiffs Are Likely to Succeed on the Merits of Their Substantive
       Due Process Claim, as Three District Courts Have Concluded in Similar
       Circumstances. ............................................................................................. 18

       1.  A COVID-19 ban on previability abortions contravenes decades
          of U.S. Supreme Court and other precedent. ....................................... 18

       2.  The Executive Order constitutes an undue burden on a patient's right
          to seek an abortion of a nonviable fetus. ............................................. 21

   B.  Plaintiffs Will Suffer Irreparable Harm if the Ban is Enforced. ............... 25

   C.  The Balance of Harms and Public Interest Support Injunctive Relief. ...... 27

   D.  A Bond is Not Necessary in this Case. ....................................................... 28

CONCLUSION .............................................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Awad v. Ziriax*,
 754 F. Supp. 2d 1298 (W.D. Okla. 2010), *aff'd,* 670 F.3d 1111
 (10th Cir. 2012) ................................................................................ 17, 25, 27

*BNSF Railway Co. v. City of Edmond, Okla.*,
 No. CIV-19-769-G, 2019 WL 5608680 (W.D. Okla. 2019) ........................................ 27

*Cont'l Oil Co. v. Frontier Ref. Co.*,
 338 F.2d 780 (10th Cir. 1964) .................................................................... 28

*Edwards v. Beck*,
 786 F.3d 1113 (8th Cir. 2015), *cert denied,* 136 S. Ct. 895 (2016) ........................... 20

*Elrod v. Burns*,
 427 U.S. 347 (1976) ........................................................................ 25, 26

*Free the Nipple-Fort Collins v. City of Fort Collins, Col.*,
 916 F.3d 792 (10th Cir. 2019) .................................................................. 25

*Henrie v. Derryberry*,
 358 F. Supp. 719 (N.D. Okla. 1973) ............................................................. 19

*Isaacson v. Home*,
 716 F.3d 1213 (9th Cir. 2013), *cert denied,* 134 S. Ct. 905 (2014) ........................... 20

*Isbell v. City of Oklahoma City*,
 No. CIV-11-1423, 2011 WL 6152852 (W.D. Okla. 2011) ........................................... 17

*Isbell v. City of Oklahoma City*,
 No. CIV-11-1423, 2011 WL 6016906 (W.D. Okla. 2011) ........................................... 27

*Jackson Women's Health Org. v. Dobbs*,
 379 F. Supp. 3d 549 (S.D. Miss. 2019), *aff'd,* 951 F.3d 246
 (5th Cir. 2020) ............................................................................... 20

*Jackson Women's Health Org. v. Dobbs*,
 945 F.3d 265 (5th Cir. 2019) ................................................................... 20

*Jackson Women's Health Org. v. Dobbs*,
 951 F.3d 246 (5th Cir. 2020) (per curiam) ...................................................... 20

*Jane L. v. Bangerter*,
  102 F.3d 1112 (10th Cir. 1996) .............................................................. 2, 19

*Little Rock Family Planning Servs. v. Rutledge*,
  397 F. Supp. 3d 1213 (E.D. Ark. 2019), *appeal docketed,* No. 19-2690
  (8th Cir. Aug. 9, 2019) ................................................................................... 20

*MKB Mgmt. Corp. v. Stenehjem*,
  795 F.3d 768 (8th Cir. 2015), *cert denied,* 136 S. Ct. 981 (2016) ............................. 20

*Planned Parenthood of Ariz., Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014).......................................................................... 26

*Planned Parenthood of Ark. & E. Okla. v. Cline*,
  910 F. Supp. 2d 1300 (W.D. Okla. 2012) ...................................................... 27

*Planned Parenthood Ass'n of Utah v. Herbert*,
  828 F.3d 1245 (10th Cir. 2016) ............................................................... 25, 27

*Planned Parenthood Ctr. For Choice v. Abbott*,
  No. A-20-CV-323-LY (W.D. Tx. Mar. 30, 2020).................................... passim

*Planned Parenthood of Southeastern Penn. v. Casey*,
  505 U.S. 833 (1992) ........................................................................... 2, 19, 21

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
  738 F.3d 786 (7th Cir. 2013)........................................................................ 26

*Preterm-Cleveland v. Atty Gen. of Ohio*,
  No. 1:19-cv-360 (S.D. Ohio Mar. 30, 2020) ......................................... passim

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v.*
  *Parson*,
  389 F. Supp. 3d 631 (W.D. Mo. 2019), *as modified,* 408 F. Supp. 3d
  1049 (W.D. Mo. 2019), *appeal docketed,* Nos. 19-2882, 19-3134 (8th
  Cir. Oct. 3, 2019)......................................................................................... 20

*Reprod. Servs. v. Keating*,
  35 F. Supp. 2d 1332 (N.D. Okla. 1998)................................................. 17, 19

*Robinson v. Marshall*,
  415 F. Supp. 3d 1053 (M.D. Ala. 2019) ...................................................... 20

*Robinson v. Marshall*,
  No. 2:19-cv-365 (M.D. Ala. Mar. 30, 2020) ........................................ passim

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ..................................................... 28

*Roe v. Wade*,
    410 U.S. 113 (1973) .............................................................. 2, 18

*Sierra Club v. Hodel*,
    848 F.2d 1068 (10th Cir. 1988), *overruled on other grounds by Village
    of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.
    1992) .................................................................................. 28

*SisterSong Women of Color Reprod. Justice Collective v. Kemp*,
    410 F. Supp. 3d 1327 (N.D. Ga. 2019) ...................................... 20

*SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc.*,
    No. 00–3051, 2000 WL 797338 (10th Cir. 2000) ....................... 28

*Sojourner T. v. Edwards*,
    974 F.2d 27 (5th Cir. 1992), *cert. denied,* 507 U.S. 972 (1993) ................ 20

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ................................................. 19, 21, 22, 23

## STATUTES

63 O.S. § 1-729.1 ........................................................................ 11

63 O.S. § 1-730(A)(1) ............................................................. 5, 6, 15

63 O.S. § 1-738 ..................................................................... 5, 11, 15

63 O.S. § 1-741.1(A) .................................................................. 11

63 O.S. § 1-745.5 ....................................................................... 10

63 O.S. § 683.8 .................................................................... 4, 5, 6, 7

## REGULATIONS AND OTHER AUTHORITIES

O.A.C. §§ 310:600 ...................................................................... 11

Sci., Eng'g & Med., *The Safety & Quality of Abortion Care in the United
    States* (The National Academies Press 2018) ............................... 7

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs South Wind Women's Center LLC, d/b/a Trust Women Oklahoma City ("Trust Women"), Dr. Larry A. Burns ("Dr. Burns"), and Comprehensive Health of Planned Parenthood Great Plains Inc. ("Planned Parenthood"), on behalf of their patients, their physicians and staff, and themselves (together, "Plaintiffs") move for a temporary restraining order and/or a preliminary injunction to enjoin enforcement of Oklahoma's ban on almost all abortion services during the COVID-19 pandemic, which was set forth in Governor Kevin Stitt's March 24, 2020, Fourth Amended Executive Order 2020-07, as expanded to abortion on March 27, 2020.[1]

## INTRODUCTION

Oklahoma is one of many states that have mandated postponement of certain healthcare services in order to preserve valuable resources needed to protect healthcare workers and care for those stricken by COVID-19. Several of these states, including Washington, Illinois, Minnesota, Massachusetts, and New Jersey, have explicitly exempted pregnancy-related care, including termination of pregnancies, from these mandates. But in the last week, Texas, Ohio, Alabama and Oklahoma, among other states, have sought to exploit general executive orders issued in response to the COVID-19 pandemic to ban abortion services.

These statewide abortion bans contravene the guidance of leading health and medical authorities, including the American College of Obstetricians and Gynecologists

---

[1] Press Release (Mar. 27, 2020), *available at* https://bit.ly/2JssTlM.

("ACOG"), which have advised that abortion care is an essential component of healthcare and cannot be delayed during the pandemic without risking the health and safety of pregnant patients.  These bans are also blatantly unconstitutional.  Decades of Supreme Court precedent categorically prohibit states from banning abortion before fetal viability.  *See*, *e.g.*, *Roe v. Wade,* 410 U.S. 113, 166 (1973); *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 846, 871 (1992).  So do precedents in this Circuit.  *See Jane L. v. Bangerter,* 102 F.3d 1112, 1117-18 (10th Cir. 1996).

Just yesterday, federal district courts in Texas, Ohio and Alabama granted emergency requests to temporarily restrain those states from banning abortion under the guise of COVID-19 executive orders.  *See Planned Parenthood Ctr. For Choice v. Abbott,* No. A-20-CV-323-LY (W.D. Tx. Mar. 30, 2020) (ECF No. 40) ("*Abbott*," attached as Exhibit 1);[2] *Preterm-Cleveland v. Atty Gen. of Ohio,* No. 1:19-cv-360 (S.D. Ohio Mar. 30, 2020) (ECF No. 43) ("*Preterm-Cleveland*," attached as Exhibit 2); *Robinson v. Marshall,* No. 2:19-cv-365 (M.D. Ala. Mar. 30, 2020) (ECF No. 83) ("*Robinson*," attached as Exhibit 3).  That same relief is warranted and necessary here.  Since Governor Stitt expanded his Executive Order to apply to "any type of abortion services," abortion services in Oklahoma have ground to a halt.  None of Plaintiffs'

---

[2] Overnight the State of Texas filed motions with the Fifth Circuit to stay the Temporary Restraining Order ("TRO") and vacate it by means of a writ of mandamus.  The Fifth Circuit this morning temporarily stayed the TRO while briefing on those motions continues.  Temporary Stay Order, No. 20-50264 (5th Cir. Mar. 31, 2020).  In a dissent, Judge Dennis noted that the Executive Order at issue in that case exempts "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster."  *Id.*

clinics is now able to provide abortion services in Oklahoma, effectively resulting in a complete ban on abortion in the state.

Absent an order from this Court, Plaintiffs' patients will continue to suffer irreparable injury, because they will be deprived of their constitutionally protected right to access safe and legal abortion in Oklahoma and suffer a range of other harms. A temporary restraining order, and subsequent preliminary injunction, are therefore necessary to stop Defendants from continuing to infringe on Oklahomans' fundamental constitutional right of access to abortion care and to preserve the status quo for patients who are seeking that care.

The balance of the equities also favors Plaintiffs. With no immediate end to the COVID-19 pandemic in sight, the ban will delay abortion access for patients in Oklahoma and for some, preclude it altogether. Not only will these patients be deprived of their constitutional rights, but they will face far greater risks to their personal health, whether they travel out of Oklahoma to access abortion services in other states or whether they carry their pregnancies to term in an overburdened healthcare system. The requested relief will further the public interest by preventing violations of individuals' constitutional rights, by eliminating the risk of community spread resulting from patients forced to travel out of state to seek abortion care, and by avoiding any additional pressure on the healthcare system resulting from patients being forced to remain pregnant.

## STATEMENT OF FACTS

### A.     The Executive Order and March 27 Statement

On March 15, 2020, the State of Oklahoma declared a state of emergency resulting from the COVID-19 pandemic.  *See* Executive Order 2020-07 at 1.[3]  This declaration followed the President's declaration of a national emergency on March 13, 2020.[4]  By now, the virus has reached every state in the country,  with 565 confirmed cases in Oklahoma and 23 deaths at the time of this filing.[5]  Federal and state officials and medical professionals expect a surge of infections that will test the limits of a health care system already facing a shortage of personal protective equipment ("PPE")[6] for healthcare providers, particularly N95 respirator masks.[7]

The Governor responded to the evolving pandemic by issuing several amendments to the initial executive order over the following days.[8]  On March 24, 2020, Governor Stitt amended the original executive order for the fourth time.  Among other things, this

---

[3] *Available at* https://bit.ly/39AnZOh.

[4] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/33UHSON.

[5] Ctrs. for Disease Control & Prevention, *Cases in U.S.* (last updated Mar. 31, 2020), https://bit.ly/39w3XEg; Okla. State Dep't of Health, *Current Situation* (last updated Mar. 31, 2020), (https://bit.ly/3dLtpJB)

[6] Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States* (last updated Feb. 29, 2020), https://bit.ly/3bxMdty.

[7] Andrew Jacobs, Matt Richtel & Mike Baker, 'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire, N.Y. Times, Mar. 19, 2020, https://nyti.ms/39AjROg.

[8] Amended Executive Order 2020-07, *available at* https://bit.ly/39vFKOD; Second Amended Executive Order 2020-07, *available at* https://bit.ly/2QTDrhB; Third Amended Executive Order 2020-07, *available at* https://bit.ly/2UO7pEV; Fifth Amended Executive Order 2020-07, *available at* https://bit.ly/2WSmHva.

amended executive order (the "Executive Order") sets out a number of directives designed to decrease transmission of the virus and to increase the number of medical providers in Oklahoma.  *E.g.* Executive Order ¶¶ 6-7, 13, 17-21. Section 18 of the Executive Order further states: "Oklahomans and medical providers in Oklahoma shall postpone all elective surgeries, minor medical procedures, and non-emergency dental procedures until April 7, 2020." Executive Order ¶ 18.[9]

At a press conference that same day, Governor Stitt clarified that Section 18 of the Executive Order was added to preserve and replenish the state's supply of PPE.[10]  When asked if this provision applied to abortion, the Governor responded that he and his team "have not gotten into the details yet."[11]  On its face, however, the Executive Order did not prevent Oklahomans from obtaining time-sensitive and essential abortion care and it plainly did not apply to abortions effected solely through medication, which are neither "elective surgeries" nor "minor medical procedures." [12]

Three days later, on March 27, 2020, Governor Stitt issued a press release (the "March 27 Statement") that purported to clarify the Executive Order, with the stated

---

[9] The Executive Order states that it is issued pursuant to the Oklahoma Emergency Management Act ("OEM") of 2003. Under Section 683.8 of the OEM, the Governor has the authority to "[m]ake, amend, and rescind the necessary orders and rules to carry out the provisions of the [OEM] within the limits of authority conferred upon the Governor herein, with due consideration of the emergency management plans of the federal government." 63 O.S. § 683.8; Fourth Amended Executive Order 2020-07 at 1.
[10] *Available at* https://bit.ly/39AjlzO
[11] *Id.*
[12] The Executive Order also mandated the closure of certain non-essential businesses. But the Governor subsequently published a memorandum clarifying that healthcare providers are "critical infrastructure" exempt from this mandate. Office of the Gov. J. Kevin Stitt, Executive Memorandum 2020-01 (Mar. 24, 2020), https://bit.ly/3bzzSVV.

purpose of preserving hospital beds and PPEs. Among other provisions, the release declared that the Executive Order requires suspension of "*any type of abortion services* as defined in 63 O.S. § 1-730(A)(1) which are not a medical emergency as defined in 63 O.S. § 1-738.1A or otherwise necessary to prevent serious health risks to the unborn child's mother are included in that Executive Order."[13] The cited statutory definition of "abortion services" subsumes all abortions, regardless of method.[14]

The March 27 Statement further stated abortions are permitted in Oklahoma only in the rare situation of a "medical emergency" under Oklahoma law or "otherwise necessary to prevent serious health risks to the unborn child's mother." Oklahoma's statutory definition of "medical emergency" in the case of abortion is exceedingly narrow, covering only abortions needed to avert the patient's "death or to avert substantial and irreversible impairment of a major bodily function arising from continued pregnancy." 63 O.S. § 1-738.1A. The exception for abortions "necessary to prevent serious health risks" has no statutory definition, but nothing in the March 27 Statement suggests that this language was intended to alter or expand upon the definition of "medical emergency." Nor does the March 27 Statement grant any safe harbor if the State later disagrees with a physician's good faith medical determination that the exception applied.

The Executive Order remains in effect until April 7, 2020, at the earliest, or until Governor Stitt rescinds or modifies it. Executive Order ¶ 18. The state of emergency

---

[13] Press Release (March 27, 2020) (emphasis added), *available at* https://bit.ly/2JssTlM.
[14] 63 O.S. § 1.730(A)(1) defines "Abortion" to mean "the use or prescription of any instrument, medicine, drug, or any other substance or device intentionally to terminate the pregnancy of a female known to be pregnant," with certain limited exceptions.

initially declared by the Governor is longer, and does not end until April 14, 2020.[15] Even that date is unrealistic. The rate of infection is skyrocketing, not diminishing, suggesting that the pandemic will continue well beyond April 7, 2020.[16] The federal government yesterday extended its COVID-19 countermeasures until at least April 30, 2020,[17] and government officials and medical professionals expect the pandemic to last for a year or eighteen months.[18] And Governor Stitt has escalated, not de-escalated, measures as the pandemic continues to worsen, evidenced by his issuance of five iterations of the Executive Order between March 15, 2020 and March 27, 2020.

Plaintiffs cannot risk disregarding the abortion ban to serve their patients. The Oklahoma Attorney General, Mike Hunter, stated that violation of the Executive Order is a misdemeanor.[19] This statement suggests that the State considers the Executive Order to be an order of the Oklahoma Department of Emergency Management (OEM), for which the penalty for a willful violation is a misdemeanor punishable by imprisonment for up to six months, fines up to $3,000, or both. Each day of violation is a separate offense.[20]

---

[15] Executive Order 2020-07, available at https://bit.ly/39AnZOh.

[16] *See* Okla. Dept. of Health, *COVID-19 Resources: Current Situation* https://bit.ly/3dLtpJB (Mar. 28, 2020); Casteel, Chris, *Coronavirus in Oklahoma; As Hospitals Tend to Hundreds of Patients, State Officials Plan for More,* The Oklahoma (Mar. 28, 2020), https://bit.ly/3at4Qig .

[17] Remarks by President Trump (March 30, 2020), *available at* https://bit.ly/3ayL98X.

[18] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts,* N.Y. Times, Mar. 8, 2020, https://nyti.ms/33XC72T.

[19] *See e.g.* Washington, Destiny, *AG Hunter Says Violation of Gov. Stitt's Executive Order Can Result in a Misdemeanor,* (March 27, 2020), https://bit.ly/3dA5PPP.

[20] 63 O.S. § 683.23. Though the Attorney General has not explained the basis for the claim of authority to prosecute violations of the Executive Order, the State presumably deems Executive Orders to be orders of the OEM because the Governor has "general direction" of the OEM. 63 O.S. § 683.8.

### B.     Abortion in Oklahoma

Legal abortion is an extremely safe and common form of healthcare.[21]   Declaration of Gillian Schivone ("Schivone Decl.," attached as Exhibit 4) ¶ 12.  Abortions rarely result in serious complications and do so at rates of no more than a fraction of a percent. *Id.* ¶ 19; *see also id.* ¶ 20 ("Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States.").

Abortion is significantly safer than carrying a pregnancy to term.  Schivone Decl. ¶ 21.  In fact, based on national averages, the risk of death for those carrying pregnancies to term is approximately 14 times higher than for those obtaining abortions.  *Id.*  In Oklahoma, the maternal mortality rate from 2003-2007 was 27.0 maternal deaths per 100,000 live births, which is higher than the national average.  *Id.*

Those risks are exacerbated by the current pandemic because, as health authorities have warned, "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV.  As such, pregnant women should be considered an at-risk population for COVID-19."  Schivone Decl. ¶ 23.

There are two main methods of abortion, medication abortion and procedural abortion, both of which are effective in terminating a pregnancy.  Schivone Decl. ¶ 13. Medication abortion involves a combination of two pills taken orally: mifepristone and

---

[21] Nat'l Acads. of Sci., Eng'g & Med., *The Safety & Quality of Abortion Care in the United States*, 77 (The National Academies Press 2018) ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.").

misoprostol.  *Id.* ¶ 14. The patient takes the mifepristone in the health center and then, typically twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy similar to a miscarriage.  *Id.* Plaintiffs Trust Women and Dr. Burns offer medication abortion up to ten weeks as measured from the first day of a pregnant person's last menstrual period ("LMP"), and Planned Parenthood does so up to eleven weeks LMP. *See* Declaration of Dr. Larry Burns ("Burns Decl.," attached as Exhibit 5) ¶ 11; Declaration of Julie Burkhart ("Burkhart Decl.," attached as Exhibit 6) ¶ 2; Schivone Decl. ¶ 3; Declaration of Brandon Hill ("Hill Decl.," attached as Exhibit 7) ¶ 8.

Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery"; it involves no incision or general anesthesia.  Schivone Decl. ¶ 15; Burns Decl. ¶ 10. Most often in a procedural abortion, the clinician uses gentle suction from a narrow, flexible tube to empty the contents of the patient's uterus.  Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods. Schivone Decl. ¶ 16. After fourteen to fifteen weeks LMP, clinicians generally must use instruments to complete the procedure, a technique called dilation and evacuation ("D&E").  Schivone Decl. ¶ 17. Further in the second trimester, the clinician may begin cervical dilation the day before the procedure, which will require two days of clinical care instead of one.  Schivone Decl. ¶¶ 18, 32.

Plaintiffs Trust Women and Planned Parenthood provide procedural abortion in both the first and second trimester, and Dr. Burns provides procedural abortion only in the first trimester. Schivone Decl. ¶ 3; Burns Decl. ¶ 11; Burkhart Decl. ¶ 2; Hill Decl. ¶ 8.

Both medication abortion and procedural abortion are safe and effective methods of terminating a pregnancy. For some patients, however, one method is medically indicated over the other. Schivone Decl. ¶ 31. For example, a procedural abortion may be contraindicated for a patient due to a medical condition. Moreover, some patients, especially those who are survivors of sexual abuse, may prefer medication abortion because it does not involve inserting anything into the vagina. *Id.*

The window during which a patient can obtain an abortion in Oklahoma is limited. Pregnancy is generally forty weeks in duration, but Oklahoma presumes a fetus is viable—and thus prohibits abortion, except in narrow circumstances—at 22 weeks LMP.[22]

Patients generally seek an abortion as soon as they are able, but many face logistical obstacles that can significantly delay access to abortion care, including the need to schedule appointments, to gather the resources to pay for the abortion and related costs, to arrange for transportation to the clinic, as well as to manage conflicting occupational and family schedules. *See* Burns Decl. ¶ 29; Burkhart Decl. ¶ 9. The

---

[22] 63 O.S. § 1-745.5 prohibits abortion when "the probable postfertilization age of the woman's unborn child is twenty (20) or more weeks." "'Postfertilization age' means the age of the unborn child as calculated from the fertilization of the human ovum;" *id.* § 1-745.2, which occurs approximately two weeks after the first day of a patient's last menstrual period. Thus, twenty weeks post-fertilization is 22 weeks LMP.

COVID-19 public health emergency further exacerbates these burdens on patients.  It has limited public transit, caused massive layoffs and other work disruptions, shuttered schools and childcare facilities, and otherwise limited patients' options for transportation and childcare support.  *See* Burns Decl. ¶ 30; Burkhart Decl. ¶ 37. Indeed, during the week ending on March 21, 2020, the number of unemployment claims in Oklahoma rose to 17,720 initial claims—an increase of 15,884 from the number of claims filed the previous week, and far greater than the number of claims made during any week in the 2008-09 recession.[23]

Abortion access in Oklahoma is made even harder by state-imposed restrictions on abortion, which are some of the harshest in the country.  For example, Oklahomans cannot obtain abortion care at public hospitals except in cases of rape, incest, or a life-threatening situation.  *See* 63 O.S. § 1-741.1(A).  Outpatient abortion facilities are scarce because they are subject to onerous regulations and licensing requirements that do not apply to other healthcare providers.  *See* O.A.C. §§ 310:600.  Patients seeking abortion care are subject to a mandatory 72-hour waiting period.  63 O.S. § 1-738.2(B).  And telemedicine, which is used safely in other states to provide medication abortions, cannot lawfully be used in Oklahoma to provide abortion care.  *See* 63 O.S. § 1-729.1.

Of course, the only alternative to an abortion is continuing to carry the pregnancy. And at this time, very little is known about COVID-19, particularly as it relates to its

---

[23] FOX25, *Record number of Oklahomans apply for unemployment benefits during COVID-19 crisis* (Mar. 26, 2020), https://bit.ly/39reTTB; The New York Times, *The Staggering Rise in Jobless Claims This Week* (Mar. 19, 2020), https://nyti.ms/2JtRWVe.

effects on pregnant women and infants.  Health authorities nevertheless have determined that pregnancy is a significant risk factor in the event of COVID-19 infection.  Schivone Decl. ¶ 23. The Centers for Disease Control ("CDC") has cautioned that "[p]regnancy loss, including miscarriage and stillbirth, has been observed in cases of infection with other related coronaviruses" and "[h]igh fevers during the first trimester of pregnancy can increase the risk of birth defects." *Id.*  Concerns have also been raised that COVID-19 may be transmitted to the fetus during pregnancy.  *Id.*

### C.    Plaintiffs' Response to COVID-19

Plaintiffs are committed to ensuring their patients have access to essential and time-sensitive abortion care during the COVID-19 pandemic.  As ACOG and other leading medical professional organizations have observed, specifically in relation to the COVID-19 pandemic, abortion "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible.  The consequences of being unable to obtain an abortion profoundly impact a person's life, health, and well-being."[24]

Plaintiffs also recognize that they, like other health providers, have an important role to play in minimizing spread of the virus and preserving medical supplies.  Even before the Executive Order, Plaintiffs began screening patients for COVID-19 symptoms and taking patients' temperatures prior to entry into the clinics.  Patients with any

---

[24] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://bit.ly/33ULFeI.

symptoms were told to reschedule their appointments when they were well.  Burns Decl. ¶ 14; Burkhart Decl. ¶¶ 24, 26; Hill Decl. ¶¶ 13-14.  Only asymptomatic patients were allowed into Plaintiffs' clinics, and once inside, patients were required to maintain appropriate distance between each other and the staff.  Burns Decl. ¶ 15; Burkhart Decl. ¶¶ 26, 27; Hill Decl. ¶ 14.  Cleaning and sanitizing of surfaces were increased.  Burns Decl. ¶ 16; Burkhart Decl. ¶ 28; Hill Decl. ¶ 13.

So that patients and staff could adhere to "social distancing" guidelines, the volume of clinic visitors was also decreased.  Other than minors (who could bring a parent), patients were no longer allowed to bring anyone else to their appointment.  Burns Decl. ¶ 15; Burkhart Decl.¶ 24; Hill Decl. ¶ 13.  Plaintiffs also cut back on other healthcare services, or moved services to telemedicine, to leave more room in the clinics for patients seeking abortion care.  Burkhart Decl. ¶ 25; Hill Decl. ¶ 13.

Even with these protective measures, abortion care does not burden hospitals or consume substantial amounts of medical supplies, including personal protective equipment (PPE).  None of the Plaintiffs performs abortions at a hospital, and their patients rarely experience complications that require hospital transfer.  *See* Burkhart Decl. ¶ 31 ("Trust Women Oklahoma City solely provides outpatient care, so we do not have hospital beds.  We almost never send patients to the hospital."); Burns Decl. ¶ 20 ("In my 46 years as an abortion provider, I have transferred only one patient from the clinic to a hospital, and I did so only in an abundance of caution."); Hill Decl. ¶ 11 (Planned Parenthood "has never had occasion to transfer a patient from the health center to a hospital."); *see also* Schivone Decl. ¶ 20.  Thus, one of the purported justifications

13

offered up for Oklahoma's abortion ban—preservation of hospital beds—is not remotely served by eliminating outpatient abortion services.

With respect to PPE, Oklahoma does not currently face a shortage. As Governor Stitt tweeted yesterday: "We are up to an 11-day supply of PPE on hand and we're expecting more big orders to come in this week!"[25] In any event, continued abortion services cannot have a material effect on this stockpile, because neither medication abortions nor procedural abortions requires the extensive use of PPE. Schivone Decl. ¶ 35; Hill Decl. ¶ 9. When providing medication abortion, clinicians typically use only one pair of non-sterile gloves to perform the ultrasound and no other PPE. Burns Decl. ¶ 23; Burkhart Decl. ¶ 33; *see* Hill Decl. ¶ 9 (Planned Parenthood "does not use any PPE when providing patients … a medication abortion."). Procedural abortions are typically performed using only minimal PPE such as gloves, shoe covers, protective eyewear or a face shield, and sometimes a surgical mask and a gown. Burns Decl. ¶ 23; Burkhart Decl. ¶ 34; Hill Decl. ¶ 10.

Once the COVID-19 pandemic escalated, staff at some of Plaintiffs' clinics started wearing masks to minimize the risk of viral transmission. Burns Decl. ¶ 23; Burkhart Decl. ¶ 35. But N95 respirator masks (a face covering designed to block at least 95% of very small test particles that is different from a basic surgical mask), which have been in short supply during the pandemic, were not used at all at Dr. Burns' clinic or Planned Parenthood. Burns Decl. ¶ 24; Hill Decl. ¶ 9. And Trust Women has only a residual

---

[25] Governor J. Kevin Stitt (@GovStitt), Twitter (Mar. 30, 2020, 2:00 PM), https://bit.ly/2Uwn5hh.

supply of approximately fifty N95 respirator masks, which it was using sparingly. Burkhart Decl. ¶ 35. Thus, Plaintiffs are still using exceedingly small amounts of PPE relative to the PPE that a hospital or even an outpatient ambulatory surgical center might use. Schivone Decl. ¶ 35; Burkhart Decl. ¶ 36.

### D.    Oklahoma's Ban on Abortion Access and the Resulting Impact

On March 27, 2020, Governor Stitt issued the March 27 Statement purporting to "clarif[y] that any type of abortion services as defined in 63 O.S. § 1-730(A)(1) which are not a medical emergency as defined in 63 O.S. § 1-738.1 or otherwise necessary to prevent serious health risks to the unborn child's mother are included in that Executive Order." In so doing, Governor Stitt has declared that *all* abortion procedures are considered "elective surgeries and minor medical procedures" that cannot be performed except in rare circumstances. *See supra* p. 6. Thus, the Executive Order, as revised by the March 27 Statement, bans almost all abortions in Oklahoma through at least April 7, 2020, and likely for the duration of the COVID-19 public health emergency.

Given the potential misdemeanor and other penalties for violating the Executive Order, Plaintiffs, their physicians, and staff have been forced to cancel scheduled appointments and to stop providing *all* abortion care. Burns Decl. ¶ 7; Burkhart Decl. ¶ 14; Hill Decl. ¶ 15. The Order thus operates as a previability ban that deprives Plaintiffs' patients of the freedom to make a very personal and constitutionally protected decision in consultation with their families and doctors.

Without access to Plaintiffs' services, patients' abortion care will be delayed, and some will be likely denied altogether. Delays in accessing abortion care impose

unnecessary health risks to patients because, though abortion is very safe throughout pregnancy, health risks increase as pregnancy progresses. Schivone ¶¶ 21, 24, 28; Burns Decl. ¶ 31; Burkhart Decl. ¶ 18. Delays require patients to endure the physical and psychological burdens of pregnancy despite their decision to terminate their pregnancies. Schivone ¶¶ 24, 28; Burkhart Decl. ¶ 18. And delays increase the costs of abortion care. Burkhart Decl. ¶ 21.

Moreover, there are certain points in pregnancy at which abortion may become more complex or fewer medical options may be available. Patients delayed beyond 11 weeks LMP will be unable to access medication abortion in Oklahoma. Patients delayed beyond 22 weeks LMP will be unable to access any form of abortion in Oklahoma. Burkhart Decl. ¶ 22. As a result, these patients will be deprived of their fundamental constitutional right to determine when and whether to have a child, and will incur greater health and other risks, as will their families. Burns Decl. ¶¶ 31-33; Burkhart Decl. ¶ 22. Finally, by targeting abortion, the Executive Order is likely to *increase* the need for other pregnancy-related healthcare and attendant medical facilities, personnel, and PPE. Schivone Decl. ¶ 37. Pre-natal care must continue even during the pandemic; the American Medical Association, American Nurses Association, and American Hospital Association have advised that even "as we reach the critical stages of our national response to COVID-19," patients "with urgent medical needs, including pregnant women, should seek care as needed."[26]  *Id.* ¶ 25.

---

[26] AMA, Am. Hosp. Ass'n & Am. Nursing Ass'n, *AMA, AHA, ANA: #StayHome to confront COVID-19* (Mar. 24, 2020), https://bit.ly/3bDR7FC.

While some patients will be forced to carry pregnancies to term, others will resort to seeking abortion services in neighboring states where abortion is accessible. Schivone Decl. ¶ 34; Burns Decl. ¶ 34; Burkhart Decl. ¶¶ 37-38. This will put more people on the road, which risks spreading COVID-19 further, within and outside the state, and does nothing but shift the alleged burden on healthcare systems to a new territory. Burns Decl. ¶ 35; Burkhart Decl. ¶ 37. In the long run, Oklahoma's ban on abortion does nothing to ease any strain on medical resources Oklahoma or the country are facing due to the COVID-19 pandemic.

## ARGUMENT

Plaintiffs seek a temporary restraining order, and thereafter, a preliminary injunction, to prevent the Executive Order from inflicting harm on Plaintiffs' patients who are unable to access abortion in Oklahoma under the Executive Order as interpreted by the Governor's press release. In ruling on such a motion, the Court considers four factors, all of which weigh heavily in Plaintiffs' favor. A movant must establish (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the injunction; and (4) the injunction would not be adverse to the public interest. *See, e.g.*, *Isbell v. City of Oklahoma City*, No. CIV-11-1423, 2011 WL 6152852, at *2 (W.D. Okla. 2011); *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *Reprod. Servs. v. Keating*, 35 F. Supp. 2d 1332, 1334 (N.D. Okla. 1998).

As three federal district courts have held with respect to efforts to apply COVID-19 executive orders to abortion services in Texas, Ohio and Alabama, abortion providers

17

such as Plaintiffs are entitled to temporary relief.  The Executive Order and March 27

Statement operate to ban virtually all abortions, in violation of decades of binding

Supreme Court precedent holding that a state may not ban abortion before viability, and

to the extent they do not outright ban abortions in Oklahoma, they place an undue burden

upon it.  Moreover, injunctive relief will prevent severe and irreparable harm to

Plaintiffs' patients; is consistent with the balance of hardships; and serves the public

interest.  Accordingly, this Court should grant a temporary restraining order and

injunctive relief.

> **A.  Plaintiffs Are Likely to Succeed on the Merits of Their Substantive Due Process Claim, as Three District Courts Have Concluded in Similar Circumstances.**

Plaintiffs are certain to succeed on the merits of their claim that the Executive

Order and March 27 Statement violate Plaintiffs' patients' liberty rights under the

Fourteenth Amendment.  Indeed, three district courts rapidly reached that conclusion

with respect to abortion services in Texas, Ohio and Alabama.  *See Abbott* at 6; *Preterm-Cleveland* at 6; *Robinson* at 6.

> **1.  A COVID-19 ban on previability abortions contravenes decades of U.S. Supreme Court and other precedent.**

For five decades, the United States Supreme Court has recognized that patients

have a constitutionally-protected right to a previability abortion.  In 1973, the Supreme

Court struck down as unconstitutional a state criminal abortion statute proscribing all

abortions except those performed to save the life of the pregnant person.  *Roe v. Wade,*

410 U.S. 113, 166 (1973).  Specifically, the Court held that the Due Process Clause of the

Fourteenth Amendment to the U.S. Constitution protects a patient's right to choose

18

abortion, *id.* at 153-54, and prior to viability, a state has *no interest* sufficient to justify a ban on abortion, *id.* at 163-65. Rather, a state may proscribe abortion only *after* viability, and even then it must allow abortion where necessary to preserve the life or health of the patient. *Id.* at 163-64.

The Supreme Court has consistently adhered to this core holding. More than 25 years ago, in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* the Court reaffirmed *Roe's* "central principle" that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion." 505 U.S. 833, 846, 871 (1992); *see also id.* at 871 (asserting that any state interest is "insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions"). *Casey* further held that state abortion regulations that impose an "undue burden" on a patient's right to abortion are unconstitutional but emphasized:

> Our adoption of the undue burden analysis does not disturb the central holding of *Roe v. Wade,* and we reaffirm that holding. Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

*Id.* at 879; *see also id.* at 846 *("Roe's* essential holding . . . is a recognition of the right of the woman to choose to have an abortion before viability"). *Roe's* central principle has been repeatedly reaffirmed by the Court, including as recently as 2016. *Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292, 2320 (2016) (viability is "the relevant point at which a State may begin limiting women's access to abortion for reasons unrelated to maternal health").

Unsurprisingly, the Tenth Circuit hews to this jurisprudence and adheres to the Supreme Court's holding that states may not prohibit previability abortions.[27]  *See Jane L. v. Bangerter,* 102 F.3d 1112, 1117-18 (10th Cir. 1996) (a statute banning abortions after twenty weeks "impose[d] an unconstitutional undue burden on [a patient's] right to choose under *Casey*"), *cert denied,* 520 U.S. 1274 (1997).  So do other circuit courts across the nation.[28]  Thus, in 2019, when several states passed abortion bans, in each place where a ban restricted access to abortion, a federal court blocked that ban from taking effect.[29]

---

[27] District courts in this Circuit have long been in accord.  *See Henrie v. Derryberry*, 358 F. Supp. 719, 724 (N.D. Okla. 1973) (holding unconstitutional Oklahoma statutes criminalizing providing or procuring abortions regardless of viability); *Reprod. Servs. v. Keating*, 35 F. Supp. 2d 1332, 1335-36 (N.D. Okla. 1998) (issuing preliminary injunction against statute requiring post-first trimester abortions to be performed in a hospital).

[28] *See, e.g., Jackson Women's Health Org. v. Dobbs,* 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) *("Jackson III")* (invalidating ban on abortions at six weeks); *Jackson Women's Health Org. v. Dobbs,* 945 F.3d 265, 268-69 (5th Cir. 2019) *("Jackson II")* (invalidating ban on abortions starting at fifteen weeks); *MKB Mgmt. Corp. v. Stenehjem,* 795 F.3d 768, 772-73 (8th Cir. 2015) (invalidating ban on abortions after six weeks), *cert denied,* 136 S. Ct. 981 (2016); *Edwards v. Beck,* 786 F.3d 1113, 1117-19 (8th Cir. 2015) (invalidating ban on abortions after twelve weeks), *cert denied,* 136 S. Ct. 895 (2016); *Isaacson v. Horne,* 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (invalidating ban on abortions starting at twenty weeks), *cert denied,* 134 S. Ct. 905 (2014); *Sojourner T. v. Edwards,* 974 F.2d 27, 29, 31 (5th Cir. 1992) (invalidating ban on all abortions), *cert. denied,* 507 U.S. 972 (1993).

[29] *See, e.g., Jackson Women's Health Org. v. Dobbs,* 379 F. Supp. 3d 549, 252 (S.D. Miss. 2019)*, aff'd,* 951 F.3d 246, 248 (5th Cir. 2020) (invalidating ban on abortions after six weeks)*; Robinson v. Marshall,* 415 F. Supp. 3d 1053, 1059 (M.D. Ala. 2019) (invalidating ban on nearly all abortions); *SisterSong Women of Color Reprod. Justice Collective v. Kemp,* 410 F. Supp. 3d 1327, 1350 (N.D. Ga. 2019) (invalidating ban on abortions after six weeks); *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson,* 389 F. Supp. 3d 631, 640 (W.D. Mo. 2019), *as modified,* 408 F. Supp. 3d 1049, 1053 (W.D. Mo. 2019) (invalidating ban on abortions after various weeks), *appeal docketed,* Nos. 19-2882, 19-3134 (8th Cir. Oct. 3, 2019); *Little Rock Family Planning Servs. v. Rutledge,* 397 F. Supp. 3d 1213, 1324 (E.D. Ark. 2019) (invalidating ban on abortions after eighteen weeks), *appeal docketed,* No. 19-2690 (8th Cir. Aug. 9, 2019).

Acknowledging this wall of precedent, three federal district courts have issued temporary restraining orders barring the enforcement of executive orders issued in Texas, Ohio and Alabama to restrict abortion services during the COVID-19 pandemic. *Abbott* at 8; *Preterm-Cleveland* at 8; *Robinson* at 11. In the words of the Texas court:

> Regarding a woman's right to a pre-fetal-viability abortion, the Supreme Court has spoken clearly. There can be no outright ban on such a procedure.

*Abbott* at 6; *see also Robinson* at 6 ("Because Alabama law imposes time limits on when women can obtain abortions, the [executive order] is likely to *fully* prevent some women from exercising their right to obtain an abortion") (emphasis in original). It is beyond dispute that the Executive Order, as expanded in the March 27 Statement, bans all abortions other than those performed in a medical emergency or to prevent serious health risks, in violation of decades of Supreme Court precedent. As the Texas court found, the Supreme Court has never suggested that states might impose such a ban by invoking a "national emergency." *Abbott* at 6. Notwithstanding the state of emergency resulting from the pandemic, the Governor and the State of Oklahoma have no legal authority to run roughshod over civil rights guaranteed by the United States Constitution.

### 2. The Executive Order constitutes an undue burden on a patient's right to seek an abortion of a nonviable fetus.

Because the Executive Order operates as an abortion ban, this Court need not look further; however, even if the Court were to apply the undue-burden test from *Casey,* Plaintiffs would certainly succeed on the merits. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey,* 505 U.S. at 877. A restriction that, "while furthering [a] valid state interest, has

the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health,* 136 S. Ct. at 2309 (alteration in original) (quoting *Casey,* 505 U.S. at 877). As the Supreme Court has held, *"Casey* requires courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2298.

District courts in Ohio and Alabama have concluded that the enforcement of similar COVID-19 executive orders in those states against abortion providers would be an "undue burden" on patients seeking to exercise their constitutional rights. *Preterm-Cleveland* at 6 ("enforcement creates a substantial obstacle in the path of patients seeking pre-viability abortions"); *Robinson* at 6 ("for those women who, despite the mandatory postponement, are able to vindicate their right, the required delay may pose an undue burden that is not justified by the State's purported rationales").

Here, in terms of the burdens, the Executive Order and March 27 Statement operate as a ban for almost all abortions, and in fact, clinics throughout Oklahoma were forced to close. The abortion ban is in effect until at least April 7, 2020, and will likely remain in effect for months, which would push many abortion patients past the legal limit in Oklahoma. Burns Decl. ¶ 33; Schivone Decl. ¶ 33. Moreover, even if some patients affected by the order are still eligible to obtain a legal abortion when the order is later lifted, they will still suffer increased risks to their health by the delay in access to abortion care. *See, e.g.,* Schivone Decl. ¶ 28; Burns Decl. ¶¶ 31-32; Burkhart Decl. ¶¶ 18-20. Thus, the Executive Order overwhelmingly harms individuals seeking an abortion.

These harms vastly outweigh any hypothesized benefits from the abortion ban. In the March 27 Statement, the Governor asserted the interest of preserving resources

22

including hospital beds and PPE. Plaintiffs share that interest, but a blanket abortion ban does not serve it. In fact, as so interpreted, the abortion ban is more likely to aggravate than alleviate the public health crisis arising by increasing the number of hospital beds and PPE required to treat pregnant women, who face an increased risk of morbidity from COVID-19. Schivone Decl. ¶ 33; Burns Decl. ¶¶ 29, 34; Burkhart Decl. ¶ 37.

Legal abortion is safe and complications associated with abortion—including those requiring hospital care—are exceedingly rare. *Whole Woman's Health*, 136 S. Ct. at 2311-2312, 2315; Schivone Decl. ¶¶ 19-20. Nearly all abortions in Oklahoma are provided in outpatient facilities, not hospitals. *See* Burns Decl. ¶ 18; Burkhart Decl. ¶ 31; Hill Decl. ¶ 8. Thus, Plaintiffs' continued provision of abortion care would not affect, much less deplete, hospital capacity.

Plaintiffs had also taken steps to preserve PPE, including by, for example, limiting the number of persons coming into their facilities and postponing or moving to telemedicine other in-person visits that may require PPE. Burkhart Decl. ¶ 25; Hill Decl. ¶ 13. Moreover, abortion care requires minimal PPE, Schivone Decl. ¶ 35, and with respect to N95 respirator masks—the PPE in shortest supply during the COVID-19 pandemic—Plaintiffs either do not use them or only do so sparingly.[30]  Burns Decl. ¶¶ 23-24; Burkhart Decl. ¶¶ 32-35; Hill Decl. ¶¶ 9-10. As such, banning abortions does little to nothing to "ensure that our health care professionals, first responders and medical facilities have all the resources they need to combat COVID-19." March 27 Statement.

---

[30] *See, e.g.,* Cassandra Sweetman, *Federal PPE Supplies for Oklahoma Come in Short and Expired*, Oklahoma News 4 (Mar. 27, 2020), https://bit.ly/2UttvOh; Jennifer Pierce, *Oklahoma Police Departments Face Critical Shortage of Protective Gear, Request Donations*, News 9 (Mar. 25, 2020), https://bit.ly/33UQ7u2.

Indeed, delaying patients in accessing abortion ultimately requires increased use of PPE. Even if the abortion ban ultimately concludes on April 7, 2020, this delay will likely push some patients beyond the time for which they would be legally eligible for medication abortion (PPE is not needed to hand a patient pills), instead requiring a procedural abortion, which necessarily require more PPE than a medication abortion. Schivone Decl. ¶ 31; Burns Decl. ¶ 31; Burkhart Decl. ¶ 19. And for some patients, the delay will push them into two-day D&E procedures. Schivone Decl. ¶ 32; Burkhart Decl. ¶ 20.

Patients who are prevented from obtaining abortions at all and thus who must seek prenatal care—or those who must seek prenatal care during the months they must wait for the Executive Order to expire—will also have to endure at least one (though often multiple) trips to heath care facilities to meet with health care providers and obtain services that involve the use of PPE. *See* Schivone Decl. ¶ 37. Ultimately, then, pregnant patients will require care from health care providers using PPE, whether the pregnancy is terminated or not. Moreover, the public health crisis caused by the COVID-19 pandemic involves not only a shortage of PPE, but also a shortage of hospital beds. Hospital beds are not utilized in providing outpatient abortion, unlike labor and delivery for patients forced to remain pregnant. *Id.*

Far from necessary to address the COVID-19 crisis, Oklahoma's abortion ban could well exacerbate the COVID-19 crisis, including by forcing patients to travel to other states to access abortion care, and potentially using public transportation, even though public health experts and the Executive Order itself have advised many members

of the public to minimize activities outside the home.[31]   Schivone Decl. ¶ 34; Burns Decl. ¶ 35; Burkhart Decl. ¶¶ 37-38.

The Executive Order, as applied to abortion through the March 27 Statement, will not meaningfully advance the State's interests and, if anything, will undermine its stated objectives.   Moreover, even assuming *arguendo* that banning abortions conferred some minimal benefit to the State in terms of conserving medical supplies, the burdens inflicted on patients delayed or prevented from obtaining a wanted abortion will be immense. Plaintiffs therefore have established that they are likely to succeed on the merits of their claim that the Executive Order violates the substantive due process rights of their patients.

### B.    Plaintiffs Will Suffer Irreparable Harm if the Ban is Enforced.

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order and preliminary injunction.   The Executive Order, as revised by the March 27 Statement, prevents Oklahomans from exercising their fundamental constitutional right to terminate a pregnancy.   A plaintiff suffers irreparable injury when a monetary remedy after a full trial would be inadequate or hard to determine.   *Awad*, 670 F.3d at 1131.  Further, it is well established that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary.  *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."); *Free the Nipple-Fort Collins v. City of Fort Collins, Col.*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the

---

[31] Executive Order ¶ 17.

infringement of a constitutional right enough and require no further showing of irreparable injury."); *Herbert*, 828 F.3d at 1263 ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

The district courts in Texas, Ohio and Alabama readily concluded that enforcement of COVID-19 executive orders against abortion providers would result in irreparable injury. *Abbott* at 7 ("Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order."); *Preterm-Cleveland* at 7 ("enforcement would, per se, inflict irreparable harm"); *Robinson* at 7-8 ("Plaintiffs' patients will be delayed in, and in some cases permanently prevented from, exercising their right to privacy—a denial which constitutes 'irreparable injury.'"). This Court should reach the same conclusion here.

Without injunctive relief, Plaintiffs will be forced to continue turning away patients, resulting in immediate and irreparable harm for which no adequate remedy at law exists. Forcing patients to forgo abortion care and remain pregnant against their will inflicts serious physical, emotional, psychological and financial consequences that alone constitute irreparable harm. *See, e.g., Elrod,* 427 U.S. at 373-74; *Planned Parenthood of Ariz., Inc. v. Humble,* 753 F.3d 905, 915-17 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen,* 738 F.3d 786, 796 (7th Cir. 2013); *see also* Schivone Decl. ¶¶ 28-33. Patients who are unable to access abortion at all will be forced to carry pregnancies to term, imposing far greater strains on an already-taxed healthcare system. Schivone Decl. ¶ 37. All patients' fundamental constitutional right to abortion access prior to viability will have been violated. The abortion ban is also in effect until at least April 7, 2020, and

will likely remain in effect for months, which would push many abortion patients past the legal limit for an abortion in Oklahoma creating irreparable harm for many patients, as this "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Abbott* at 7 (quoting *Planned Parenthood of Kan. & Mid-Mo. v. Andersen,* 882 F.3d 1205, 1236 (10th Cir. 2018)).

   **C.    The Balance of Harms and Public Interest Support Injunctive Relief.**

   Plaintiffs' requested relief will "preserve the status quo," tipping the balance of equities toward Plaintiffs and serving the public interest. *Isbell v. City of Oklahoma City*, No. CIV-11-1423, 2011 WL 6016906, at *2-3 (W.D. Okla. 2011); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1266 (10th Cir. 2016). As the Tenth Circuit has made clear, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 754 F. Supp. 2d 1298, 1308 (W.D. Okla. 2010), *aff'd,* 670 F.3d 1111 (10th Cir. 2012); *Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012) ("The public has an interest in constitutional rights being upheld and in unconstitutional decisions by the government being remedied."); *BNSF Railway Co. v. City of Edmond, Okla.*, No. CIV-19-769-G, 2019 WL 5608680, at *3 (W.D. Okla. 2019) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm. Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.") (quoting *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). In the words of the Texas federal court, "the grant of an injunction will not

disserve the public interest…when an injunction is designed to avoid constitutional deprivations." *Abbott* at 8 (internal quotations omitted).

Here, the benefits, if any, of a small potential reduction in the use of some PPE by abortion providers is significantly outweighed by the harm of eliminating abortion access in the midst of a pandemic, which increases the risks of not only continuing an unwanted pregnancy, but the risks of patients traveling to other states in search of time-sensitive medical care. *Preterm-Cleveland* at 7 ("There is no demonstrated "beneficial amount of net saving of PPE…such that the net saving of PPE outweighs the harm of eliminating abortion."); *Robinson* at 10 ("[T]he benefits of some potential increase in the availability of equipment (some of which may be ill-suited to the task of disease containment) do not outweigh the serious, and in some cases, permanent, harms imposed by the denial of an individual's right.").

### D.  A Bond is Not Necessary in this Case.

This Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. The Tenth Circuit has frequently recognized its discretion in the matter of requiring security, holding in many cases that no bond is necessary. *See e.g.*, *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (finding that "[t]he cases upon which Palace relies only underscore the latitude given to courts in making bond decisions); *SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc.,* No. 00–3051, 2000 WL 797338, at *7 (10th Cir. 2000); *Sierra Club v. Hodel*, 848 F.2d 1068, 1097 (10th Cir. 1988), *overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973

(10th Cir. 1992) (affirming the district court's decision not to award damages under Rule 65(c) where "plaintiffs raised legitimate environmental concerns having a high public interest and litigated in good faith"). This Court should use its discretion to waive the bond requirement here, where the relief sought will result in no monetary loss to Defendants, as was done by the three district courts that have restrained enforcement of similar abortion bans. *Abbott* at 9; *Preterm-Cleveland* at 8; *Robinson* at 9.

## CONCLUSION

Just yesterday, the American Medical Association noted its regret that "elected officials in some states are exploiting this moment to ban or dramatically limit women's reproductive healthcare."[32] This leading organization of American physicians—the very people in the front line of fighting the virus—voiced its opposition to "government intrusion in medical care" at this critical moment in our nation's history, emphasizing that physicians and patients "should be the ones deciding" which medical services "need to be performed, and which ones can wait." *Id.*

For the reasons stated above, this Court should grant Plaintiffs' motion for a temporary restraining order and/or preliminary injunction to enjoin enforcement of the Executive Order as expanded by the March 27 Statement to prohibit abortions in Oklahoma.

Dated: March 31, 2020                         Respectfully submitted,

---

[32] Patrice A. Harris, President, AMA, AMA Statement on Government Interference in Reproductive Healthcare (Mar. 30, 2020), https://bit.ly/2X4OAjT.

/s/ J. Blake Patton_____
J. Blake Patton
WALDING & PATTON PLLC
518 Colcord Drive, Suite 100
Oklahoma City, OK 73102
(405) 605-4440
bpatton@waldingpatton.com

*Attorney for Plaintiffs*

Travis J. Tu (*pro hac vice* pending)
Kirby Tyrrell (*pro hac vice* pending)
Ezra Cukor (*pro hac vice* pending)
Jiaman Wang (*pro hac vice* pending)
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3723
tjtu@reprorights.org
ktyrrell@reprorights.org
ecukor@reprorights.org
awang@reprorights.org

Linda C. Goldstein (*pro hac vice* pending)
Kathryn Barrett (*pro hac vice* pending)
Samantha Rosa (*pro hac vice* pending)
Alyssa Clark (*pro hac vice* pending)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel: (212) 698-3817
Fax: (212) 698-0684
linda.goldstein@dechert.com
kathryn.barrett@dechert.com
samantha.rosa@dechert.com
alyssa.clark@dechert.com

*Attorneys for Plaintiffs South Wind Women's
Center LLC, d/b/a Trust Women Oklahoma
City and Dr. Larry A. Burns*

30

Diana Salgado (*pro hac vice* pending)
PLANNED PARENTHOOD
FEDERATION OF AMERICA
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
(212) 261-4399
diana.salgado@ppfa.org

*Attorney for Plaintiff Planned Parenthood of Central Oklahoma*