# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SOUTH WIND WOMEN'S CENTER, | § | |
| | § | |
| et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIV-20-277-G |
| v. | § | |
| | § | |
| J. KEVIN STITT, in his official capacity as Governor of Oklahoma, | § | |
| | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

# BRIEF OF AMICI CURIAE
# BY THE STATES OF ALABAMA, ARKANSAS, IDAHO, INDIANA, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, NEBRASKA, OHIO SOUTH DAKOTA, SOUTH CAROLINA, TEXAS, TENNESSEE, UTAH, AND WEST VIRGINIA

**SPENCER FANE LLP**
ANDREW W. LESTER (OBA 5388)
ANTHONY J. FERATE (OBA 21171)
9400 North Broadway Ext., Ste.600
Oklahoma City, OK 73114
Telephone: (405) 844-9900
alester@spencerfane.com
ajferate@spencerfane.com

**JEFF LANDRY**
  **LOUISIANA ATTORNEY GENERAL**
ELIZABETH B. MURRILL
  *Solicitor General*
JOSEPH S. ST. JOHN
  *Deputy Solicitor General*
LOUISIANA DEPT. OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 456-7544 (cell)
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 6

I.   STATES HAVE VAST POWER TO PROTECT THE PUBLIC FROM
     EPIDEMICS. ......................................................................................................... 6

II.  PLAINTIFFS ARE NOT ENTITLED TO A CATEGORICAL
     EXEMPTION FROM EMERGENCY RULES, ISSUED UNDER
     RAPIDLY-DEVELOPING EMERGENCY CONDITIONS THAT
     THREATEN THE HEALTH AND SAFETY OF MILLIONS. ......................... 10

     A.   Plaintiffs concede there is an epidemic, contend they use minimal PPE,
          and acknowledge their activities may spread COVID-19. ............................... 10

     B.   Under Jacobson and Compagnie Francaise, a federal court generally
          cannot reevaluate State's response to an epidemic. ......................................... 11

     C.   Even if this Court were permitted to reevaluate the State's measures to
          contain the COVID-19 epidemic, there is no basis in the record for it to
          do so. ................................................................................................................... 13

III. THIS CASE POSES A GRAVE THREAT TO STATE AUTHORITY TO
     PROTECT PUBLIC HEALTH. ............................................................................ 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Smith & Nephew, P.L.C.,*
  98 F. Supp. 2d 1287, 1293 (N.D. Okla. 2000) ............................................................ 13

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) ..................................................................................................... 11

*Banzhaf v. F.C.C.,*
  405 F.2d 1082, 1096-97 (D.C. Cir. 1968) ...................................................................... 6

*Bowditch v. City of Boston,*
  101 U.S. 16, 18 (1879) ................................................................................................... 7

*Cf. Elk Grove Unified Sch. Dist. v. Newdow,*
  542 U.S. 1, 15 & n.7 (2004) ......................................................................................... 12

*Compagnie Francaise de Navigation a Vapeur v. State Board of Health,*
  186 U.S. 380 (1902) ....................................................................................... 8, 9, 11, 12

*District of Columbia v. Heller,*
  554 U.S. 570, 626 (2008) ............................................................................................. 10

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136, 146 (1997) ............................................................................................. 14

*Hickox v. Christie,*
  205 F. Supp. 3d 579 (D.N.J. 2016) ............................................................................ 8, 9

*Jacobson v. Massachusetts,*
  197 U.S. 11 (1905) ................................................................................................ passim

*Kansas v. Hendricks,*
  521 U.S. 346, 366 (1997) ............................................................................................. 10

*Lawton v. Steele,*
  152 U.S. 133, 136 (1894). .............................................................................................. 6

*Michigan v. Fisher,*
  558 U.S. 45 (2009) ....................................................................................................... 10

*Mozee v. Am. Commercial Marine Serv. Co.,*
    963 F.2d 929, 935 (7th Cir. 1992) ................................................................. 12

*Near v. Minnesota,*
    283 U.S. 697, 716 (1931) .............................................................................. 10

*Ralston v. Smith & Newphew Richards, Inc.,*
    275 F.3d 965, 970 (10th Cir. 2001) ............................................................... 13

*State Oil Co. v. Kahn,*
    522 U.S. 3, 20 (1997) .................................................................................... 12

*Thomas J. Kline, Inc. v. Lorillard, Inc.,*
    878 F.2d 791, 799-800 (4th Cir. 1989) .......................................................... 14

*United States v. Caltex,*
    344 U.S. 149 , 154 (1953) ................................................................................ 7

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579, 635-37 (1952) ......................................................................... 15

*Zemel v. Rusk,*
    381 U.S. 1, 14-17 (1965) ............................................................................... 10

## OTHER AUTHORITIES

A. MARCIUS, *Coronavirus Threat Forces Longer Waits for Some Organ-Transplant Patients*,
    WSJ (Mar. 25, 2020), https://www.wsj.com/articles/coronavirus-threat-forces-
    longer-waits-for-some-organ-transplant-patients-11585137601 (visited April 1,
    2020). ............................................................................................................... 3

*Adult Elective Procedure Recommendations*, CMS,
    https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-
    procedures-recommendations.pdf (visited April 1, 2020). ............................... 3

D.L HEYMANN & N. SHINDO, 395 LANCET 542, 543 (2020). ......................................... 2

*Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19)
    Outbreak*, 85 Fed. Reg. 15337 (Mar. 18, 2020). ............................................. 2

*Delegating Additional Authority Under the DPA with Respect to Health and Medical Resources to
    Respond to the Spread of COVID-19*, https://www.whitehouse.gov/presidential-
    actions/eo-delegating-additional-authority-dpa-respect-health-medical-resources-
    respond-spread-covid-19/ (visited April 1, 2020) ............................................ 3

J. ADAMY, *Doctors with Coronavirus Frightened by Their Own Symptoms*, https://www.wsj.com/articles/doctors-with-coronavirus-frightened-by-their-own-symptoms-11585479600 (accessed Mar. 31, 2020)............................................................ 2

L.F. MORIARTY ET AL, *Pub. Health Responses to COVID-19 Outbreak*, 69 MMWR 347, 350 (2020). ....................................................................................................................... 1

LDH, *Coronavirus*, http://ldh.la.gov/Coronavirus. ................................................................ 1

M. NACOTI ET AL, *At the Epicenter of the COVID-19 Pandemic and Humanitarian Crisis in Italy*,  https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0080 (accessed Mar. 31, 2020). ....................................................................................................................... 2

Okla. 4th Am. EO 2020-07, https://www.sos.ok.gov/documents/executive/1919.pdf......................................... 4

Okla. 5th Am. EO 2020-07, https://www.sos.ok.gov/documents/executive/1923.pdf......................................... 4

OKLA. ATTORNEY GENERAL, *Attorney General Hunter Clarifies Governor's Executive Order Regarding Law Enforcement Action for Non-compliance*, OKGOV, http://www.oag.ok.gov/attorney-general-hunter-clarifies-governors-executive-order-regarding-law-enforcement-action-for-non-compliance. .................................... 5

OKLA. GOVERNOR KEVIN STITT, *Governor Stitt Clarifies Elective Surgeries and Procedures Suspended Under Executive Order*, OKGOV, https://www.governor.ok.gov/articles/press_releases/governor-stitt-clarifies-elective-surgeries. ................................................................................................................ 6

OKLA. GOVERNOR KEVIN STITT, *Live Update on Oklahoma's Response to Covid-19*, https://www.facebook.com/GovStitt/videos/347717132833192/. .......................... 4

*Resources for Clinics and Healthcare Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html (visited Apr. 1, 2020). ................................................................................................ 3

*Strategies to Optimize the Supply of PPE and Equipment*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html (visited April 1, 2020). ............................................................................................... 3

T. PEARCE, *Emergency Field Hospitals Popping Up Across the Country for Corona Virus Patients*, https://www.washingtonexaminer.com/news/emergency-field-hospitals-popping-up-around-the-country-for-coronavirus-patients............................................ 1

*U.S. Emergency Medical Stockpile Nearly Out of Protective Gear*, REUTERS,
https://news.trust.org/item/20200401004741-7rc0u (visited April 1, 2020)............. 5

Y. WU ET AL, *Prolonged Presence of SARS-CoV-2 Viral RNA in Faecal Samples*, LANCET
GASTROENTEROL HEPATOL (2020),
https://www.thelancet.com/journals/langas/article/PIIS2468-1253(20)30083-
2/fulltext (accessed Mar. 31, 2020)................................................................. 2

## BACKGROUND

Responding to COVID-19 has challenged States and the Federal government in every way. Louisiana saw a tenfold increase in cases in only *10 days*.[1] As of Thursday, April 2, 2020, 310 Louisianans have died. Another 507 are kept alive only by the State's dwindling supply of ventilators. By the time this brief is filed, those numbers will have increased as the State's healthcare system marches toward collapse. Every day, governors report the numbers of people who have tested positive, have died and have been hospitalized, and have been placed in ICU and on ventilators. Several states are experiencing exponential growth in COVID-19 cases. Convention centers and parks are being transformed into field hospitals.[2]

Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Disease, recently warned that the outbreak could kill 100,000–200,000 Americans. Other officials warn of shortages of personal protective equipment ("PPE") used to protect healthcare providers and prevent the spread of infections, and nurses and doctors on the front lines plead for PPE.

Officials and citizens are understandably very concerned. COVID-19 appears to be transmissible by asymptomatic carriers.[3] The virus has an incubation period of

---

[1] LDH, *Coronavirus*, http://ldh.la.gov/Coronavirus.
[2] T. PEARCE, *Emergency Field Hospitals Popping Up Across the Country for Corona Virus Patients*, https://www.washingtonexaminer.com/news/emergency-field-hospitals-popping-up-around-the-country-for-coronavirus-patients.
[3] L.F. MORIARTY ET AL, *Pub. Health Responses to COVID-19 Outbreak*, 69 MMWR 347, 350 (2020).

up to 14 days, during which "[i]nfected individuals produce a large quantity of virus . . . are mobile, and carry on usual activities, contributing to the spread of infection."[4] The virus can remain on surfaces many days[5], and patients may remain infectious for weeks after their symptoms subside.[6] Not surprisingly, healthcare professionals have tested positive even while going to great lengths to protect themselves,[7] and healthcare facilities have been identified as a vector for COVID-19 transmission.[8]

Citing the grave threat posed by the epidemic, the President declared a national emergency March 13, 2020.[9] He has invoked the Defense Production Act to prioritize and allocate medical resources, to prevent hoarding of resources, and "to expand domestic production of health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators."[10] At the

---

[4] D.L HEYMANN & N. SHINDO, 395 LANCET 542, 543 (2020).

[5] MORIARTY, *supra* Note 3, at 350.

[6] Y. WU ET AL, *Prolonged Presence of SARS-CoV-2 Viral RNA in Faecal Samples*, LANCET GASTROENTEROL HEPATOL (2020), https://www.thelancet.com/journals/langas/article/PIIS2468-1253(20)30083-2/fulltext (accessed Mar. 31, 2020).

[7] J. ADAMY, *Doctors with Coronavirus Frightened by Their Own Symptoms*, https://www.wsj.com/articles/doctors-with-coronavirus-frightened-by-their-own-symptoms-11585479600 (accessed Mar. 31, 2020).

[8] *Id.*; *see also* M. NACOTI ET AL, *At the Epicienter of the COVID-19 Pandemic and Humanitarian Crisis in Italy*, https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0080 (accessed Mar. 31, 2020).

[9] *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak*, 85 Fed. Reg. 15337 (Mar. 18, 2020).

[10] *Delegating Additional Authority Under the DPA with Respect to Health and Medical Resources to Respond to the Spread of COVID-19*, https://www.whitehouse.gov/presidential-actions/eo-

same time, the Centers for Disease Control and Prevention ("CDC") issued guidance that healthcare providers should "delay all elective ambulatory provider visits" and "delay inpatient and outpatient elective surgical procedural cases."[11] The CDC explained that doing so "can preserve staff, personal protective equipment, and patient care supplies; ensure staff and patient safety; and expand available hospital capacity during the COVID-19 pandemic." Indeed, the CDC issued detailed guidance on optimizing the supply of PPE under both contingency and crisis conditions.[12] The Centers for Medicare and Medicaid Services ("CMS") also issued detailed recommendations for conserving resources by limiting non-essential adult elective surgery and medical and surgical procedures, including all dental procedures.[13] Heeding that advice, healthcare providers have deferred a wide variety of procedures, even life-saving transplants.[14]

As has been done in all 50 states, on March 15, 2020, Oklahoma Governor Kevin Stitt declared a state of emergency issued executive orders to combat the

---

delegating-additional-authority-dpa-respect-health-medical-resources-respond-spread-covid-19/ (visited April 1, 2020).

[11] *Resources for Clinics and Healthcare Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html (visited Apr. 1, 2020).

[12] *Strategies to Optimize the Supply of PPE and Equipment*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html (visited April 1, 2020).

[13] *Adult Elective Procedure Recommendations*, CMS, https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf (visited April 1, 2020).

[14] A. MARCIUS, *Coronavirus Threat Forces Longer Waits for Some Organ-Transplant Patients*, WSJ (Mar. 25, 2020), https://www.wsj.com/articles/coronavirus-threat-forces-longer-waits-for-some-organ-transplant-patients-11585137601 (visited April 1, 2020).

pandemic, including banning social gatherings of more than 10 people, directing

"vulnerable individuals" to stay in their homes, and requiring  reporting of COVID-

19 infections, ICU and ventilator availability, and daily stocks of PPE.[15] As particularly

relevant here, a March 24 amendment ordered

> Oklahomans and medical providers in Oklahoma [to] postpone all
> elective surgeries, minor medical procedures, and non-emergency dental
> procedures until April 7, 2020.[16]

At a press conference, the Governor explained he was "making decisions based

on reliable data, the emerging science, and the advice of experts;" Oklahoma was

forecast to have "thousands" of cases of COVID-19; and absent actions to "reduce

the spread" of COVID-19, the virus would rapidly "outstrip the capacity of

[Oklahoma's] health care system."[17] Oklahoma Secretary of Health Jerome

Loughridge noted the State had an "average of just over 9 days" of PPE, but "rural

hospitals are experiencing tighter supply," and the State was relying on federal

government's Strategic National Stockpile.

During a question and answer session, the Governor faced repeated media

queries about whether he was going far enough. Oklahoma's Secretary of Science and

Innovation, Dr. Kayse Shurm, explained the Governor's orders were based on data

---

[15] Okla. 5th Am. EO 2020-07, https://www.sos.ok.gov/documents/executive/1923.pdf.
[16] Okla. 4th Am. EO 2020-07, https://www.sos.ok.gov/documents/executive/1919.pdf.
[17] OKLA. GOVERNOR KEVIN STITT, *Live Update on Oklahoma's Response to Covid-19*, https://www.facebook.com/GovStitt/videos/347717132833192/.

and were intended "slow the transmission and preserve [Oklahoma's] PPE" so as not to "outpace what [Oklahoma's] health care infrastructure can handle."[18]

On March 26, the Oklahoma Attorney General issued a press release emphasizing voluntary compliance:

> ***What we are calling on more than anything, is for Oklahomans to be good citizens, good neighbors and comply*** with the governor's executive order, as well as the ordinances of local governments, to protect one another from this deadly illness.
>
> "While a violation of an executive order can be a misdemeanor, law enforcement officers are counseled to inform and persuade to effect compliance when confronted with violations, emphasizing the gravity of the ongoing public health emergency we are experiencing.
>
> "This is not intended to undercut law enforcement's ability to make decisions based on their training, discretion and the facts of any given situation. Rather, this statement is provided to support and enable law enforcement to make sound, fact based decisions given the circumstances while appropriately balancing the interests of public safety and public health."
>
> "We are in an unprecedented time. The Coronavirus has and will continue to cause profound disruptions in everyone's lives and livelihoods and we are all painfully aware of those who have become ill or tragically, have died. But rest assured, by following the advice of our state, municipal, county and federal leaders, and complying with the measures laid out in the governor's executive order, we will save lives."[19]

---

[18]The situation with PPE has worsened. As of April 1, 2020, press reports indicate the National Strategic Stockpile on which Oklahoma was relying to bridge shortages in PPE has "nearly run out of protective gear," including "masks, respirators, gloves, gowns, and face shields." *U.S. Emergency Medical Stockpile Nearly Out of Protective Gear*, REUTERS, https://news.trust.org/item/20200401004741-7rc0u (visited April 1, 2020).

[19] OKLA. ATTORNEY GENERAL, *Attorney General Hunter Clarifies Governor's Executive Order Regarding Law Enforcement Action for Non-compliance*, OKGOV, http://www.oag.ok.gov/attorney-general-hunter-clarifies-governors-executive-order-regarding-law-enforcement-action-for-non-compliance.

Apparently in response to an inquiry at the March 24 press conference, the Governor

subsequently clarified his order in a press release:

> [A]ny type of abortion services as defined in 63 O.S. § 1-730(A)(1) which
> are not a medical emergency as defined in 63 O.S. § 1-738.1 or otherwise
> necessary to prevent serious health risks to the unborn child's
> mother are included in that Executive Order.

> This also includes routine dermatological, ophthalmological, and dental
> procedures, as well as most scheduled healthcare procedures such as
> orthopedic surgeries.

> The rapid spread of COVID-19 has increased demands for hospital beds
> and has created a shortage of personal protective equipment (PPE)
> needed to protect health care professionals and stop transmission of the
> virus.[20]

## ARGUMENT

### I.   STATES HAVE VAST POWER TO PROTECT THE PUBLIC FROM EPIDEMICS.

The States' police power "is universally conceded to include everything

essential to the public safety, health, and morals, and to justify the destruction or

abatement, by summary proceedings, of whatever may be regarded as a public

nuisance." *Lawton v. Steele*, 152 U.S. 133, 136 (1894). "The power to protect the public

health lies at the heart of [that] power." *Banzhaf v. F.C.C.*, 405 F.2d 1082, 1096-97

(D.C. Cir. 1968). Indeed, protection of the public health "has sustained many of the

---

[20] OKLA. GOVERNOR KEVIN STITT, *Governor Stitt Clarifies Elective Surgeries and Procedures Suspended Under Executive Order*, OKGOV,
https://www.governor.ok.gov/articles/press_releases/governor-stitt-clarifies-elective-surgeries.

most drastic exercises of that power, including quarantines, condemnations, civil commitments, and compulsory vaccinations." *Id.* And where necessity warrants, States may go further still. *See, e.g., United States v. Caltex*, 344 U.S. 149, 154 (1953) ("[T]he common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved."); *Bowditch v. City of Boston*, 101 U.S. 16, 18 (1879) ("There are many other cases besides that of fire—some of them involving the destruction of life itself—where the same rule is applied. The rights of necessity are a part of the law.").

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905), is instructive. In *Jacobson*, Massachusetts authorized a board of health to require vaccination "if, in its opinion, it is necessary for the public health or safety." *Id.* at 12-13. Reciting that "smallpox . . . was prevalent to some extent in the city of Cambridge, and the disease was increasing," the city of Cambridge adopted a mandatory vaccination regulation. *Id.* at 12-13, 27-28. Jacobson was convicted for refusing to be vaccinated. *Id.* at 21. The Supreme Court rejected his Fourteenth Amendment challenge, explaining that "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27.

Pointing to the State's authority to conscript for military service and to forcibly quarantine its citizens, the Court held that "in every well-ordered society charged with

the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to . . . restraint." *Id.* at 29. The Court acknowledged the "power of a local community to protect itself against an epidemic . . . might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere[.]" *Id.* at 28. But where the existence of the emergency was undisputed, the Court declined to "usurp the functions of another branch of government" by reweighing the risks and benefits of the emergency action. *Id.* at 27-28, 36-37.

Similarly, in *Compagnie Francaise de Navigation a Vapeur v. State Board of Health*, 186 U.S. 380 (1902), the Supreme Court upheld a geographic quarantine of several parishes around New Orleans. That quarantine sought to "exclude healthy persons from a locality infested with a contagious or infectious disease." *Id.* at 385. The objective was to limit the number of people brought within danger of contagion or infection and thereby accomplish "the subsidence and suppression of the disease and the spread of the same." *Id.* The quarantine was held not to violate the Fourteenth Amendment. *Id.* at 387, 393.

The United States has thankfully had limited experience with epidemics for over 100 years. *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016), for example, is one of only a handful of postwar cases addressing the power of a State to quarantine.

But that case makes clear that *Jacobson* and *Compagnie Francaise* remain good law. In *Hickox*, a nurse who returned to New Jersey after caring for ebola patients was quarantined and sued State officials alleging Fourth and Fourteenth Amendment violations. *Id.* at 584. The court began by pragmatically observing "[t]he State is entitled to some latitude . . . in its prophylactic efforts to contain what is, at present, an incurable and often fatal disease." *Id.* at 584. The court then explained that although "the federal government has the power to declare and enforce a quarantine," it generally plays "a supportive role, with the States taking the lead in quarantine matters." *Id.* at 590-91.

With respect to ebola, the CDC had issued guidance that healthcare workers who had provided care to ebola victims were at higher risk for viral exposure and suggested that "additional precautions may be recommended." *Id.* at 590. Hickox was detained pursuant to an executive order by the New Jersey Governor that was consistent with the CDC's guidance. *Id.* at 585, 591. The court rejected Hickox's contention "that she wore protective gear and took appropriate measures to prevent the spread of disease." *Id.* "The authorities were not required . . . to take it on faith that Ms. Hickox had been 100% compliant, or the measures 100% effective." *Id.* Citing *Jacobson*, and *Compagnie Francaise*, the court found no unconstitutionality. *Id.* at 591-94. It concluded that "[t]o permit these constitutional claims to go forward . . . would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not [the court's]) expertise." *Id.* at 594.

That the States' vast power to deal with epidemics has been repeatedly upheld is unsurprising. The Fourteenth Amendment does not ban the deprivation of any right. Rather, it provides that no State shall "deprive any person of life, liberty, or property without due process of law." The Supreme Court has made clear that even fundamental rights may yield in the face of a sufficiently compelling government interest. *Near v. Minnesota*, 283 U.S. 697, 716 (1931) (First Amendment); *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (Second Amendment); *Michigan v. Fisher*, 558 U.S. 45 (2009) (Fourth Amendment); *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997) (civil commitment); *Zemel v. Rusk*, 381 U.S. 1, 14-17 (1965) (substantive due process right to travel). Nothing in *Roe v. Wade* exempts abortion providers from compliance with generally applicable public health orders in the face of a grave public health crisis.[21]

## II.     PLAINTIFFS ARE NOT ENTITLED TO A CATEGORICAL EXEMPTION FROM EMERGENCY RULES, ISSUED UNDER RAPIDLY-DEVELOPING EMERGENCY CONDITIONS THAT THREATEN THE HEALTH AND SAFETY OF MILLIONS.

### A. Plaintiffs concede there is an epidemic, contend they use minimal PPE, and acknowledge their activities may spread COVID-19.

Plaintiffs concede COVID-19 is a pandemic, that "federal and state officials and medical professionals expect a surge of infections that will test the limits of the

---

[21] The Western District has already found that a fundamental right must yield to the public interest: it has continued criminal proceedings after finding continuances due to COVID-19 outweigh a defendant's right to a speedy trial. W.D. Okla. Gen. Order 20-8.

healthcare system [that is] already facing a shortage of [PPE] for healthcare providers." Mem. (ECF 16) at 4. Indeed, Plaintiffs admit "***[t]he rate of infection is skyrocketing***." *Id.* at 7 (emphasis added). Yet Plaintiffs claim they use "minimal" PPE, raising grave concern that they are spreading the virus. CHPPGP, for example, reuses the same PPE in multiple abortion procedures over the course of a day. Hill Decl. (ECF 16-7) ¶ 10. And plaintiff Dr. Gillian Schivone routinely travels 500 miles between her hospital-based practice in St. Louis and her high-volume abortion practice in Oklahoma City, which she admits "carries significant health risks because [a traveler] may be exposed to the virus along the way." Schivone Decl. (ECF 16-4) ¶¶ 4, 34. Disturbingly, Dr. Schivone's declaration makes clear that the risk is not only to her, but to "the community . . . who may be exposed to the virus" by her, *e.g.*, her patients. *Id.* at ¶ 34; *see also* Burns Decl. (ECF 16-5) ¶ 35 (declaring that "interstate travel" "increases the likelihood that [the traveler] may be exposed to COVID-19").

### B. Under *Jacobson* and *Compagnie Francaise*, a federal court generally cannot reevaluate State's response to an epidemic.

Plaintiffs spend pages rehashing the existence of a right to abortion and demand a categorical exemption—not granted for any other provider or procedure—from a facially neutral order that is applicable to all surgeries and medical procedures.[22] But even as construed by Plaintiffs, that order complies with *Jacobson.*

---

[22] *Jacobson* contemplates as-applied challenges to emergency public health orders by specific individuals. 197 U.S. at 38-39. Modern abortion law is in accord. *See generally Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006). Plaintiffs do not pursue that option, and

197 U.S. at 38-39. Plaintiffs nevertheless insist they are entitled to an extraordinary exception. They claim *their* judgment should override the judgment of subject matter experts at *every level of government* who are seeking to protect the health of the public and medical providers. They ask this court to allow them to ignore experts' warnings that PPE should be conserved and that delaying medical procedures will protect the public from the spread of a deadly disease. In short, Plaintiffs ask this Court to "usurp the functions of another branch of government," *Jacobson*, 197 U.S. at 28, by reweighing the risks and benefits of Governor Stitt's emergency order. That the Court should not do. *Id.* at 28, 39.

This Court also cannot ignore *Jacobson* and *Compagnie Francaise*, as Plaintiffs invite. Rather, "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Kahn*, 522 U.S. 3, 20 (1997); *see also Mozee v. Am. Commercial Marine Serv. Co.*, 963 F.2d 929, 935 (7th Cir. 1992) (holding that where lines of Supreme Court cases conflict, a lower court bears the "difficult task" of reconciling them). The straight-forward, legally correct answer is that *Jacobson* and *Compagnie Francaise* make clear that a Plaintiff cannot litigate the details of the State's response to an epidemic, even if that means their Fourteenth Amendment rights must yield for a short period of time. That answer is medically correct too. As one doctor explained,

---

instead pursue a broad challenge that is adverse to the interest of at least any patient who would be able to pursue such an individual challenge. *Cf. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 & n.7 (2004) (third party standing vitiated by potential conflict of interest).

an epidemic requires a change of perspective toward a concept of *community-centered care*, *i.e.* the focus must be on protecting the population as a whole.[23]

### C. Even if this Court were permitted to reevaluate the State's measures to contain the COVID-19 epidemic, there is no basis in the record for it to do so.

Plaintiffs fail to supply any evidentiary basis for challenging the Governor's executive order, which was issued based on advice from the State's experts and is consistent with guidance issued by the CDC and CMS. Plaintiffs offer declarations by two business managers — Julie Burkhart and Brandon Hill — with *no identified medical expertise*. One of the two doctors who provided a declaration, Dr. Larry Burns, apparently never completed a residency. Burns Decl. ¶¶ 2-3. He is—at most— qualified to opine on the abortion procedure itself. *See Ralston v. Smith & Newphew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue."); *see also Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1287, 1293 (N.D. Okla. 2000) (rejecting contention that a "medical degree is qualification enough"). Dr. Schivone might have experience in gynecology. Schivone Decl. Exh. 1. But neither is qualified to opine on the risk the novel COVID-19 virus poses to their patients, whether the PPE and procedures they are using are adequate to mitigate that risk, or whether any benefit to their patients outweighs the risk to public health as a whole.

---

[23] NACOTI, *supra*, note 8.

*Ralston*, 275 F.3d at 270; *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) (district court erred by admitting testimony of "expert" who had an advanced degree but no relevant experience or publications). They—at most—offer only thin *ipse dixit* testimony, on risk that is insufficient to clear the bar of Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### III.     THIS CASE POSES A GRAVE THREAT TO STATE AUTHORITY TO PROTECT PUBLIC HEALTH.

This case is not occurring in isolation. All states have issued similar emergency restrictions on medical procedures that are not immediately medically necessary. Governors, in consultation with public health experts and federal experts, must have the flexibility to address the rapidly changing needs in each of their states.

Plaintiffs ask the Court to overrule Oklahoma's decisions based on evidence that actually demonstrates the threat to the clinics' patients, their staff, and the public. Far from providing grounds for an exception to the Governor's order, Plaintiffs' declarations prove they should not be performing any procedures while a deadly virus is spreading through the nation. Allowing Oklahoma abortion providers a categorical exception to the Governor's orders will also further undermine efforts to obtain compliance from other segments of society.

The federal judiciary is uniquely unsuited to the task it is being asked to undertake—second-guessing the judgment of infectious disease experts, public health officials, and state disaster managers. Those officials are expressly tasked with

protecting the public. Absent wholly unreasonable and arbitrary conduct, federal courts should allow them space to do so, as *Jacobson* commands. Plaintiffs' attitude of exceptionalism underscores the challenge states face stemming the spread of the virus.

The harm caused by second guessing the judgment of state and federal officials during an ongoing pandemic disaster response goes well beyond their singular exception because it broadly undermines compliance, with attendant prolonging of the epidemic and increased death tolls. There is no effective remedy for this harm. This is precisely why the Supreme Court—and virtually every state court to consider the issue—has recognized that state power is at its zenith during an epidemic. Spotty compliance or flagrant noncompliance by those who believe they are exceptional (or invincible) contributes to higher exposure and death rates.

Regardless, in the middle of *responding* to this threat as it unfolds, States should not be required to provide categorical exclusions to public health orders, and no federal court should assume that grave responsibility. It was well within the State's power to articulate a simple, workable rule requiring physicians to defer procedures that are not immediately medically necessary.

## CONCLUSION

Plaintiffs invite this Court on a perilous journey. They challenge emergency orders issued by the Governor of Oklahoma under conditions expressly authorized by Oklahoma law, when his powers are at their zenith, to address a grave threat to public health. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) (Jackson,

J., concurring). Plaintiffs nevertheless ask this Court to permit medical procedures that, in the judgment of both State and Federal experts, risk further spreading a deadly epidemic. This Court should decline that request.

Dated April 2, 2020                    Respectfully submitted,

**SPENCER FANE LLP**

/s/ Andrew W. Lester
ANDREW W. LESTER (OBA # 5388)
ANTHONY J. FERATE (OBA # 21171)
9400 North Broadway Extension, Ste. 600
Oklahoma City, Oklahoma 73114
Telephone: (405) 844-9900
Facsimile: (405) 844-9958
alester@spencerfane.com
ajferate@spencerfane.com

**JEFF LANDRY**
**LOUISIANA ATTORNEY GENERAL**
*ELIZABETH B. MURRILL
  *Solicitor General*
*JOSEPH S. ST. JOHN
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 456-7544 (cell)
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
*pro hac vice applications forthcoming*

Steve Marshall
Alabama Attorney General

Leslie Rutledge
Arkansas Attorney General

Lawrence Wasden
Idaho Attorney General

Curtis T. Hill Jr.
Indiana Attorney General,

Daniel Cameron
Kentucky Attorney General,

Lynn Fitch
Mississippi Attorney General,

Eric Schmitt
Missouri Attorney General

Douglas J. Peterson
Nebraska Attorney General

Dave Yost
Ohio Attorney General

Alan Wilson
South Carolina Attorney General

Jason Ravnsborg
South Dakota Attorney General

Herbert Slatery III
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Sean Reyes
Utah Attorney General

Patrick Morrisey
West Virginia Attorney General

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing has been sent to all registered users of the Court's CM/ECF system who have appeared in this case.

Oklahoma City, OK, this 2nd day of April, 2020.

_____/s/  Andrew W. Lester_