## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SOUTH WIND WOMEN'S CENTER LLC, d/b/a   )
TRUST WOMEN OKLAHOMA CITY, on behalf of  )
itself, its physicians and staff, and its patients;  )
LARRY A. BURNS, D.O., on behalf of himself,  )
his staff, and his patients; and COMPREHENSIVE  )
HEALTH OF PLANNED PARENTHOOD GREAT  )
PLAINS, INC., on behalf of itself, its physicians  )   No. 5:20-cv-00277-G
and staff, and its patients,  )
  )
                 Plaintiffs,  )
  v.  )
  )
J. KEVIN STITT in his official capacity as  )
Governor of Oklahoma; MICHAEL HUNTER in  )
his official capacity as Attorney General of  )
Oklahoma; DAVID PRATER in his official  )
capacity as District Attorney for Oklahoma  )
County; GREG MASHBURN in his official  )
capacity as District Attorney for Cleveland  )
County; GARY COX in his official capacity as  )
Oklahoma Commissioner of Health; and  )
MARK GOWER in his official capacity as  )
Director of the Oklahoma Department of  )
Emergency Management,  )
  )
               Defendants.  )

### Plaintiffs' Notice of Supplemental Authority

Plaintiffs South Wind Women's Center LLC d/b/a Trust Women Oklahoma City,

Dr. Larry Burns, and Comprehensive Health of Planned Parenthood Great Plains, Inc.

hereby notify the Court of two recent decisions by federal district courts in Alabama and

Arkansas.

First, on April 12, 2020, a federal district court in Alabama granted plaintiffs' motion for a preliminary injunction, thereby enjoining Alabama from enforcing its state health order and permitting medication and procedural abortions if a physician determines delay would be inappropriate after considering various factors.  The court's opinion is attached as Exhibit 1 and the preliminary injunction is attached as Exhibit 2.  On April 13, 2020, the state defendants filed a notice of appeal, and on April 16, 2020, the state defendants filed an emergency  motion for stay pending appeal with the United States Court of Appeals for the Eleventh Circuit.

Second, on April 14, 2020, a federal district court in Arkansas granted plaintiffs' motion for a temporary restraining order, thereby enjoining Arkansas from enforcing an executive order that banned surgical (i.e. procedural) abortions.  A copy of this order is attached as Exhibit 3.  On April 15, 2020, the state defendants filed a petition for writ of mandamus with the United States Court of Appeals for the Eighth Circuit.


Respectfully submitted,

/s/ J. Blake Patton
J. Blake Patton, Oklahoma Bar No. 30673
WALDING & PATTON PLLC
518 Colcord Drive, Suite 100
Oklahoma City, OK 73102
Phone: (405) 605-4440
Fax: None
bpatton@waldingpatton.com

*Attorney for Plaintiffs*

Travis J. Tu*
Kirby Tyrrell*
Ezra Cukor*
Jiaman Wang*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
Phone: (917) 637-3627
Fax: (917) 637-3666
tjtu@reprorights.org
ktyrrell@reprorights.org
ecukor@reprorights.org
awang@reprorights.org

Linda C. Goldstein*
Kathryn Barrett*
Samantha Rosa*
Alyssa Clark*
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Phone: (212) 698-3817
Fax: (212) 698-0684
Linda.Goldstein@dechert.com
Kathryn.Barrett@dechert.com
Samantha.Rosa@dechert.com
Alyssa.Clark@dechert.com

*Attorneys for Plaintiffs South Wind Women's
Center LLC, d/b/a Trust Women Oklahoma
City and Dr. Larry A. Burns*

Diana Salgado*
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
Phone: (212) 261-4399
Fax: (202) 296-3480
diana.salgado@ppfa.org

*Attorney for Plaintiff Comprehensive Health of
Planned Parenthood Great Plains, Inc.*

*Admitted *Pro Hac Vice*

# Exhibit 1

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
YASHICA ROBINSON, M.D.,      )
et al., on behalf of         )
themselves, their            )
patients, physicians,        )
clinic administrators,       )
and staff,                   )
                             )
        Plaintiffs,          )
                             )        CIVIL ACTION NO.
        v.                   )         2:19cv365-MHT
                             )            (WO)
STEVEN MARSHALL, in his      )
official capacity as         )
Alabama Attorney General,    )
et al.,                      )
                             )
        Defendants.          )
```

OPINION

In December 2019, a novel coronavirus, which causes the disease now known as COVID-19, began to spread quickly around the world. On March 13, 2020, the President of the United States and the Governor of the State of Alabama declared the COVID-19 outbreak both a national and state emergency. Following these declarations, Alabama's State Health Officer issued a series of orders suspending certain public gatherings.

One of these orders, published on March 27, mandated the postponement of "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."   State Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.

Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center are abortion providers in Alabama.  They seek in this ongoing litigation to enjoin enforcement against them of the State Health Officer's March 27 "Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19," extended (with identical language as relevant here) on April 3.[1]  *See* State Health Order of April 3, 2020 (doc.

---

1.  This ongoing litigation was initiated in May 2019 to challenge an Alabama statute that imposed criminal liability on abortion providers for nearly all abortions, completed or attempted, regardless of fetal viability.

no. 109-1). The defendants are Steven Marshall, the Attorney General, and Dr. Scott Harris, the State Health Officer.[2]

For the reasons described below, the plaintiffs' motion for a preliminary injunction will be granted in

---

See *Robinson v. Marshall*, 415 F. Supp. 3d 1053 (M.D. Ala. 2019) (Thompson, J.). Because the statute contravened clear Supreme Court precedent, the court preliminarily enjoined enforcement of the statute as applied to pre-viability abortion. *See id.* On March 30, 2020, the plaintiffs then moved to supplement their complaint to challenge the March 27 state health order, and the court granted the motion.

2. Additional defendants are the district attorneys of the four counties where the plaintiff clinics are located, the Chairman of the Alabama Board of Medical Examiners, and the Chairman of the Medical Licensure Commission of Alabama. *See* First Amended Complaint (doc. no. 79) at 8-12 ¶¶ 20-28. These defendants were named in the original complaint in this case, *see* Complaint (doc. no. 1) at ¶¶ 18-25, but were voluntarily dismissed without prejudice after they agreed to abide by any relief issued by the court as to the statute originally challenged. *See* Orders (doc. nos. 44, 49). They were were added back in as parties in the amended complaint, *see* First Amended Complaint (doc. no. 79) at 8-12 ¶¶ 20-28, but have not appeared or participated in this phase of the litigation. When the court refers to the defendants in this opinion, the court is referring to only Steven Marshall, the Attorney General, and Dr. Scott Harris, the State Health Officer.

3

part, denied in part, and held in abeyance in part.[3]

## I.   BACKGROUND

In light of the ongoing COVID-19 emergency, Alabama's State Health Officer, Dr. Scott Harris, has issued a series of state health orders suspending certain public gatherings and placing limits on the performance of many medical "procedures."   How the restrictions on medical procedures apply to abortion was not immediately clear. In part because abortion providers in Alabama operate in an atmosphere of hostility, the plaintiffs sought clarification of whether the restrictions allow the continued performance of abortions.   Repeated efforts to

---

3. In light of the temporary restraining order issued in *S. Wind Women's Ctr. LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020) (Goodwin, J.), the motion for a preliminary injunction is held in abeyance to the extent that it seeks relief prohibiting application to *all* medication abortions of the medical restrictions of the State Health Officer's March 27, 2020 and April 3, 2020 state health orders (and to any future orders extending the application of the medical restrictions).   The court will further consider whether relief is appropriate on this issue.

4

clarify the application of the medical restrictions to abortion, including by the plaintiffs and by this court, have yielded multiple inconsistent interpretations put forth by the defendants and their attorneys.

The initial state health order, entered on March 19, 2020, delayed "all elective dental and medical procedures." State Health Order of March 19, 2020 (doc. no. 88-4) at 4 ¶ 6. On March 20, an assistant general counsel for the Alabama Department of Public Health confirmed to the plaintiffs' counsel that the department "ha[d] no plans to apply the order to the [abortion] clinics." Decl. of Pls.' Counsel (doc. no. 73) at 46 ¶ 4.

However, on March 27, the State Health Officer amended the restriction on medical procedures in the March 19 state health order, postponing "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as

5

part of a patient's ongoing and active treatment."  State
Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.

Counsel for the plaintiffs reached out again to the
Alabama Department of Public Health, seeking to confirm
that the March 27 state health order would still not be
applied to the clinics.  *See* Decl. of Pls.' Counsel (doc.
no. 73) at 47 ¶ 9-10.  As the plaintiffs interpreted the
state health order, "medication abortion is not a
procedure within the terms of the order and ... surgical
abortion procedures fall within the exceptions."  *Id.* at
47 ¶ 10.  On March 29, the chief counsel to the attorney
general stated in response to the questions from the
plaintiffs' counsel that "we are unable to provide ... a
blanket affirmation that abortions will, in every case,
fall within one of the exemptions."  *Id.* at 48 ¶ 14.  In
other words, under this interpretation, the restrictions
on medical procedures may prohibit some abortions.  Given
this, the plaintiffs filed both a motion to file a
supplemental complaint and a motion for a temporary
restraining order and preliminary injunction, seeking to

6

immediately enjoin enforcement of the March 27 order against abortion providers and abortion clinics.

During an emergency on-the-record hearing on March 30, this court asked counsel for the defendants whether the State Health Officer had taken a position interpreting the revised March 27 state health order. *See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 5:23-25, 21:17-22:1. Counsel for defendants represented that the State Health Officer had taken a position and had communicated that position to counsel's office. *See id.* at 6:1-7, 20:4-8, 22:2-5. Counsel explained that, per the State Health Officer's own interpretation, the March 27 state health order *did* apply to abortions and that abortions would only meet the exceptions where required to protect the life and health of the mother. *See id.* at 20:22-21:1, 22:6-10. In response to these representations, the court entered a broad temporary restraining order enjoining the application of the March 27 state health order against abortion providers and abortion clinics because the state health order, as so

7

described by defense counsel, operated as a prohibition on abortion during the pendency of the order. *See Robinson v. Marshall*, 2020 WL 1520243 (M.D. Ala. 2020) (Thompson, J.), *amended by Robinson v. Marshall*, 2020 WL 1659700 (M.D. Ala. 2020), *and appeal dismissed*, No.20-cv-11270-B (11th Cir. 2020).

As requested, the court gave the defendants 48 hours to respond to the plaintiffs' motion for a preliminary injunction and indicated that, upon receipt of the defendants' response, the court would immediately reconsider its decision. The court set the motion for a preliminarily injunction for a fast-track hearing a week later, on April 6.

Late in the day on April 1, before this court could hold a preliminary injunction hearing, the defendants filed a motion to dissolve the temporary restraining order and a motion to stay enforcement of that order pending appeal. In their briefs, the defendants advanced a new interpretation of the March 27 state health order. The defendants explained in a footnote that they actually

8

"did not mean to suggest that [protecting the life or
health of the mother] are the only circumstances where
an abortion would fit within one of the two exceptions"
in the March 27 order. Defs.' Br. in Support of Mot. to
Dissolve (doc. no. 89) at 26 n.30. Instead, the
defendants indicated, this was just one example of a
range of exceptions, though they did not affirmatively
provide any other examples of how the exceptions would
permit an abortion to proceed. *See id*. In an
accompanying declaration, Dr. Scott Harris, the State
Health Officer, explained that while "abortions
constitute 'procedures'" under the order and that "no
particular type of ... procedure categorically fits
within one of the two exceptions," the determination of
whether an exception applies "should be made by a doctor
using reasonable medical judgment based upon his or her
patient's individual circumstances." Decl. of State
Health Officer (doc. no. 88-15) at 6 ¶¶ 22-23. But Dr.
Harris still did not explain how the restrictions on
medical procedures and associated exceptions in the March

9

27 order applied to abortions.  The plaintiffs and the court were still in the dark on this point.

The court held an immediate hearing on April 3 to discuss, among other things, the defendants' revision in their April 1 brief (allowable abortions *not* limited to protecting the life or health of the mother) of their prior interpretation in the March 30 hearing (abortions limited to protecting the life or health of the mother), both of which, according to defense counsel, were made after talking with State Health Officer Harris.  *See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 6:1-7, 20:4-8, 22:2-5; April 3, 2020, Hr'g Tr. (doc. no. 123) at 35:9-13, 37:13-14.  During the April 3 hearing, the court understood the defendants to make four critical clarifications of the scope of the restrictions on medical procedures and its exceptions.  These clarifications, however, were not in the March 27 state health order, the defendants' brief, or Dr. Harris's declaration.  As a result, the court reduced the defendants' four April 3 clarifications to writing.

10

- First, "[i]n general, for an abortion, like any other procedure, a doctor should examine his or her patient, consider all circumstances, and determine whether one of the exceptions to the March 27 order applies. If they do, the procedure can go forward." *Robinson v. Marshall*, 2020 WL 1659700, at *3 (M.D. Ala. Apr. 3, 2020) (internal quotation marks, alteration, and citation omitted).

- Second, "if a healthcare provider determines, on a case-by-case basis in his or her reasonable medical judgment, that a patient will lose her right to lawfully seek an abortion in Alabama based on the March 27 order's mandatory delays ... then the abortion may be performed without delay pursuant to the exceptions in the March 27 order. The provider may examine his or her patient as needed to make the necessary determination regarding the age of the fetus." *Id*. (internal citation omitted).

- Third, "[i]f a healthcare provider determines, again

11

on a case-by-case basis in his or her reasonable medical judgment, that the abortion cannot be delayed in a healthy way, then the abortion may be performed without delay pursuant to the exceptions in the March 27 order." *Id.* (internal quotation marks, alteration, and citation omitted). "[A] healthcare provider may also examine his or her patient to assess whether or not an abortion can be delayed for two weeks in a healthy way...." *Id.* (internal quotation marks omitted).

- Fourth, and finally, "[t]he reasonable medical judgment of abortion providers will be treated with the same respect and deference as the judgments of other medical providers. The decisions will not be singled out for adverse consequences because the services in question are abortions or abortion-related." *Id.* (internal citation omitted).

Based largely upon these clarifications, the court found that its initial March 30 temporary restraining order "swept too broadly," as the April 3 clarifications

12

"alleviated the court's most serious concerns underlying the issuance of its temporary restraining order." *Id*. The court thus narrowed its temporary restraining order by granting the defendants' motion to stay "to the extent that the court adopts as its order the clarifications agreed upon by the defendants." *Id*. at *4. The court did not stay the temporary restraining order in full because the defendants' clarifications of the state health order were not otherwise binding.[4]

Also on April 3, in the midst of the court's resolution of the motion to stay, the State Health Officer issued a new state health order that extended the relevant restrictions on medical procedures until April

---

4. The court did not act on the motion to dissolve the temporary restraining order because it lacked jurisdiction to do so, given that the defendants had filed an appeal from the temporary restraining order to the Eleventh Circuit Court of Appeals. *See* Notice of Appeal (doc. no. 94); *see also Robinson v. Marshall*, 2020 WL 1659700, at *1 (M.D. Ala. 2020) (Thompson, J.). The appeal was later dismissed on April 4 pursuant to the parties' joint motion. *See* Letter from David J. Smith, Clerk of Eleventh Circuit Court of Appeals, to Clerk, Middle District of Alabama (doc. no. 122).

30.  *See* State Health Order of April 3, 2020 (doc. no. 109-1).  The restrictions on medical procedures in the March 27 order are identical to the restrictions in the April 3 order.  As a result, the defendants agreed that "to the extent that any provider could lawfully have considered the April 17 expiration date from the March 27 order, that provider can instead consider the new expiration date of April 30, 2020." Order (doc. no. 113) at 2.

On April 5, counsel for the defendants submitted three additional written clarifications to the court's understanding of their April 3 oral clarifications.  *See* Defs.' Notice (doc. no. 120).

- First, the defendants additionally clarified that "a healthcare provider's assertion that a procedure meets one of the exceptions is not conclusive proof that the procedure meets one of the exceptions." *Id*. at 2.

- Second, the defendants additionally clarified that "any healthcare provider would still need to make an

14

individualized determination for his or her patient as to whether losing the ability to have a procedure performed would cause serious harm to the patient." *Id.* at 3.

- Third, the defendants additionally clarified that "the exceptions require that the risk to a patient's health be sufficiently serious." *Id.* at 3 (internal quotation marks, alteration, and citation omitted).

During the April 6 preliminary injunction hearing, however, the State Health Officer, Dr. Scott Harris, put forth yet another interpretation of the restrictions on medical procedures. First, although the March 19 and March 27 state health orders had been interpreted differently, *see* Decl. of Pls.' Counsel (doc. no. 73) at 46 ¶ 4 ("no plans to apply" March 19 order to abortion clinics); *id.* at 48 ¶ 14 ("unable to provide ... blanket affirmation that abortions will, in every case, fall within one of the exemptions" to the March 27 order), Dr. Harris explained that he meant for the two orders "to have the same effect." April 6, 2020, Hr'g Tr. (doc. no.

15

133) at 12:17. Second, just as the determination of whether a particular procedure was elective or not in the March 19 order was "left ... to the discretion of the provider," *id*. at 11:8, for the current restrictions on medical procedures "[t]he providers are the ones who determine whether their procedure fits in those exceptions, not the health department." *Id.* at 49:19-21. Third, a provider can consider "whatever factors they would deem ... appropriate" when making a determination of whether the exceptions in a particular circumstance have been satisfied. *Id*. at 15:25-16:8. Fourth, the Department of Public Health does not intend for an abortion provider to necessarily delay even a single procedure as a result of the restrictions on medical procedures. *See id*. at 50:5-14. Fifth, and finally, the Department does not intend to review healthcare providers' decisions. *See id*. at 44:3-14.

To the extent that Dr. Harris's April 6 testimony represents the current interpretation of the restrictions on medical procedures, it reveals substantial common

16

ground between the two parties. Dr. Harris, for instance, made clear that the order was never intended to establish a blanket ban on abortions, but rather that the order contemplated "case-by-case determination[s]." *Id*. at 18:1-8. Dr. Harris further emphasized that providers, and not the Alabama Department of Health, should decide which factors to consider in deciding whether the order's exceptions apply. *See id*. at 13:18-21, 15:3-16:8. And Dr. Robinson, one of the plaintiffs in this litigation and the medical director of the plaintiff Alabama Women's Center, agreed that providers could delay abortions under certain circumstances. *See, e.g.*, *id*. at 139:20-23 (for patients presenting with COVID-19 symptoms); *id*. at 155:8-10 (acknowledging possibility that at least one abortion could be safely postponed).

Nonetheless, Dr. Robinson testified that the defendants' additional written clarifications on April 5 to the court's understanding of their representations on April 3, caused her serious concern. According to her,

17

the written clarifications "made it very clear to me that my medical judgment was not the final decision when it came to the care decisions that I was making for my patients.  I don't know who that is going to be left up to, but it made it very clear to me ... that [my medical judgment] would not be the final call." *Id*. at 125:7-13.

With all of these varying interpretations of the State's public health orders in mind, including the interpretations provided to the plaintiffs' counsel before the filing of the motion for temporary restraining order, the court now turns to the plaintiffs' motion for a preliminary injunction.

## II.  LEGAL STANDARDS

For a preliminary injunction to issue, the plaintiffs must establish the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the preliminary injunction is not granted; (3) that the threatened injury to the plaintiffs outweighs the threatened harm that the

18

injunction may cause the defendants; and (4) that granting preliminary injunctive relief is not adverse to the public interest. *See Ferrero v. Associated Materials, Inc*., 923 F.2d 1441, 1448 (11th Cir. 1991); *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983). Further, where a court issues an injunction, "invalidating the statute entirely is not always necessary or justified;" rather, courts "may be able to render narrower declaratory and injunctive relief." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 323 (2006).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

On March 27, 2020, the State Health Officer released an order that mandated the postponement of "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as

19

part of a patient's ongoing and active treatment."  State
Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.
On April 3, the State Health Officer entered a new order
with identical medical restrictions that extended their
expiration date from April 17 to April 30.  *See* State
Health Order of April 3, 2020 (doc. no. 109-1).  As
described   above,   these   medical   restrictions   are
susceptible to multiple readings.  Over the course of
this litigation, the defendants themselves have put forth
several   divergent   interpretations   of   the   medical
restrictions,   each   with   dramatically   different
implications for the plaintiffs.

Under one of the interpretations put forth by the
defendants, for all of April, abortions can lawfully
proceed without delay *only* when necessary to protect
maternal life or maternal health.  Based on the record
that is now before the court, the medical restrictions,
read  pursuant  to  this  interpretation,  violate  the
Fourteenth Amendment.   The court has no enforceable
guarantee that the medical restrictions will *not* be

20

interpreted in this way by those tasked with their
enforcement through 1975 Ala. Code § 22-2-14 or other
mechanisms. *See* April 6, 2020, Hr'g Tr. (doc. no. 133)
at 44:15-25 (Dr. Harris disclaiming knowledge of how the
order might be enforced by others). The plaintiffs and
the court also cannot rely on the defendants' non-binding
assurances that they will not return to this
interpretation. Accordingly, as explained below, the
court finds that the plaintiffs have demonstrated a
substantial likelihood of success on the merits.


### 1. Effects of Mandatory Postponement

On March 30, counsel for the defendants represented
that, under the medical restrictions, abortions could
lawfully proceed without delay only if they were
necessary to protect the life and health of the mother.
*See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 20:22-21:1,
22:6-10. Under this reading, the medical restrictions
would mandate the postponement until at least April 30
of all abortions not performed to protect maternal life

or maternal health.[5]

On the limited record before the court, the precise implications of the medical restrictions, interpreted in this way, remain murky.  The COVID-19 crisis leaves the court and the parties in uncharted territory.  But this much is clear: for at least some women,[6] a mandatory postponement until April 30 would operate as a

_____

5. This reading by the defendants is a plausible one. The restrictions allow medical procedures only when "necessary to treat an emergency medical condition" or "to avoid serious harm from an underlying condition or disease."  State Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.   While there are other plausible interpretations, the exception *can* be read to mandate postponement of any abortion not necessary to protect the life or health of the mother.  And while the medical restrictions also allow for procedures that are "necessary as part of a patient's ongoing and active treatment," *id.*, the meaning of this provision, and whether and how it applies to abortion, is far from clear.

6. Dr. Robinson acknowledged that, at least hypothetically, it was "possible for there to be at least one abortion that can be safely postponed in [her] judgment."  April 6, 2020, Hr'g Tr. (doc. no. 133) at 155:8-10.  But "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894.

22

*prohibition* of abortion, entirely nullifying their right to terminate their pregnancies, or would impose a substantial burden on their ability to access an abortion. The court provides examples here, though it cautions that the groups described do not constitute an exhaustive accounting of the medical restrictions' likely effects.

First, for some group of women, a mandatory postponement will make a lawful abortion literally impossible. Under Alabama law, a woman's window for seeking a lawful abortion is limited: abortion becomes illegal when the probable postfertilization age of the fetus is at least 20 weeks. *See* 1975 Ala. Code, as amended, § 26-23B-5. A mandatory postponement until April 30 could thus extend a woman's pregnancy beyond the 20-week boundary imposed by law, making an abortion illegal. *See id.*; *see also* Pls.' Mem. in Supp. of a T.R.O. (doc. no. 73-1) at 2 (describing a woman who would be "pushed past the legal limit for abortion in Alabama if she does not obtain an abortion *this week*").

23

For other women, a postponement would make securing a lawful abortion far more difficult, or even impossible, including because of major logistical hurdles. Take, for instance, abortions performed after 14 weeks. Only one clinic in Alabama can perform such abortions, *see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 78:4-9, which are normally a very small minority of all abortions performed statewide. *See* Induced Termination of Pregnancy Statistics (doc. no. 88-13) at 10. But if widespread delays to abortions occur, that clinic's limited capacity will likely become a serious barrier that renders lawful abortions entirely unavailable to some women in Alabama. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 114:7-116:1. Women in Alabama might also face difficulty traveling to a clinic, *see id.* at 92:16-19, particularly if they live in the far reaches of the State; receiving necessary time off, *see id.* at 92:11-15, or child care, *see id.* at 92:24-93:1; and affording an abortion in the first place, *see id.* at 92:5-10. (In Alabama, an abortion requires two visits, so these obstacles must be navigated

24

twice.  *See, e.g., id.* at 93:2-6.)  A mandatory delay would greatly exacerbate many of these difficulties, unseating plans in the midst of a pandemic that has yielded widespread job loss, financial difficulty, and social isolation.  *See, e.g., id.* at 113:11-13 (Dr. Robinson noting that "[w]ith each week that the pregnancy is delayed or termination of the pregnancy is delayed, that means there is an increased cost to the patient"); *id.* at 93:7-14 (noting the pandemic's impact on women seeking abortions, apart from the medical restrictions).[7] It is abundantly clear, and the court now finds, that a delay until April 30 will pose a tremendous, and sometimes insurmountable, burden for many women in Alabama.

Further, for some women, a postponement of an abortion may cause serious harm, or a substantial risk of serious harm, to that woman's health.  Dr. Robinson

---

7. The court finds that Dr. Robinson is an expert in obstetrics and gynecology and abortion practice. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 72:21-24.

credibly testified that, for at least some women, even a
short delay can make an abortion (or the ongoing
pregnancy) substantially riskier. *See, e.g.*, April 6,
2020, Hr'g Tr. (doc. no. 133) at 160:11-13 (discussing
the increase in risk to patients as time passes); *id.* at
84:10-21 (discussing conditions associated with
pregnancy); *id.* at 111:16-18 (noting that "each week that
the abortion is delayed, it increases the risk to the
patient"); *id.* at 112:18-24 (discussing risks of delay
for women at risk of domestic violence or who have
experienced rape); *id.* at 111:4-6 (noting that each week
of delay "increases the risk of mortality"); *id.* at
107:2-11 (reading from a report concluding that, while
complications are rare, the risk of serious complications
increases with delay[8]); *id.* at 110:2-5 (summarizing a

---

8. Dr. Robinson read from a report admissible as a
learned treatise. *See* Committee on Reproductive Health
Services: Assessing the Safety and Quality of Abortion
Care in the U.S., National Academies of Sciences,
Engineering, and Medicine, *The Safety and Quality of
Abortion Care in the United States* (2018); *see also* Fed.
R. Evid. 803(18).

report concluding that "every week an abortion is delayed increases the risk [of mortality or death in the patient] by approximately 38 percent"[9]); *see generally id.* at 39:17-40:4 (Dr. Harris agreeing regarding Alabama's high rate of childbirth complications and maternal mortality). Abortion is a "very safe" procedure, *id.* at 110:24-25, but, for some patients, the relative risk can dramatically increase in a short time--and for these patients, a mandatory delay would create a substantial and serious risk of harm for many patients.

## 2. The Medical Restrictions' Constitutionality

The court finds that, in light of these effects, the plaintiffs have shown a substantial likelihood of success on the merits. That is, it is substantially likely that the medical restrictions, when interpreted to allow only

_____

9. Here, Dr. Robinson was summarizing a section of a learned treatise. *See* Linda A. Bartlett, *Risk Factors for Legal Induced Abortion-Related Mortality in the United States*, 103 Obstetrics & Gynecology 729, 731, 735 (2004); *see also* Fed. R. Evid. 803(18).

27

those abortions necessary to protect the life and health of the mother, are unconstitutional.  First, to the extent that they are interpreted to *prohibit* certain women from *ever* obtaining a pre-viability abortion--and force them, instead, to carry their pregnancies to term--the medical restrictions are very likely unconstitutional on the record before the court.  And, second, to the extent that they impose substantial burdens upon or create serious and substantial health risks for women seeking abortions, they very likely pose an unconstitutional burden.

The plaintiffs and the defendants posit two distinct legal frameworks for this case.  The plaintiffs suggest that the substantive-due-process analysis of *Roe v. Wade*, 410 U.S. 113 (1973), *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), and other related cases should govern.  The defendants argue that the court should instead turn to the State's emergency powers, as set forth in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), in reviewing the

28

order.  The court need not decide which legal framework
applies, and instead assumes that they can and should be
applied together in these circumstances.  Under either
framework, the plaintiffs have shown a substantial
likelihood that, if read to effect a postponement of any
abortion not required to protect the life and health of
the     mother,     the     medical     restrictions     are
unconstitutional.

In *Jacobson*, amid a smallpox outbreak in Cambridge,
Massachusetts, the City (acting pursuant to a state
statute) mandated the vaccination of all of its citizens.
The Court upheld the statute against a Fourteenth
Amendment challenge, clarifying that the State's action
was a lawful exercise of its police powers and noting
that, "[u]pon the principle of self-defense, of paramount
necessity, a community has the right to protect itself
against an epidemic of disease which threatens the safety
of its members."  *Id.* at 27.  Still, while *Jacobson* urges
deferential review in times of emergency, it clearly
demands that courts enforce the Constitution.  *See id* at

29

28. Indeed, *Jacobson* explicitly contemplates a backstop role for the judiciary: "[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, *a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution*." *Id.* at 30 (emphasis added); *see also Casey*, 505 U.S. at 857 (citing *Jacobson* for the proposition that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims").

Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it impinges on a fundamental right in a "plain, palpable" way. *Jacobson*, 197 U.S. at 31.[10] Abortion is a fundamental right. *See,*

---

10. The *Jacobson* Court--writing long before the development of modern substantive-due-process jurisprudence--found no clear invasion of any fundamental right. "Whatever may be thought of the expediency of

30

*e.g.*, *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (noting that "[t]he Supreme Court has recognized that fundamental rights include those guaranteed by the Bill of Rights as well as certain 'liberty' and privacy interests," which include the right "to abortion" (internal citation marks omitted)). And so *Jacobson* asks courts to protect it, even in times of emergency.

Here, the contours of the fundamental right at stake are described in *Roe*, *Casey*, and subsequent cases. As the Supreme Court has repeatedly re-affirmed, the Fourteenth Amendment protects a woman's right to terminate her pregnancy. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (noting that the Supreme Court "has determined and then redetermined that the Constitution offers basic protection to the woman's right to choose").

---

this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution." *Jacobson*, 197 U.S. at 31. Its inquiry thus ended with deference to the State's chosen policy. But here, a fundamental right is clearly at issue.

Still, the right to an abortion does have limits. As the Court recognized in *Casey*, a State may regulate pre-viability abortion to further its legitimate interests, but only if the laws in question do not place an "undue burden" on a woman's right to end her pregnancy. *Casey*, 505 U.S. at 876–79 (plurality opinion). Further, *Casey* itself held that, as applied to a *prohibition* (rather than a mere regulation) of pre-viability abortion, the State's interests *must* give way to a woman's right to terminate her pregnancy. "Before viability, the State's interests are not strong enough to support a prohibition of abortion ...." *Casey*, 505 U.S. at 846 (opinion of the Court); *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (reiterating that "[b]efore viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy" (internal citations and quotation marks omitted)).

It is abundantly clear that the medical restrictions in the state health order are unconstitutional to the

32

extent that they *prevent* a woman from obtaining an
abortion before viability--that is, where they effect a
*prohibition* on abortion. Although *Casey* did not consider
the interests presented by the defendants here
(preserving healthcare resources and reducing close
social contact), it plainly holds that the choice to
terminate a pregnancy before viability must belong to the
woman, not the State.[11]  *Casey*, 505 U.S. at 846 (opinion
of the Court); *see also Gonzales*, 550 U.S. at 146.  To
fully prevent this choice (by, for example, mandating
that a woman's abortion be delayed until it is illegal)
violates *Casey*'s central holding, and thus violates
*Jacobson*, too.  *See Jacobson*, 197 U.S. at 31; *see also
id.* at 25 ("A local enactment or regulation, even if
based on the acknowledged police powers of a state, must

---

11. Indeed, the underlying logic of *Casey* centers on
dignity and autonomy.  *See Casey*, 505 U.S. at 852 (noting
that, in the abortion context, "the liberty of the woman
is at stake in a sense unique to the human condition and
so unique to the law").  These essential values require
the court's protection, even (or, maybe, especially) in
an emergency.

33

always yield in case of conflict ... with any right which [the Constitution] gives or secures."). On the record before the court, even where the State's interests are reviewed with great deference, that violation is "plain, palpable," and constitutionally forbidden.[12] *Id.* at 31.

---

12. *Jacobson* also discusses an exception for "[e]xtreme cases," when the police power is exerted "in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression." *Jacobson*, 197 U.S. at 38. *Jacobson* continues: "It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned." *Id.* at 38-39. *Jacobson* thus recognizes the need for exemptions to allow individuals to avoid serious, lasting impacts--but, unlike in the case of abortion, it did not face such an impact directly. *See generally In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 819 (S.D. Ohio 1995) (noting that *Jacobson* "involved minimally invasive procedures with no lasting side effects"). At minimum, this exception makes clear that *Jacobson* does not give blanket authority to the State, even in an emergency.

34

But even where they operate as a "regulation" of abortion, and not a "prohibition," the medical restrictions, if interpreted to mandate the postponement of any abortion not necessary to protect the life and health of the mother, are very likely unconstitutional. The court finds it substantially likely that they pose an "undue burden," *Casey*, 505 U.S. at 786, that is so extreme that the restrictions effect "a plain, palpable invasion of rights secured by the fundamental law," *Jacobson*, 197 U.S. at 31.

Under the "undue burden" analysis, a regulation of pre-viability abortion cannot survive if the "burdens a law imposes on abortion access" outweigh its benefits. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016). Put another way, "the court must determine whether, examining the regulation in its real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) (Thompson, J.).

35

Considered in their real-world context, the medical restrictions will pose a substantial obstacle to many women in Alabama. In general, even a brief delay causes serious challenges: a 24-hour waiting period, though upheld in *Casey*, posed a close question for the Supreme Court. As this court later noted, the one-day wait "seems to have fallen just on the other side of the line from being a substantial obstacle." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1286 (M.D. Ala. 2014) (Thompson, J).

Here, counted from the initial imposition of the medical restrictions, a delay could exceed *one month*-- even if the restrictions are not extended--and the lengthy postponement period sweeps in many women.[13] The

---

13. The defendants have admitted that the course of the pandemic could last three or four months, beginning in early March. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 37:21-22. The medical restrictions could certainly be extended beyond April 30. *See, e.g.*, *id.* at 104:11-14 (Dr. Robinson explaining that she understands the medical restrictions could be extended past April 30).

36

possible implications of a postponement, applied across the board, are varied and deeply troubling, as the court discussed above. The medical restrictions would amplify existing challenges, pose severe health risks, and render abortions functionally unavailable for at least some women. Most importantly, however, if the restrictions are read to delay any abortion not necessary to protect the life and health of the mother, then abortion providers would be categorically unable to even *consider* these factors in determining whether an abortion can or should be postponed.

These extensive burdens must be balanced against the interests put forth by the defendants: the preservation of healthcare resources (including personal protective equipment) and the prevention of close social contact.[14]

---

14. In *Casey* and its progeny, regulations of abortions are typically justified by two legitimate interests: "preserving and promoting fetal life," *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007), and protecting the health of the woman, *see id.* at 146. Here, the court assumes that the defendants' interests in preserving healthcare resources and preventing social

37

*See, e.g.*, April 6, 2020, Hr'g Tr. (doc. no. 133) at 10:19:11:1 (describing the interests motivating the restrictions); *id.* at 8:3-9:3 (describing the State's interest in conserving personal protective equipment); *id.* at 9:16-10:2 (social distancing); Decl. of State Health Officer (doc. no. 88-15) at ¶ 24 (discussing reasons for mandating delay of abortions). The court recognizes the urgency and breadth of the State's COVID-19 response. But compared to the serious burdens imposed by the medical restrictions, the benefits to the State and the public fall far short.

First, most abortions and related appointments require a limited amount of personal protective equipment (PPE), and a delayed abortion does not erase even the patient's short-term need for medical care. For instance, the defendants have stated that normal prenatal visits and mandatory pre-abortion examinations can

---

contact may legitimately support a regulation of abortion during an emergency.

38

proceed as scheduled under the medical restrictions. *See, e.g.*, April 3, 2020, Hr'g Tr. (doc. no. 123) at 42:4-16; *see also Robinson v. Marshall*, 2020 WL 1659700, at *3 (M.D. Ala. 2020) (Thompson, J.) (court memorializing this); Defs.' Clarifications (doc. no. 120) at 2-3 (not disputing it).

Beyond those appointments, abortions themselves require only a limited amount of PPE.[15] *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 30 (discussing the PPE required for a medication abortion); April 6, 2020, Hr'g Tr. (doc. no. 133) at 54:14-55:2 (same); Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 30 (discussing the

---

15. Indeed, the State Health Officer conceded that administering a medication abortion "may not itself" require the use of PPE. Decl. of State Health Officer (doc. no. 88-15) at ¶ 24. He justified delaying medication abortions based on the risk of possible complications requiring a surgical abortion or emergency medical care. Decl. of State Health Officer (doc. no. 88-15) at ¶ 24. However, the rate of such complications is extremely low, a fact that Dr. Harris admitted he did not know when he made the decision that medication abortions should be postponed. *See, e.g.*, April 6, 2020, Hr'g Tr. (doc. no. 133) at 79:2-15 (discussing the rate of complications); *id.* at 55:23-56:1.

39

PPE required for procedural/surgical abortions); April 6, 2020, Hr'g Tr. (doc. no. 133) at 132:10-18 (same). Further, the risk of a serious complication of abortion is extremely low. *See id.* at 78:11-16. For some delays, therefore, some amount of PPE will be conserved; for other delays, a very small amount of PPE (if any) will be conserved; and for other delays, any PPE conserved will simply be re-routed to routine prenatal visits or, often, appointments required to address the complications of pregnancy.[16] *See, e.g., id.* at 51:6-8 (Dr. Harris's expectation that a pregnant woman should continue to receive prenatal care under the medical restrictions). Indeed, as to hospital resources more generally, the medical restrictions are very unlikely to make a significant difference: the rate of abortions that require hospitalization is extremely low. *See, e.g.,* April 6, 2020, Hr'g Tr. (doc. no. 133) at 79:2-23

---

16. With respect to any PPE that *is* conserved, the defendants have not put forward evidence regarding how it might be used or re-directed to hospitals that are experiencing shortages.

(discussing the rate of complications and noting that most complications can be managed in an outpatient setting). Put simply, even when measured on a very short time horizon, the benefits of the medical restrictions as applied to abortions, are limited, particularly compared to the burdens that they impose.

Further, if an abortion is delayed and then does *not* proceed, the medical restrictions may backfire over time: PPE usage will often be higher and provider-patient contact will likely increase. A typical uncomplicated pregnancy will require *multiple* prenatal appointments and delivery, each of which require PPE, even if there are no unforeseen complications. *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 32; April 6, 2020, Hr'g Tr. (doc. no. 133) at 125:19-126:5 (Dr. Robinson); *see also id.* at 51:6-8 (Dr. Harris's expectation that a pregnant woman should receive prenatal care). A complicated pregnancy would require far more. *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 32. At least some of these needs will emerge before the restrictions expire, especially if they

41

are further extended.

Thus, assuming that the defendants' interests posited here may be considered and granting them substantial deference, the court finds that the burden imposed by the medical restrictions is undue. Indeed, it is substantially and plainly undue--enough that to impose it impinges the right to an abortion in a "plain, palpable" fashion. *Jacobson*, 197 U.S. at 31.[17]

Finally, the defendants also rely upon *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on unrelated grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), arguing that it supersedes the *Casey* framework and imposes far more deferential review. In *Avino*, reviewing an evening curfew imposed in the wake of Hurricane Andrew, the Eleventh Circuit held that, "when a curfew is imposed as an emergency measure in

_____

17. As discussed above, the court assumes that *Jacobson* applies and dictates substantial deference to the state. If only *Casey* applies, the analysis here remains valid and comes to the same conclusion--albeit even more firmly, because the defendants' stated interests would be considered with greater scrutiny.

42

response to a natural disaster, the scope of review in cases challenging its constitutionality is limited to a determination whether the [executive's] actions were taken in good faith and whether there is some factual basis for the decision that the restrictions ... imposed were necessary to maintain order." *Avino*, 91 F.3d at 109 (internal citations, alteration, and quotation marks omitted). But unlike the instant case, *Avino* addressed only temporary, partial restrictions on certain fundamental rights, *see id.*, and explicitly addressed times "when a *curfew* is imposed ... in response to a natural disaster." *Id.* (emphasis added). This court declines to extend it beyond those contexts.[18]

_____

18. Further, in arguing that *Avino* should be extended to state actions that impact fundamental rights in other contexts, including where such rights may be permanently denied, the defendant's argument proves too much. In an emergency, the defendants suggest, a reviewing court may investigate only "whether the executive's actions were taken in good faith and whether there is some factual basis for the decision that the restrictions imposed were necessary to maintain order." *Avino*, 91 F.3d at 109 (internal citations, alteration, and quotation marks omitted). But under this logic, with only "good faith" and "some factual basis," government actors in any

Notably, the court's conclusions come despite the substantial deference to the State that *Jacobson* and *Avino* recommend. In light of the ongoing emergency, the court gives great weight to the State's interests: preventing social contact, preserving personal protective equipment, and preserving other healthcare resources. But the court must nonetheless intervene. A fundamental right is at stake; that right, for some women, is subject to a possible *permanent denial*, not a mere delay or temporary denial; and, based on the Supreme Court's clear holdings on the right to an abortion, the State's asserted interests, even when viewed with a tremendous degree of deference, cannot support the accompanying deprivation of a Fourteenth Amendment right.

---

emergency could permanently curtail nearly *any constitutional right*. *Id.* That assertion, which flows directly from the State's argument, is extreme, and plainly false; *Avino* should not be read to stand for such a broad proposition. *Compare id.* (asserting that fundamental rights may be "temporarily limited or suspended" in emergencies, citing *Korematsu v. United States*, 323 U.S. 214 (1944)) *with Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (noting that "*Korematsu* was gravely wrong the day it was decided").

44

The plaintiffs have, therefore, demonstrated a likelihood of success on the merits.

### 3. Appropriate Remedy

Still, the medical restrictions' constitutional problems do not justify the plaintiffs' requested remedy: an injunction of the medical restrictions, as applied to abortion providers, in their entirety. The court declines to use a sledgehammer where a scalpel will do. *Cf. Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 323 (2006) (holding that "invalidating the statute entirely is not always necessary or justified" when "lower courts may be able to render narrower declaratory and injunctive relief"). Accordingly, rather than enjoin the medical restrictions in full, the court will enjoin them only to prevent those applications of the medical restrictions that are inconsistent with the mandates of the Constitution, as described above.

The defendants have put forward multiple interpretations of the medical restrictions. Based upon

45

the defendants' most recent clarifications, the medical restrictions grant substantial leeway to providers acting in their reasonable medical judgment (in contrast to the previous interpretation, described above, which was far more restrictive).  For instance, the defendants have clarified that the medical restrictions allow providers to consider a range of factors in determining whether a procedure can lawfully proceed as scheduled.  When asked *which* factors, Dr. Harris pointed only to providers' clinical judgment.  "[T]he clinician should use their clinical judgment and consider *whatever factors they would deem would be appropriate* to make that determination [of whether a procedure falls within one of the order's exceptions]."  April 6, 2020, Hr'g Tr. (doc. no. 133) at 16:3-5 (testimony of Dr. Scott Harris) (emphasis added).  Ultimately, "[t]he providers are the ones who determine whether their procedure fits in [the order's] exceptions, not the health department."  *Id.* at 49:19-21.

By the State Health Officer's telling, then, an

46

abortion provider is permitted to consider all of those factors that he or she reasonably deems relevant in deciding whether an abortion can be delayed.  As Dr. Robinson credibly testified (and as the court now finds), an abortion provider might reasonably consider many factors, including: whether the woman's abortion would become riskier because of a substantial delay, *see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 105:22-23; the patient's "socioeconomic factors, her medical history, [or] the circumstances surrounding her decision to proceed with an abortion," *id.* at 158:21-23; and the "logistics of getting back to the clinic, taking the time off of work, [and] coordinating care for their children," *id.* at 114:1-2.  Where these considerations (or others) are relevant to a provider's determination under the medical restrictions, that provider may lawfully consider them, and  Dr. Harris explicitly disclaimed any interest in second-guessing those decisions.  *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 44:3-10.

The court assumes that, if they were only read in

47

this way, the medical restrictions *would not* constitute an unlawful prohibition of any woman's abortion. Rather, they would allow a provider to consider whether a patient's abortion must proceed as scheduled because that patient will not, or likely will not, be able to terminate her pregnancy if it is postponed.

Still, the plaintiffs have expressed a lingering reticence to trust the representations of the defendants, particularly with respect to non-binding interpretations that emerged after multiple days of litigation. The court finds these concerns warranted: "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018) (affirming an injunction despite a non-binding clarification from the State), *cert. denied sub nom. Harris v. W. Alabama Women's Ctr.*, 139 S. Ct. 2606 (2019); *see also Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (cautioning against accepting an Attorney General's

48

non-binding interpretation of a state law).  Despite the
defendants' most recent clarifications, therefore, an
injunction must issue.

A clear, enforceable standard is especially
essential given the long history of anti-abortion
sentiment in Alabama and nationwide.  *See, e.g.*, *Planned
Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330,
1334 (M.D. Ala. 2014) (Thompson, J.), *as corrected* (Oct.
24, 2014), *supplemented*, 33 F. Supp. 3d 1381 (M.D. Ala.
2014), *and amended*, No. 2:13-cv-405-MHT, 2014 WL 5426891
(M.D. Ala. Oct. 24, 2014).  Said history is no secret to
any abortion provider in Alabama--it is evident "when she
opens the newspaper, drives by a group of protesters at
a clinic, or learns that another piece of legislation
concerning abortion has been enacted."  *Id.*[19]  As the
court noted, this observation "does not imply that such

---

19. Just last year, this court preliminarily enjoined
a law that imposed a "near-total ban on abortion."
*Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1055 (M.D.
Ala. 2019) (Thompson, J.).

activities are illegal, improper, or morally wrong; indeed, the right to express deeply held beliefs is of the utmost importance." *Id.* But these events have inarguably yielded a "climate of violence, harassment, and hostility," *id.*, that pervades the day-to-day work of abortion providers in Alabama.[20]

---

20. These challenges clearly persist. As one example, Dr. Robinson regularly receives threatening and harassing messages online and in person because she is an abortion provider, including a recent social media message expressing "hope" that she contracts COVID-19. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8; Attachment 2 (doc. no. 110-2). Anti-abortion advocates, including another physician, have also filed complaints against Robinson with the Board of Medical Examiners. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8-9; April 6, 2020, Hr'g Tr. (doc. no. 133) at 168:20-169:13. Although these complaints have never been substantiated, they have triggered investigations, which Dr. Robinson must now report each time she renews her medical license. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8; April 6, 2020, Hr'g Tr. (doc. no. 133) at 169:14-19. Protesters have also filed complaints against AWC with the Alabama Department of Public Health, which reliably lead to investigations of the clinic, disrupting the clinic's practice though never leading to a finding of any wrongdoing. *See id.* at 122:13-25. Dr. Robinson testified that these tactics of protesters "keep[] me and my staff constantly feeling on edge, I mean, wondering from day to day what the next attack is going to be and how effective they will be." *Id.* The court finds Dr. Robinson's testimony credible.

In this environment, a provider might reasonably fear that prosecutions under the medical restrictions will proceed despite the defendants' on-the-record interpretations.[21] But to proceed with lawful abortions, providers must be *confident* that their exercise of reasonable medical judgment will not be met with unconstitutional or bad-faith prosecution. That is, physicians acting lawfully cannot be left to "the tender mercies of a prosecutor's discretion and the vagaries of a jury's decision," *W. Alabama Women's Ctr.*, 900 F.3d at 1329, or wrongly deterred from performing lawful procedures in the first place. *See generally Colautti v. Franklin*, 439 U.S. 379, 396 (1979) ("The prospect of

---

21. These fears are justified by, among other things, recent events. Dr. Robinson testified that, since the medical restrictions went into effect, protestors have called the police asking them to "come and check on us," "thinking that we were supposed to be shut down" and urging investigations from the police and the Department of Public Health. April 6, 2020 Hr'g Tr. (doc. no. 133) at 121:3-21. The police have responded in person at least once since the pandemic began. *See id.* at 121:22-122:9. In general, these efforts (and others like them) keep Dr. Robinson and her staff "constantly feeling on edge." *Id.* at 122:23.

such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination ..., could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.").

Given these realities, guaranteeing practical, reliable flexibility to abortion providers requires an injunction. But the court's injunction will be limited in scope. It will essentially reduce to an order the most recent representations made by the defendants (and, in particular, by Dr. Scott Harris), rendering them enforceable and locking them into place. To the extent that the state health order is applied in a fashion inconsistent with this mandate, and *only* to that extent, it will be enjoined.

## B. Irreparable Harm

The plaintiffs have demonstrated that the medical restrictions, if left in place, would result in imminent,

irreparable harm to some, though not all, of their
patients. The medical restrictions are clearly
susceptible to an interpretation that would permanently
prevent or impose plainly undue burdens upon abortions
for some women, denying those women their fundamental
right to privacy. As the Eleventh Circuit has held, any
denial of that right constitutes "irreparable injury."
*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v.
City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th
Cir. 1990). The effects of such a denial are particularly
severe in the abortion context: the Seventh Circuit
recently noted that a "delay in obtaining an abortion can
result in the progression of a pregnancy to a stage at
which an abortion would be less safe, and eventually
illegal." *Planned Parenthood of Wisconsin, Inc. v. Van
Hollen*, 738 F.3d 786, 796 (7th Cir. 2013). For those
women approaching 20 weeks of pregnancy, such harms are
especially acute. As described above, in the instant
case, these harms include an increase in medical risk,
*see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 105:19-23,

106:17-107:11, 109:20-25, and serious logistical challenges, *id.* at 112:25-114:4, including substantial travel, *see, e.g.*, *id.* at 92:16-19.

Moreover, the plaintiffs have demonstrated that, despite the defendants' clarifications stated on the record, they remain at serious risk of prosecution, including because, without an injunction, the defendants would retain the option to revise their interpretation of the medical restrictions. Such enforcement also poses a threat of imminent harm.

## C. The Balance of Hardships

The plaintiffs have shown that, with no injunction in place, some women would very likely be forced to carry their pregnancies to term; others would face serious obstacles that render obtaining an abortion very difficult. Further, they have demonstrated a meaningful risk of unwarranted prosecutions that deter abortion providers and, in turn, create a substantial obstacle for women seeking abortions. These injuries are substantial.

54

In contrast, the state health order, as applied to abortion providers, contributes relatively little to the State's efforts to preserve healthcare resources and prevent close personal contact.  (The court describes and weighs these benefits in detail above.)  As importantly, the court's injunction is narrow, minimizing harm to the defendants by embracing recent clarifications made on the record by the State Health Officer.  In sum, the court finds that the balance of hardships tips towards the plaintiffs.

## D. The Public Interest

The court also finds that a narrow preliminary injunction serves the public interest.  The defendants have described serious and urgent conditions--conditions that merit an equally serious and urgent response.  But, based on the current record, the defendants' efforts to combat COVID-19 do not outweigh the lasting harm imposed by the denial of an individual's right to terminate her pregnancy, by an undue burden or increase in risk on

patients imposed by a delayed procedure, or by the cloud of unwarranted prosecution against providers.

Still, the court recognizes the demands of the ongoing crisis. By issuing a narrowly tailored injunction, the court simultaneously insists, on the one hand, that abortion providers shoulder some of the burden of the State's widespread response--and protects, on the other, the right to privacy guaranteed by the United States Constitution.

***

In accordance with this opinion, the court will issue an appropriate injunction separately. The bond requirement of Fed. R. Civ. P. 65(c) will be waived.

DONE, this the 12th day of April, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

# Exhibit 2

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
YASHICA ROBINSON, M.D.,        )
et al., on behalf of           )
themselves, their              )
patients, physicians,          )
clinic administrators,         )
and staff,                     )
                               )
       Plaintiffs,             )
                               )        CIVIL ACTION NO.
       v.                      )        2:19cv365-MHT
                               )           (WO)
STEVEN MARSHALL, in his        )
official capacity as           )
Alabama Attorney General,      )
et al.,                        )
                               )
       Defendants.             )
```

PRELIMINARY INJUNCTION

In accordance with the opinion entered today, it is

ORDERED as follows:

(1) The motion for a preliminary injunction (doc.

no. 73) filed by the plaintiffs, Yashica Robinson,

M.D., Alabama Women's Center, Planned Parenthood

Southeast Inc., Reproductive Health Services, and West

Alabama Women's Center is granted in part, denied in

part, and held in abeyance in part, as set forth in
further detail below.

(2) The motion is denied to the extent that it
seeks a blanket injunction blocking *all* enforcement of
the "medical restrictions" in the State Health
Officer's March 27, 2020, and April 3, 2020, state
health orders against the plaintiffs and their staff
(or of any future order extending the application of
the "medical restrictions"). "Medical restrictions"
refers to paragraph 7 of the March 27 order and
paragraph 14 of the April 3 order and to any identical
language in any subsequently issued state health order.

(3) The motion is granted to the following extent.
The defendants Alabama State Health Officer and Alabama
Attorney General, and their officers, agents, servants,
employees, and attorneys, and other persons who are in
active concert or participation with any of the
aforementioned individuals, are each PRELIMINARILY
ENJOINED and RESTRAINED from, when applying and

2

enforcing the "medical restrictions," whether through Ala. Code 1975 § 22-2-14 or other mechanisms, failing to allow healthcare providers who are determining whether to postpone abortions to consider and to base their decisions on the following factors, using the providers' reasonable medical judgment exercised on a case-by-case, individualized basis:

(a) Whether under 1975 Ala. Code § 26-23B-5, a patient would lose her legal right to obtain an abortion if the procedure were delayed until after April 30, 2020 (or, if a new order is entered extending the application of the medical restrictions, if delayed until after the end date of that future state health order);

(b) The timing of the patient's last menstrual period, as determined by the healthcare provider;

(c) Gestational age of the fetus, as determined by the healthcare provider;

3

(d) The increase in risk to the life or health of the patient if the abortion is delayed;

(e) The increase in risk of serious complications if the abortion is delayed;

(f) Economic factors that may impact the patient's ability to obtain an abortion if the abortion is delayed;

(g) Social factors that may impact the patient's ability to obtain an abortion if the abortion is delayed;

(h) Logistical factors that may impact the patient's ability to obtain an abortion if the abortion is delayed; and

(i) Medical history and conditions of the patient.

(4) The preliminary injunction shall remain in effect until further order of the court.

(5) In light of the temporary restraining order issued in *S. Wind Women's Ctr. LLC v. Stitt*, No.

4

CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020)
(Goodwin, J.), the motion is held in abeyance to the
extent it seeks relief prohibiting application to *all*
medication abortions of the medical restrictions of the
State Health Officer's March 27, 2020 and April 3, 2020
state health orders (and to any future orders extending
the application of the medical restrictions). The
court will further consider whether relief is
appropriate on this issue.

(6) The bond requirement of Fed. R. Civ. P. 65(c)
is waived.

DONE, this the 12th day of April, 2020.

                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE

# Exhibit 3

# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**LITTLE ROCK FAMILY PLANNING SERVICES,** *et al.*          **PLAINTIFFS**

**v.**                          **Case No. 4:19-cv-00449-KGB**

**LESLIE RUTLEDGE, in her official capacity as Attorney
General of the State of Arkansas,** *et al.*          **DEFENDANTS**

## TEMPORARY RESTRAINING ORDER

Before the Court are a motion for expedited leave to file a supplemental complaint and a motion for an *ex parte* temporary restraining order and/or preliminary injunction filed by separate plaintiffs Little Rock Family Planning Services ("LRFP") and Thomas Tvedten, M.D., on behalf of himself and his patients (collectively, the "Supplemental Complaint Plaintiffs") (Dkt. Nos. 132, 134). In the instant motions, the Supplemental Complaint Plaintiffs challenge as unconstitutional the State of Arkansas' enforcement of Arkansas Governor Asa Hutchinson's April 4, 2020, Executive Order 20-13, which amended both Executive Order 20-03, issued March 11, 2020, and Executive Order 20-10, issued March 26, 2020, and application of the April 3, 2020, Arkansas Department of Health's ("ADH") Directive on Elective Surgeries (the "ADH Directive") through an April 10, 2020, cease-and-desist order sent by ADH to LRFP to bar all surgical abortions, "except where immediately necessary to protect the life or health of the patient" (the "ADH Cease-and-Desist Order") (collectively, the "Challenged Provisions"). For the reasons set forth herein, the Court provisionally grants the Supplemental Complaint Plaintiffs' motion for expedited leave to file a supplemental complaint and motion for an *ex parte* temporary restraining order. The Court has under advisement the Supplemental Complaint Plaintiffs' motion for a preliminary injunction. The Court will reconsider these matters upon the submission of defendants' written arguments.

## I.    Factual And Procedural History

Plaintiffs commenced this action on June 26, 2019. Along with the complaint for injunctive and declaratory relief, a motion for a temporary restraining order and/or preliminary injunction was filed by separate plaintiffs LRFP and Dr. Tvedten (Dkt. Nos. 1, 2).[1] Plaintiffs filed this action seeking declaratory and injunctive relief on behalf of themselves and their patients under the United States Constitution and 42 U.S.C. § 1983 to challenge three acts passed by the Arkansas General Assembly: (1) Arkansas Act 493 of 2019, which bans abortion "where the pregnancy is determined to be greater than 18 weeks," as measured from the first day of a woman's last menstrual period ("LMP") in nearly all cases; (2) Arkansas Act 619 of 2019, which prohibits a physician from intentionally performing or attempting to perform an abortion "with the knowledge" that a pregnant woman is seeking an abortion "solely on the basis" of: a test "indicating" Down syndrome, a prenatal diagnosis of Down syndrome, or "[a]ny other reason to believe" the "unborn child" has Down syndrome ("Act 619"); and (3) Arkansas Act 700 of 2019, which provides that "[a] person shall not perform or induce an abortion unless that person is a physician licensed to practice medicine in the state of Arkansas and is board-certified or board-eligible in obstetrics and gynecology." The Court entered a temporary restraining order on July 23, 2019 (Dkt. No. 83). The Court subsequently entered a preliminary injunction order on August 6, 2019 (Dkt. No. 119). Defendants appealed (Dkt. No. 120), and their appeal remains pending before the Eighth Circuit Court of Appeals.

On April 13, 2020, the Supplemental Complaint Plaintiffs filed a motion for expedited leave to file a supplemental complaint and a motion for an *ex parte* temporary restraining order and/or preliminary injunction (Dkt. Nos. 132, 134). Defendants have not yet responded to either

---

[1] Not all named plaintiffs in this lawsuit joined in the initial motion for temporary restraining order and/or preliminary injunction (Dkt. Nos. 2, 32).

motion. However, plaintiffs notified counsel for defendants on April 12, 2020, of their intent to seek an *ex parte* temporary restraining order barring enforcement of the Challenged Provisions against LRFP to bar all surgical abortions, "except where immediately necessary to protect the life or health of the patient" (Dkt. No. 134-18, ¶ 4).

To briefly summarize the factual background, on April 3, 2020, the ADH issued the ADH Directive that states that elective surgery "[p]rocedures. . . that can be safely postponed shall be rescheduled to an appropriate future date," subject to certain enumerated exceptions (Dkt. No. 134-7, at 2). The next day, by Executive Order 20-13, Governor Hutchinson declared that a violation of a directive from the Secretary of Health "is a misdemeanor offense, and upon conviction therefore is punishable by a fine of not less than one hundred ($100) nor more than five hundred dollars ($500) or by imprisonment not exceeding one (1) month, or both." (Dkt. No. 132-1, at 29–32). On April 10, 2020, the ADH sent LRFP the ADH Cease-and-Desist Order stating that the April 3, 2020, ADH Directive "mandates the postponement of all procedures that are not immediately medically necessary," and thus, according to ADH, the "prohibition applies to surgical abortions that are not immediately necessary to protect the life or health of the patient." (Dkt. No. 134-2, at 31). The ADH Cease-and-Desist Order requires LRFP to "immediately cease and desist the performance of surgical abortions, except where immediately necessary to protect the life or health of the patient." (*Id.*). The ADH Cease-and-Desist Order also states that "[a]ny further violations of the April 3 [ADH] Directive will result in immediate suspension of [LRFP's] license." (*Id.*). Based on record evidence, the Challenged Provisions do not contain an expiration date, and neither the ADH nor Governor Hutchinson have determined how long the Challenged Provisions will remain in effect (Dkt. No. 132-1, ¶ 35).

3

Based on record evidence, only the following types of abortion care are available in Arkansas currently: medication abortions, which are available only up to 10 weeks as measured from the first day of a woman's last menstrual period ("LMP"), aspiration surgical procedures, which are performed until approximately 13 weeks LMP, and dilation and evacuation ("D&E") surgical procedures, which are performed until 21.6 weeks LMP, the legal time limit for an abortion in Arkansas. After 10 weeks LMP, the only type of abortion care available in Arkansas is surgical abortion.

## II.     Motion For Expedited Leave To File A Supplemental Complaint

Rule 15(d) of the Federal Rules of Civil Procedure authorizes supplementation of a complaint based on later events. While an amended pleading under Rule 15(a) "is designed to include matters occurring before the filing of the bill but either overlooked or not known at the time," a supplemental pleading under Rule 15(d) "is designed to cover matters subsequently occurring but pertaining to the original cause." *United States v. Vorachek*, 563 F.2d 884, 886 (8th Cir. 1977). "The purpose of Rule 15(d) is to promote, as complete an adjudication as possible, of an existing dispute between the parties, which may have evolved since the action was initiated." *Schneeweis v. Nw. Tech. Coll.*, No. CIV.97-1742 (JRT/RLE), 1998 WL 420564, at *13 (D. Minn. June 1, 1998).

A copy of the Supplemental Complaint Plaintiffs' proposed first supplemental complaint for injunctive and declaratory relief is attached as Exhibit 1 to the Supplemental Complaint Plaintiffs' motion for expedited leave to file a supplemental complaint. The Supplemental Complaint Plaintiffs maintain that 2 of the 4 plaintiffs in their proposed supplemental complaint are the same, as are all 18 named defendants. They allege that the Challenged Provisions, among other things, violate Arkansas women's right to access abortion care under the Substantive Due

Process and Equal Protection Clauses of the Fourteenth Amendment. Further, the Supplemental Complaint Plaintiffs plead facts relating to: (i) abortion procedures typically provided in Arkansas and their safety compared to other medical procedures; (ii) the importance of abortion as an element of women's health care; (iii) the significant obstacles that women face in accessing abortion care in Arkansas, including travel distance and a lack of financial resources; and (iv) risks to women's health and well-being that arise when access to abortion care is delayed, or denied altogether (Dkt. No. 133, at 5).

These issues are factually and legally similar to those raised in the operative complaint (Dkt. No. 1, ¶¶ 37–108) and have previously been addressed by the Court (Dkt. Nos. 83, 119). The Supplemental Complaint Plaintiffs represent that that the Court's analysis of the supplemental complaint's claims will involve facts, issues, and witnesses common to the underlying litigation, as well. Further, because plaintiffs' appeal remains pending in the Eighth Circuit, neither the discovery period nor other pre-trial district-court proceedings have commenced in this case.

Having carefully reviewed the motion and associated briefing, as well as the entire record in this case, the Court provisionally grants the Supplemental Complaint Plaintiffs' motion for expedited leave to file a supplemental complaint (Dkt. No. 132) and directs the Supplemental Complaint Plaintiffs to file their proposed first supplemental complaint for injunctive and declaratory relief, attached as Exhibit 1 to their motion for expedited leave to file a supplemental complaint, within seven days from the entry of this Order.

### III.     Motion For An *Ex Parte* Temporary Restraining Order

On the limited record before it, the Court finds that the Supplemental Complaint Plaintiffs have demonstrated a likelihood of success on their substantive due process argument, irreparable harm should the temporary restraining order not be granted, and that the balance of the equities

and the public interest will be served by a temporary restraining order. Accordingly, the Supplemental Complaint Plaintiffs are entitled to an *ex parte* temporary restraining order barring enforcement of the Challenged Provisions against LRFP.

### A.     Standing To Seek Injunctive Relief

Having independently considered the issue, the Court finds that the Supplemental Complaint Plaintiffs have standing under Article III and 42 U.S.C. § 1983 to pursue a temporary restraining order to prohibit defendants from enforcing the Challenged Provisions against LRFP (Dkt. No. 119, at 76–82).  Further, the Court construes this as a facial challenge to the Challenged Provisions (Dkt. No. 119, at 83–84).

### B.     Legal Standard

In the Eighth Circuit, the same standards are applied to a request for a preliminary injunction as to a request for a temporary restraining order.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  In determining whether to issue a temporary restraining order, a district court should consider:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  Under *Dataphase*, no one factor is determinative.  *See Dataphase*, 640 F.2d at 113.  A temporary restraining order "is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant," here, the Supplemental Complaint Plaintiffs.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted).  Additional considerations impact the Court's determination to grant *ex parte* relief.  *See* Fed. R. Civ. P. 65(b).

### C. Discussion

The limited record before the Court demonstrates that the Supplemental Complaint Plaintiffs are entitled to a temporary retraining order barring enforcement of the Challenged Provisions.

### 1. Scope Of The Challenged Provisions

Although Arkansas has undertaken statewide efforts to counter the impact of the coronavirus diseases 2019 ("COVID-19"), those efforts have been targeted. Although Governor Hutchinson declared in Executive Order 20-13, issued April 4, 2020, "the entire state an emergency disaster area" and prohibited "gatherings of more than ten (10) people in any confined indoor or outdoor space . . . until further notice," Governor Hutchinson has declined to issue a stay-home order to all Arkansas residents. (Dkt. No. 132-1, ¶ 29 (alteration in original)). Governor Hutchinson permits "gatherings of ten (10) or more people in . . . parks, trials, athletic fields and courts, parking lots, golf courses, and driving ranges where social distancing of at least six (6) feet can be easily maintained." (*Id.* (alteration in original)). Further, Governor Hutchinson exempted "businesses, manufacturers, construction companies, places of worship, the Arkansas General Assembly, municipal or county governing bodies, [and] the judiciary" from Executive Order 20-13. (*Id.*).

The Court is mindful that, in the April 3, 2020, ADH Directive, due to "increasing concerns of staff and medical supplies capabilities in hospitals statewide," the ADH directed that "mandatory actions" be taken by all health facilities, including ambulatory surgery centers and abortion facilities, to "preserve staff, personal protective equipment (PPE), and patient care supplies; ensure staff and patient safety; and expand available hospital capacity during the COVID-19 pandemic." (*Id.*, at 27). Specific to this dispute, the ADH required that "[p]rocedures, testing,

7

and office visits that can be safely postponed shall be rescheduled to an appropriate future date," but recognized that "[e]mergent, urgent and care designated as an exception. . . will continue." (*Id.*). As specific exceptions to the ADH Directive, the ADH cited:

- If there is a threat to the patient's life if the procedure is not performed.

- If there is a threat of permanent dysfunction of an extremity or organ system if the surgery is not done.

- If there is a risk of metastasis or progression of staging of a disease or condition if surgery is not performed.

- If there is a risk that the patient's condition will rapidly deteriorate if surgery is not done, and there is a threat to life or an extremity or organ system or a threat of permanent dysfunction or disability.

(*Id.*).

When asked about the April 3, 2020, ADH Directive, the ADH explained that it is "not intended to replace a physician's judgment" and reiterated that the ADH Directive encompasses only procedures that can be "safely deferred." (Dkt. No. 134-2, ¶ 31). As of April 8, 2020, Arkansas Governor Hutchinson represented in public comments that, based on the statewide efforts, Arkansas has "a lot of hospitals that are empty right now and health care workers that are empty," presumably meaning that are available to provide care (Dkt. No. 132-1, ¶ 32). When asked on April 9, 2020, if "elective surgeries" were still permitted in Arkansas, ADH responded that judgments at surgical centers would be left primarily to the providers (Dkt. No. 134-2, ¶ 36).

In the April 10, 2020, ADH Cease-and-Desist Order, the ADH stated to LRFP:

Your facility was found to be performing surgical abortions that are not immediately necessary to protect the life or health of the patient, and your facility is therefore in violation of the April 3 Directive. Your facility is required to postpone such procedures until after the COVID-19 emergency has ended and the April 3 Directive is withdrawn.

Accordingly, your facility is ordered to immediately cease and desist the performance of surgical abortions, except where immediately necessary to protect

8

the life or health of the patient. Any further violations of the April 3 Directive will
result in an immediate suspension of your facility's license.

(Dkt. No. 132-1, at 36).

From the face of the April 3, 2020, ADH Directive and the April 10, 2020, ADH Cease-
and-Desist Order, defendants appear to have created a conflict or narrowing of the exceptions
available to LRFP and its clinicians when determining how to proceed with surgical abortion
patient care in Arkansas. The Court is aware of no clarification provided by defendants with
respect to this apparent conflict.[2]

The record demonstrates the reality of abortion care in Arkansas (Dkt. No. 134-2, ¶¶ 16–
17, 19–22). Mandatory in-person counseling is required prior to procedures, with prescribed wait
times and return visits to the clinic. The Court understands that these in-person counseling sessions
have not been permitted to be conducted by telemedicine by defendants and instead are still
proceeding as required by current law. Further, there are limits on clinic capacity resulting from
the COVID-19 pandemic and required social distancing (*Id.*, ¶ 26). There also are limits on
LRFP's capacity to see surgical abortion patients each day (*Id.*, ¶ 48). Moreover, every day
patients are at risk of contracting the COVID-19 virus, jeopardizing their ability to visit a clinic
and receive time-sensitive care (*Id.*, ¶ 49).

The Supplemental Complaint Plaintiffs maintain that they seek relief "on behalf of patients
who are particularly burdened" due to the time-sensitive nature of abortion care, including patients

---

[2] As a claim in their supplemental complaint, the Supplemental Complaint Plaintiffs also
assert that the Challenged Provisions are unconstitutionally vague because, according to
Supplemental Complaint Plaintiffs, it is "impossible to determine what specific medical
procedures the Arkansas Health Department's April 3, 2020 Directive on Elective Surgeries
prohibits clinicians from providing their patients." (Dkt. No. 132-1, ¶ 53).

for whom the Challenged Provisions will, in the good faith, professional judgment of the treating

physician:

> (i) likely worsen any maternal-health conditions that predate the pregnancy or result from the pregnancy;
>
> (ii) likely stand in the way of the patient ultimately accessing abortion care, because of patient-specific factors like medical history, the circumstances that led to the patient's decision to seek care in the first place (*i.e.*, domestic violence), and the logistical and financial obstacles faced by the patient;
>
> (iii) bar access to abortion because medication abortion is contraindicated;
>
> (iv) likely push to a more complex and more time-intensive surgical-abortion procedure (beginning around 14 weeks LMP);
>
> (v) require the patient to visit the clinic an additional time for a two-day procedure, instead of a one-day procedure, which beings at approximately 18 weeks LMP; or
>
> (vi) likely push beyond the point at which abortion is available in the State (*i.e.*, 21.6 weeks LMP).

(Dkt. No. 135, at 41).

### 2. Likelihood Of Success On The Merits

"In considering the likelihood of the movant prevailing on the merits, a court does not

decide whether the movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d

1137, 1143 (8th Cir. 2007) (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367,

371 (8th Cir. 1991)). Rather, the Eighth Circuit has instructed district courts to "flexibly weigh

the case's particular circumstances to determine whether the balance of equities so favors the

movant that justice requires the court to intervene to preserve the status quo until the merits are

determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (quoting

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)). Still, "an

injunction cannot issue if there is no chance of success on the merits." *Mid-Am. Real Estate Co.

v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005); *see also Wachovia Sec., L.L.C. v. Stanton*,

571 F. Supp. 2d 1014, 1033 (N.D. Iowa 2008) ("Likelihood of success on the merits requires that the movant find support for its position in governing law.").[3]

This Court has previously examined the law generally directed at pre-viability abortions and the types of abortions offered in Arkansas (Dkt. No. 119, at 84–89). The Court concludes that, at this stage of the proceedings, and on the record evidence currently before the Court, the Supplemental Complaint Plaintiffs are likely to prevail on their argument that the Challenged Provisions unconstitutionally restrict pre-viability abortions and, therefore, are facially unconstitutional. The Challenged Provisions prohibit virtually all pre-viability abortions after 10 weeks LMP and prohibit virtually all pre-viability abortions for patients for whom medication abortion is contraindicated. That the ADH Cease-and-Desist Order allows for a very narrow exception for surgical abortions "immediately necessary to protect the life or health of the patient" does not change the Court's analysis.

It is the view of the Court that the undue-burden test announced by the Supreme Court in *Planned Parenthood of Southern Pennsylvania v. Casey*, 505 U.S. 833 (1992), does not apply to its analysis of the Challenged Provisions. The Supplemental Complaint Plaintiffs are likely to prevail on their argument that the Challenged Provisions prohibit nearly all pre-viability abortions

---

[3] The Court notes that the Eighth Circuit has revised the *Dataphase* test for preliminary injunctive relief when applied to challenges to laws passed through the democratic process, which are entitled to a "higher degree of deference." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008). In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. *Id.* at 730. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *See id.* Given the nature of the Challenged Provisions, it is not clear that this heightened standard applies. These actions were taken as authorized by Arkansas Code Annotated § 20-7-110 and, under Arkansas law, appear to have the force and effect of law. *See Mannis v. State*, 398 S.W.2d 206 (Ark. 1966); *Wright v. DeWitt School Dist. #1*, 385 S.W.2d 644 (Ark. 1965). However, even if the *Rounds* standard applies here, the Court determines that the Supplemental Complaint Plaintiffs meet it at this stage of the litigation.

past 10 weeks LMP, which the Supreme Court has repeatedly held is a prohibition that cannot be imposed by the state. *See Casey*, 505 U.S. at 846 (plurality op.) (affirming *Roe*'s "essential holding" that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure"); *see also Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1266 (E.D. Ark. 2019) ("[P]rohibitions on abortions pre-viability, even when they contain limited exceptions, are per se unconstitutional under binding Supreme Court precedent" (citing *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015), and *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–23 (8th Cir. 2015))), *appeal docketed*, No. 19-2690 (8th Cir. Aug. 9, 2019).  And this Court is not alone is refusing to apply the undue-burden standard when presented with state laws that unconditionally eliminate the right to abort a nonviable fetus for a defined class of women. *See Isaacson v. Horne*, 716 F.3d 1213, 1225 (9th Cir. 2013) (reasoning that *Casey*'s undue-burden analysis "has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the conditions under which such abortions are to be allowed.").

The limited exceptions to the Challenged Provisions do not change the constitutional analysis or this Court's determination at this stage of the proceedings. *See Edwards*, 786 F.3d at 1117 ("Whether or not 'exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.'" (quoting *Casey*, 505 U.S. at 879)); *MKB Mgmt.*, 795 F.3d at 772–23 (8th Cir. 2015) (determining that a North Dakota law prohibiting all abortions to the point in pregnancy when the fetus possessed a detectable heartbeat, which are detectable at about six weeks, with exception for medical necessity, impermissibly infringed on a woman's due process right to choose to terminate

pregnancy before viability); *Isaacson*, 716 F.3d at 1228 ("[W]hile a health exception is necessary to save an otherwise constitutional post-viability abortion ban from challenge, it cannot save an unconstitutional prohibition on the exercise of a woman's right to choose to terminate her pregnancy before viability."); *see also Robinson v. Marshall*, No. 2:19cv365-MHT (WO), at 22 n.6, 32–33 (M.D. Ala. Apr. 12, 2020) (reasoning, in the context of a constitutional challenge to a pre-viability ban on abortion premised upon COVID-19 concerns, that "[i]t is abundantly clear that the medical restrictions in the state health order are unconstitutional to the extent that they *prevent* a woman from obtaining an abortion before viability—that is, where they effect a *prohibition* on abortion), *appeal filed*, (11th Cir. Apr. 13, 2020).

Even if the undue-burden standard applies to the Court's analysis of the Supplemental Complaint Plaintiffs' substantive due process claim, the Court determines that the Supplemental Complaint Plaintiffs are likely to prevail because the burdens of the Challenged Provisions far outweigh their purported benefits. This Court is bound to apply Supreme Court and Eighth Circuit precedents. Generally, to determine whether a state statute restricting abortion access is unconstitutional and violates substantive due process rights, the Court applies the "undue-burden" standard developed in *Casey*, 505 U.S. at 876–79 (plurality op.), and *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2296, 2309–11 (2016). The Supplemental Complaint Plaintiffs may prevail on a facial challenge to the Challenged Provisions if they "can show that 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1050 (E.D. Ark. 2017) (alteration in original) (quoting *Casey*, 505 U.S. at 895), *amended*, No. 4:17-CV-00404-KGB, 2017 WL 6946638 (E.D. Ark. Aug. 2, 2017), *appeal docketed*, No. 17-2879 (8th Cir. Aug. 28, 2017). The Court determines, at least at this preliminary stage of the litigation, that the

Supplemental Complaint Plaintiffs are likely to prevail on their argument that, when the Court weighs the benefits and burdens of the Challenged Provisions, they place an undue burden on a woman's access to abortion in violation of the Fourteenth Amendment to the United States Constitution.

The Court first examines Arkansas' asserted interest in the Challenged Provisions. The Supplemental Complaint Plaintiffs are likely to prevail on their argument that the Challenged Provisions do not meaningfully further the State's admittedly legitimate interests in protecting or promoting the public's health and safety during the COVID-19 pandemic. There is record evidence that LRFP is wholly self-sustaining in terms of personal protective equipment ("PPE") and has no plans to utilize State PPE resources. Further, there is record evidence that, if women are forced to continue their pregnancies, the PPE required for the associated pre-natal care and delivery would surpass that used at LRFP in providing abortion care. Likewise, record evidence demonstrates that pre-viability abortion care decreases rather than exacerbates demand for hospital capacity, especially given this Court's findings that abortion is safer and does not burden hospitals as much as continued pregnancy, miscarriage management, and childbirth.

On the record before the Court, the Challenged Provisions are not necessitated by social-distancing concerns, given LRFP's Precautions and Protocols in Response to COVID-19 Pandemic, formalized and instituted on April 2, 2020 (Dkt. No. 134-2, at 23–25). Numerous medical experts have determined that abortion care remains critical, time-sensitive health care that should not be delayed even during this pandemic (Dkt. No. 135, at 16–18). In determining whether regulations actually further women's health, the Supreme Court has repeatedly looked at the generally accepted standards for medicine set by the nation's major health organizations. *See*, *e.g.*,

*Simopoulos v. Virginia*, 462 U.S. 506, 517 (1983) (considering standards for obstetric-gynecological services standards set by the American College of Obstetricians and Gynecologists).

This Court next examines the claimed burden of the Challenged Provisions, having previously explained the scope of this inquiry (Dkt. No. 119, at 164–68). Based on the record evidence before the Court at this stage of the proceedings, the Court finds that based on the number and types of abortions provided in Arkansas, the types of abortions to which the Challenged Provisions are relevant, and the likely impact of the Challenged Provisions on the availability of surgical abortion in Arkansas, the Supplemental Complaint Plaintiffs are likely to prevail on their argument that "'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Jegley*, 267 F. Supp. 3d at 1050 (alteration in original) (quoting *Casey*, 505 U.S. at 895). The Challenged Provisions indefinitely postpone in Arkansas virtually all pre-viability abortions after 10 weeks LMP and indefinitely postpone virtually all pre-viability abortions for patients for whom medication abortion is contraindicated. The only exception cited in the ADH Cease-and-Desist Order is for abortions "immediately necessary to protect the life or health of the patient." The record evidence includes the number of abortions performed at LRFP, including medication and surgical, in 2019 and in 2020 to date (Dkt. No. 132-1, ¶ 10). The Challenged Provisions do not contain an expiration date, and neither the ADH nor Governor Hutchinson have indicated how long the Challenged Provisions will remain in effect.

In past decisions, this Court has declined to consider the availability of out-of-state abortion providers when examining the undue burden imposed by an abortion regulation (Dkt. No. 119, at 162–64). However, even if the Court considers such providers, that does not sway this Court's undue-burden analysis, given the states where alternate abortion care may be provided, the

logistical and financial arrangements necessary for patients to seek such care, the risk of contracting COVID-19 when traveling to an out-of-state abortion clinic and then spreading it to other Arkansawyers, the uncertainty of whether out-of-state abortion clinics will have the capacity to treat Arkansas women seeking a surgical abortion, and the uncertainty of whether other states will restrict abortion access during this time.

Further, the record supports a finding that enforcement of the Challenged Provisions against LRFP will inflict serious physical, emotional, and psychological injuries on LRFP's patients by forcing them to delay, or altogether forgo, access to abortion care (Dkt. No. 135, at 28–29).

When the Court examines the burdens that the Challenged Provisions impose on access to abortion, which is a fundamental right, together with the benefits that the Challenged Provisions are likely to confer, the Court determines that the Supplemental Complaint Plaintiffs are likely to prevail on the merits of their substantive due process claim.

This finding is consistent with the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), in which the Court upheld the authority of Massachusetts to enforce a compulsory vaccination law during a smallpox outbreak in Cambridge, Massachusetts. While the *Jacobson* Court acknowledged that "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety," it also cautioned that:

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 25, 31. The *Jacobson* Court further explained that:

> the police power of a state, whether exercised directly by the legislature, or by a
> local body acting under its authority, may be exerted in such circumstances, or by
> regulations so arbitrary and oppressive in particular cases, as to justify the
> interference of the courts to prevent wrong and oppression.

*Id.* at 38. For the reasons discussed above, the Court is justified in barring enforcement of the

Challenged Provisions against LRFP on this temporary basis given the record evidence before it.

The Court notes that four other federal district courts have found that such a pre-viability

ban on abortion premised upon COVID-19 concerns is unconstitutional. *See S. Wind Women's*

*Ctr. LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020), a*ppeal*

*docketed*, No. 20-6045 (10th Cir. Apr. 7, 2020); *Robinson*, 2020 WL 1520243 (M.D. Ala. Mar.

30, 2020), *stay granted, order amended*, 2020 WL 1659700 (M.D. Ala. Apr. 3, 2020); *Pre-term*

*Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360 (S.D. Ohio Mar. 30, 2020), *stay denied*

*and appealed dismissed*, No. 20-3365 (6th Cir. Apr. 6, 2020); *Planned Parenthood Ctr. for Choice*

*v. Abbott*, No. A-20-CV-323-LY, 2020 WL 1502102, (W.D. Tex. Mar. 30, 2020), *temporary stay*

*entered sub nom.*, *In re Abbott*, No. 20-50264, 2020 WL 1685929 (5th Cir. Apr. 7, 2020), *vacated*,

No. A-20-CV-323-LY, 2020 WL 1808897 (W.D. Tex. Apr. 8, 2020), The Court acknowledges

that a divided panel of the Fifth Circuit dissolved the partial stay issued by the Western District of

Texas, reasoning that the abortion provider had not shown a substantial likelihood of success on

its claim that Texas Governor Greg Abbott's Executive Order postponing non-essential surgeries

and procedures until 11:59 p.m. on April 21, 2020, is unlawful. *See In re Abbott*, 2020 WL

1685929. That the Challenged Provisions are of an indefinite duration readily distinguishes this

case from *In re Abbott*.

Having determined that the Supplemental Complaint Plaintiffs are likely to prevail on the

merits of their substantive due process claim, the Court does not consider at this stage the

Supplemental Complaint Plaintiffs' likelihood of success on their equal protection or void-for-vagueness claims.

### 3. Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996)). It is well-established that the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also M.B. v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 5504178, at *5 (W.D. Mo. Oct. 29, 2018) ("A threat to a constitutional right is generally presumed to constitute irreparable harm.").

Here, "[LRFP's] showing that the [Challenged Provisions] interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury." *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977). The limited record supports the Supplemental Complaint Plaintiffs' allegation that enforcement of the Challenged Provisions against LRFP will inflict serious physical, emotional, and psychological injuries on LRFP's patients by forcing them to delay, or altogether forgo, access to abortion care. "[T]he abortion decision is one that simply cannot be postponed, or it will be made by default with far-reaching consequences." *Bellotti v. Baird*, 443 U.S. 622, 643 (1979). A disruption or denial of LRFP's patients' abortion care cannot be undone after a trial on the merits. Therefore, the Court

18

finds, on the limited record before it, that the Supplemental Plaintiffs will suffer irreparable harm without preliminary injunctive relief.

### 4.    Balance Of The Equities And The Public Interest

The determination of where the public interest lies is dependent on the determination of the likelihood of success on the merits of the Fourteenth Amendment challenge "because it is always in the public interest to protect constitutional rights."  *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008); *see also Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) ("[W]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." (second alteration in original) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)))).

Here, because the Court has already determined that, at least on the limited record before it, the Supplemental Complaint Plaintiffs have shown a substantial likelihood that the Challenged Provisions barring all surgical abortions, "except where immediately necessary to protect the life or health of the patient," are unconstitutional, no substantial harm to others can be said to inhere in its enjoinment.  Accordingly, at this stage of the proceedings, the Court finds that any potential harm to defendants resulting from the denial of the motion for an *ex parte* temporary restraining order is outweighed by the threat of irreparable harm to the Supplemental Complaint Plaintiffs and the public interest.

### 5.    Security

Under Federal Rule of Civil Procedure 65(c), a district court may issue a temporary restraining order "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Because the Supplemental Complaint Plaintiffs are "serving a public interest in acting to protect constitutional rights related to abortion," and because defendants "will not be harmed by the order to preserve the *status quo*," the Court waives the bond requirement under Rule 65(c). *Jegley*, 267 F. Supp. 3d at 1111 (E.D. Ark. 2017).

### 6.    Nature Of *Ex Parte* Relief

Pursuant to Federal Rule of Civil Procedure 65(b)(1), the Court issues this *ex parte* temporary restraining order until all parties can be heard on the merits within the time permitted by Rule 65(b). Counsel for the Supplemental Complaint Plaintiffs certified in writing the efforts made to give notice to defendants and their counsel in this case before filing this motion and explained the reasons why notice should not be required (Dkt. No. 134-18). Further, in making the determination to grant this relief, the Court reviewed and relies upon the affidavits presented by the Supplemental Complaint Plaintiffs in this matter (Dkt. Nos. 134-2; 134-3) and the proposed verified supplemental complaint (Dkt. No. 132-1), which, along with the record evidence, the Court concludes clearly show that immediate and irreparable loss or damage will result to the Supplement Complaint Plaintiffs before defendants can be heard in opposition. The Supplemental Complaint Plaintiffs turned away numerous women seeking care at LRFP on April 10, 2020, and would have to do the same each day thereafter for an indefinite period of time due to the Challenged Provisions. Based on record evidence, there were 8 patients at LRFP to receive surgical abortion care on April 10, 2020, who LRFP had to turn away due to the Challenged Provisions, including a patient at 17 weeks LMP (*Id.*, ¶ 34). The Supplemental Complaint Plaintiffs present record evidence that, during the week of April 14, 2020, LRFP has 26 patients scheduled to receive surgical abortion care, including: (1) 12 patients who are more than 10 weeks LMP (*i.e.*, patients who are not candidates for a medication abortion); (2) 8 patients who are more

than 12 weeks LMP and will soon require a D&E instead of an aspiration abortion to terminate

their pregnancies if their abortions are delayed; and (3) 3 patients who are more than 17 weeks

LMP and will soon require a 2-day procedure instead of a 1-day procedure and very soon will be

past Arkansas's legal limit for abortion care (*Id.*, ¶ 46).

## IV.     Conclusion

For the foregoing reasons, the Court provisionally grants the Supplemental Complaint

Plaintiffs' motion for expedited leave to file a supplemental complaint (Dkt. No. 132) and directs

the Supplemental Complaint Plaintiffs to file their proposed first supplemental complaint for

injunctive and declaratory relief, attached as Exhibit 1 to their motion for expedited leave to file a

supplemental complaint, within seven days from the entry of this Order.  Additionally, the Court

provisionally grants the Supplemental Complaint Plaintiffs' motion for an *ex parte* temporary

restraining order and has under advisement the request for a preliminary injunction (Dkt. No. 134).

The Court hereby orders that defendants, and all those acting in concert with them,

including their employees, agents, and successors in office, are temporarily enjoined from

enforcing the Challenged Provisions against any providers of surgical abortions in Arkansas to bar

all surgical abortions, "except where immediately necessary to protect the life or health of the

patient."  Further, defendants are enjoined from failing to notify immediately all state officials

responsible for enforcing the requirements of the Challenged Provisions about the existence and

requirements of this temporary restraining order.  Pursuant to Federal Rule of Civil Procedure

65(b)(2), this temporary restraining order shall not exceed 14 days from the date of entry of this

Order and shall expire by its own terms on Tuesday, April 28, 2020, at 3:30 p.m. CT, unless before

that time, for good cause shown and for reasons entered in the record, the Court extends it for a

like period or defendants consent to a longer extension, the Court modifies it, or the Court dissolves it.

The Court will reconsider these matters upon the submission of defendants' written arguments.

It is so ordered this Tuesday, April 14, 2020, at 3:30 p.m. CT.

Kristine G. Baker
United States District Judge