## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SOUTH WIND WOMEN'S CENTER LLC, d/b/a TRUST WOMEN OKLAHOMA CITY, on behalf of itself, its physicians and staff, and its patients, et al.,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **Case No. CIV-20-277-G** |
| **J. KEVIN STITT in his official capacity as Governor of Oklahoma et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>PRELIMINARY INJUNCTION</u>

This matter is before the Court on Plaintiffs'[1] Motion for Preliminary Injunction

(Doc. No. 16).  Following the submission of that Motion, Defendants[2] filed a Response

(Doc. No. 54) and Supplement (Doc. No. 82) thereto, Plaintiffs filed a Reply (Doc. No. 84)

and Supplements (Doc. Nos. 86, 87) thereto, and Defendants filed a Surreply (Doc. No.

96).  Further, Plaintiffs and Defendants submitted proposed findings of fact and

---

[1] Plaintiffs are: South Wind Women's Center LLC, d/b/a Trust Women Oklahoma City, on behalf of itself, its physicians and staff, and its patients; Larry A. Burns, DO, on behalf of himself, his staff, and his patients; and Comprehensive Health of Planned Parenthood Great Plains, Inc., on behalf of itself, its physicians and staff, and its patients.  The Supreme Court has held that abortion providers have standing to raise constitutional challenges on behalf of their patients. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality op.).

[2] Defendants are: J. Kevin Stitt in his official capacity as Governor of Oklahoma; Michael Hunter in his official capacity as Attorney General of Oklahoma; David Prater in his official capacity as District Attorney for Oklahoma County; Greg Mashburn in his official capacity as District Attorney for Cleveland County; Gary Cox in his official capacity as Oklahoma Commissioner of Health; and Mark Gower in his official capacity as Director of the Oklahoma Department of Emergency Management.

conclusions of law (Doc. Nos. 92, 93) and responses to each other's respective proposals (Doc. Nos. 100, 101).  Finally, as directed by the Court, Defendants filed a Supplemental Brief (Doc. No. 102) addressing the effect of the executive order and guidance issued by the Governor of Oklahoma on April 16, 2020.  In addition to the evidence and argument submitted by the parties in the briefs detailed above, the Court on April 3, 2020, held a telephonic hearing on the initial question of whether a temporary restraining order should issue and, on April 20, 2020, held a telephonic hearing on the question of whether a preliminary injunction should issue.[3]

This case presents an issue that has long been a source of struggle for the courts: the proper use of the judicial power in reviewing laws and executive orders or actions taken in response to a public health emergency.  There is no dispute that the State of Oklahoma— like governments across the globe—is facing a health crisis in the COVID-19 pandemic that requires, and will continue for an indeterminate time to require, emergency measures. In this effort to secure the health and safety of the public, the State has broad power to act and even, temporarily, impose requirements that intrude upon the liberty of its citizens. "[T]he rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905).  That power is not unfettered, however, and courts should carefully guard against "unreasonable," "arbitrary," or "oppressive" exercises of it.  *Id.* at 27, 38.  The

---

[3] Various amicus briefs and a response thereto also have been allowed and considered by the Court.  *See* Doc. Nos. 59, 68, 76, 85.

court's duty, then, is narrow but essential: it must not "usurp the functions of another branch of government" by substituting its opinion for that of the officers tasked with responding to an emergency, *see id.* at 26, 28, 30, but neither may it permit "a plain, palpable invasion of rights" or any action for which "the means prescribed by the state . . . has no real or substantial relation to the protection of the public health and the public safety," *id.* at 31.

The right at issue here is access to abortion.  The Supreme Court has held (and the parties do not dispute, at least for purposes of this action) that the Fourteenth Amendment to the United States Constitution establishes a fundamental right of a woman to "mak[e] the ultimate decision to terminate her pregnancy before viability."  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality op.).  This holding prohibits outright bans on abortion prior to viability and shields the right of access to abortion from any "undue burden" caused by state regulation.  *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016) ("[T]he standard that this Court laid out in *Casey* . . . asks courts to consider whether any burden imposed on abortion access is 'undue.'").  In applying *Casey*'s undue burden rule, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer."  *Id.* at 2309.

Plaintiffs contend that executive orders issued by the Governor of Oklahoma impose a complete ban on nonemergency abortion procedures in the State of Oklahoma, violating the Fourteenth Amendment's guarantees of due process and equal protection.  *See* Compl. ¶¶ 65-70 (Doc. No. 1).  Plaintiffs seek entry of a preliminary injunction barring

enforcement of those executive orders as applied to previability abortions.  *See* Pls.' Mot.

Prelim. Inj. (Doc. No. 16) at 22-33.

I.

At the April 3, 2020 telephonic hearing on Plaintiffs' request for a temporary

restraining order, the Court discussed with counsel the procedures to be employed in

determining the Motion for Preliminary Injunction.  The parties stipulated that the Court

may consider the Motion based on the evidence submitted with the briefing of that Motion

and need not conduct any additional evidentiary hearing.  Specifically, the parties agreed

that the Court may accept the submitted affidavit testimony and documentary exhibits as

evidence and waived the right to call or cross-examine any affiant (or other witness) at a

hearing.  At the April 20, 2020 telephonic hearing, the Court heard further argument from

counsel for both Plaintiffs and Defendants.

Upon careful consideration of the evidence and argument submitted by the parties,

the Court makes the following findings of fact:

1.     In Oklahoma, nonemergency abortions are prohibited when "the probable

postfertilization age of the woman's unborn child is twenty (20) or more weeks."  Okla.

Stat. tit. 63, § 1-745.5(A).

2.     Plaintiffs in this action are providers of abortion services in Oklahoma.

Compl. ¶¶ 9-11.  Although each Plaintiff's services vary, one or more of them provide

abortion through administration of two pills ("medication" or "chemical" abortion) up to

10 or 11 weeks from the pregnant person's last menstrual period (i.e., eight or nine weeks

postfertilization)  and  provide  abortion  through  cervical  suction  and/or  instruments

4

("procedural" or "surgical" abortion) up to 21.6 weeks from the last menstrual period (i.e., 19.6 weeks postfertilization). *See* Pls.' Mot. Prelim. Inj. at 13-15; *id.* Ex. 5, Burns Decl. ¶ 11 (Doc. No. 16-5); *id.* Ex. 6, Burkhart Decl. ¶ 2 (Doc. No. 16-6); *id.* Ex. 7, Hill Decl. ¶ 8 (Doc. No. 16-7).

3.      The coronavirus known as COVID-19 ("COVID-19") has caused a global pandemic and public health crisis that is expected to test the limits of this country's healthcare system.   On March 13, 2020, President Donald J. Trump declared that the COVID-19 outbreak in the United States constitutes a national emergency.[4]

4.      On March 15, 2020, the Governor of Oklahoma issued Executive Order No. 2020-07.  *See* EO 2020-07, https://www.sos.ok.gov/documents/executive/1913.pdf.  In EO 2020-07, the Governor declared a state of emergency in all 77 counties in Oklahoma "caused by the impending threat of COVID-19 to the people of this State and the public's peace, health, and safety."  *Id*. at 1.

5.      On March 24, 2020, the Governor issued an amended version of EO 2020-07, which directed at Paragraph 18: "Oklahomans and medical providers in Oklahoma shall postpone all elective surgeries, minor medical procedures, and non-emergency dental procedures until April 7, 2020."  Compl. Ex. 1, EO 2020-07 (4th Am.) ¶ 18 (Doc. No. 1-1); *see also* Compl. ¶¶ 1-2.

6.      Generally, EO 2020-07 did not specify which surgeries and procedures fall within Paragraph 18's prohibition against elective surgeries and minor medical procedures

---

[4]  *See*  https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

or prescribe how that determination is to be made.  *See* EO 2020-07 (4th Am.), ¶ 18.  As to abortion procedures, the Governor on March 27, 2020, stated in a Press Release that the postponement referenced in the Executive Order applied to "any type of abortion services as defined in 63 O.S. § 1-730(A)(1) [that] are not a medical emergency as defined in 63 O.S. § 1-738.1[A] or otherwise necessary to prevent serious health risks to the unborn child's mother."  Compl. Ex. 2, Press Release at 1 (Doc. No. 1-2).[5]

7.   The stated purpose and benefit of EO 2020-07's requirement of postponement of "all elective surgeries" and "minor medical procedures" is to protect the public's health by preventing "(1) close interpersonal contact [in order to slow the rate of spread of the virus], (2) depletion of medical PPE [personal protective equipment], and (3) activities that will increase the use of hospital beds, staff, and other resources."  Defs.' Resp. (Doc. No. 54) at 26-27; *see also id.* at 23-38; *accord* Defs.' Suppl. Br. (Doc. No. 102) at 4-5.

8.   EO 2020-07 states that it was issued pursuant to, among other things, the Oklahoma Emergency Management Act of 2003 ("OEMA," Okla. Stat. tit. 63, §§ 683.1 et seq.).  *See* EO 2020-07, at 1.  Pursuant to the OEMA, the Governor is authorized to "[m]ake, amend, and rescind the necessary orders and rules to carry out the provisions of

---

[5] Title 63, section 1-738.1A(5) of the Oklahoma Statutes  provides that a "medical emergency" "means the existence of any physical condition, not including any emotional, psychological, or mental condition, which a reasonably prudent physician, with knowledge of the case and treatment possibilities with respect to the medical conditions involved, would determine necessitates the immediate abortion of the pregnancy of the female to avert her death or to avert substantial and irreversible impairment of a major bodily function arising from continued pregnancy."

the [OEMA] within the limits of authority conferred upon the Governor [pursuant to the OEMA], with due consideration of the emergency management plans of the federal government." Okla. Stat. tit. 63, § 683.8(D)(1).

9.       On March 26, 2020, the Oklahoma Attorney General stated that "violation of an executive order can be a misdemeanor."  Press Release, Attorney General Hunter Clarifies Governor's Executive Order Regarding Law Enforcement Action for Non-Compliance (Mar. 26, 2020), http://www.oag.ok.gov/attorney-general-hunter-clarifies-governors-executive-order-regarding-law-enforcement-action-for-non-compliance.    The OEMA provides that willful violation of an OEMA order is a misdemeanor punishable by imprisonment for up to six months and/or a fine of up to $3000, with each day of violation constituting a separate offense.  Okla. Stat. tit. 63, § 683.23(C).

10.       On April 1, 2020, the Governor amended EO 2020-07 by extending the postponement of elective surgeries and minor medical procedures "until April 30, 2020." Pls.' Notice Ex. 1, EO 2020-07 (7th Am.), ¶ 18 (Doc. No. 38-1).

11.       On April 16, 2020, the Governor issued Second Amended Executive Order No. 2020-13 ("EO 2020-13"), which further revised the directive regarding elective surgeries and minor medical procedures as follows:

> Oklahomans and medical providers in Oklahoma shall postpone all elective surgeries until April 24th, 2020.  Elective procedures after April 24th, 2020 are subject to the guidelines set forth in Executive Memo 2020-02. Oklahomans and medical providers in Oklahoma shall postpone minor medical procedures and non-emergency dental procedures until April 30th, 2020.  For purposes of aiding in the determination of what is considered an elective surgery, medical providers are encouraged to consult the Centers for Medicare & Medicaid Services (CMS) Non-Emergent, Elective Medical Services, and Treatment Recommendations.

Defs.' Suppl. Br. Ex. 1, EO 2020-13 (2nd Am.), ¶ 22 (Doc. No. 102-1).[6]

12.     On that same date, the Governor issued Executive Memorandum No. 2020-02 ("EM 2020-02"), which provides guidance to "be [used] when elective surgeries are performed."  Defs.' Suppl. Br. Ex. 2, EM 2020-02, at 2 (Doc. No. 102-2).  The guidance "is subject to individual institutions' availability of personal protective equipment" and sets forth both "key considerations for providers" and a tiered approach to surgeries (the "Elective Surgery Acuity Scale" or "ESAS").  *Id.* at 2-3.  Providers are instructed that they "should" both "abide by" the ESAS and "require a COVID-19 test as a portion of the pre-operation process."  *Id.*[7]

13.     The ESAS sets forth a scale of Tiers 1 through 3, each with sub-tiers "a" and "b."[8]  Defendants have clarified that the impact on persons seeking abortion is as follows:

---

[6] On April 20, 2020, the Governor issued Third Amended Executive Order No. 2020-13, which amended the "after April 24th, 2020," of the second sentence to read "*on and* after April 24th, 2020."  EO 2020-13 (3rd Am.) ¶ 22 (Doc. No. 106-1).

[7] Defendants state that the requirement of a COVID-19 test "does not apply where not feasible because the surgery is immediately necessary as part of a medical emergency," Defs.' Suppl. Br. at 4, but no such exception appears in the cited guidance.  At the April 20, 2020 hearing, Plaintiffs raised the concern that asymptomatic patients who have not had exposure to the virus do not currently qualify in all counties for testing and, thus, could be unable to access an abortion even if one was otherwise allowable.  The Court lacks a sufficient record to make any finding as to the effect of the testing requirement at this juncture.

[8] The Centers for Medicare & Medicaid Services Non-Emergent, Elective Medical Services, and Treatment Recommendations ("CMS Recommendations") referenced in EO 2020-13 set forth a different tiered framework and state: "A tiered framework is recommended to prioritize services and care to those who require emergent or urgent attention to save a life, manage severe disease, or avoid further harms from an underlying condition.  Decisions remain the responsibility of local healthcare delivery systems, including state and local health officials, and those clinicians who have direct responsibility for their patients."  *CMS Recommendations* (Apr. 7, 2020),

a.  Tiers 3a and 3b concern surgeries that are performed only in hospitals and are "[h]igh acuity." *Id.* at 2.  These surgeries are "[n]ot impacted" by the Executive Order postponement and are "allowable currently."  *Id.*  Defendants state that Tier 3a and Tier 3b surgeries include the emergency abortions referenced in the Press Release.  *See* Defs.' Suppl. Br. at 2.

b.  Tiers 2a and 2b concern surgeries that are performed in either a hospital or a surgery center for conditions that are "[n]ot life threatening but [have] potential for future morbidity and mortality."  EM 2020-02, at 2.  Surgeries that fall within these Tiers may take place on April 24, 2020.  *See id.*; *accord* EO 2020-13, ¶ 22.  Defendants state that Tier 2a and Tier 2b surgeries include "elective surgical abortions where delay until April 30 would make elective abortion unavailable under Oklahoma law."  Defs.' Suppl. Br. at 2; *see also id.* at 3.

c.  Tiers 1a and 1b concern surgeries that are outpatient by nature and performed in connection with non-life-threatening illnesses.  *See* EM 2020-02, at 2.  Surgeries that fall within these tiers may take place on April 30, 2020.  *See* EO 2020-13, ¶ 22.[9]  Defendants state that Tiers 1a and 1b "include[] all elective surgical abortions" that would still be

---

https://www.cms.gov/files/document/cms-non-emergent-elective-medical-recommendations.pdf.

[9] On April 20, 2020, the Governor issued Amended Executive Memorandum No. 2020-02, which clarified that these surgeries are "[a]llowable April 30."  EM 2020-02 (Am.) at 2 (Doc. No. 106-2); *see also* Defs.' Suppl. Br. at 3 n.4.

available to the pregnant person on or after April 30, 2020.  Defs.' Suppl.

Br. at 3.

-and-

d.  Defendants state that medication abortions remain subject to the

Executive Orders' postponement on "minor medical procedures" and

therefore likewise may not be provided "'until April 30th, 2020.'"  *Id.*

(quoting EO 2020-13, ¶ 22).

14.    Accordingly, as of April 20, 2020, the effect of the Executive Orders, Press

Release, and Executive Memorandum (collectively, the "Executive Orders"), absent any

Court intervention, is to prevent abortion providers statewide from lawfully performing an

elective surgical abortion[10] until: (a) April 24, 2020, for abortions where delay until April

30, 2020, or thereafter would make surgical abortion unavailable under Oklahoma law; or

(b) April 30, 2020, for abortions where delay until that date or thereafter would not make

surgical abortion unavailable under Oklahoma law.  Further, the effect of the Executive

orders, absent any Court intervention, is to prevent abortion providers statewide from

lawfully performing an elective medication abortion until April 30, 2020.

15.    Absent travel to another state, the postponement directed by the Executive

Orders would require at least some pregnant persons in Oklahoma who would be eligible

---

[10] The Court here uses "elective" solely to distinguish the abortions at issue from those
abortions not affected by the Executive Order—i.e., those abortions deemed necessary "to
avert [the pregnant person's] death or to avert substantial and irreversible impairment of a
major bodily function [of the pregnant person] arising from continued pregnancy" or to
"otherwise . . . prevent serious health risks to" the pregnant person.  Okla. Stat. tit. 63, § 1-
738.1A(5); Press Release at 1; *see also* Defs.' Suppl. Br. at 2.

for a medication abortion to instead obtain a more invasive surgical abortion.  Pls.' Mot. Prelim. Inj. Ex. 4, Schivone Decl. ¶¶ 31-32 (Doc. No. 16-4).  Further, this postponement would effectively eliminate the ability of some pregnant persons in Oklahoma who are presently able to obtain a medication abortion, but for whom the surgical option is medically contraindicated, to obtain an abortion at all.  *See id.* ¶ 31.

16.     Absent travel to another state, the postponement directed by the Executive Orders would effectively eliminate the ability of pregnant persons in Oklahoma who would reach their last eligible date under Oklahoma law prior to April 30, 2020—specifically, the date when "the probable postfertilization age of the woman's unborn child is twenty (20) or more weeks," Okla. Stat. tit. 63, § 1-745.5(A)—to obtain an abortion until April 24, 2020, or thereafter.  *See* Pls.' Reply Ex. 2, Burkhart Suppl. Decl. ¶¶ 4, 6 (Doc. No. 84-2); EO 2020-13, ¶ 22; Defs.' Suppl. Br. at 2 (representing that "elective surgical abortions where delay until April 30 would make elective abortion unavailable under Oklahoma law" "may take place starting on April 24").

17.     A surgical abortion is an outpatient procedure.  The PPE commonly used in performing these procedures includes sterile or non-sterile gloves, a gown, a face shield or protective eyewear, a surgical mask, a hair cover, and shoe covers.  Pls.' Reply Ex. 3, Hill Suppl. Dec. ¶¶ 17-18 (Doc. No. 84-3); Burns Decl. ¶ 23; Burkhart Decl. ¶ 34; Hill Decl. ¶ 10; *see also* Burkhart Decl. ¶ 35 (stating that clinic already had a small quantity of N95 masks in stock and was planning to have staff use one per week until that supply ran out). The invasiveness, complexity, potential need for sedation, clinic time, and use of staff and PPE involved in the surgical abortion increase as the pregnancy progresses.  Pls.' Reply

Ex. 1, Nichols Decl. ¶ 25 & n.8 (Doc. No. 84-1); Burkhart Suppl. Decl. ¶¶ 16, 17; Hill Suppl. Decl. ¶¶ 13-14.

18.     On a surgical abortion performed up until 12 to 13 weeks postfertilization, the clinician typically uses aspiration, which involves dilating the cervix using medications and/or small expandable rods, inserting a narrow, flexible tube through the cervix into the uterus, and emptying the uterus through suction.  Schivone Decl. ¶ 16.  This procedure typically takes 5 to 10 minutes.  *Id.*

19.     Beginning at approximately 12 to 13 weeks postfertilization, patients cannot have an aspiration procedure; clinicians instead use instruments to complete the surgical abortion in a technique called dilation and evacuation.  *Id.* ¶ 17; Nichols Decl. ¶ 26; Burkhart Suppl. Decl. ¶ 15.  This procedure typically can be completed in one day.  Nichols Decl. ¶ 27; Burkhart Suppl. Decl. ¶ 16.

20.     Beginning at approximately 16 to 18 weeks postfertilization, patients must come to the clinic twice over two consecutive days to receive a surgical abortion.  Nichols Decl. ¶ 27; Burkhart Suppl. Decl. ¶ 17.  The patient visits the clinic on the first day to commence dilation and then returns for the uterine evacuation.  Nichols Decl. ¶ 27.

21.     A medication abortion typically requires an in-person visit, with an ultrasound and bloodwork, and a prescription of two pills (mifepristone and misoprostol).  The pregnant person takes the first pill at the provider's office and the second pill at a location of her choosing.  Schivone Decl. ¶ 14; Hill Suppl. Decl. ¶ 17.  There is a later follow-up appointment, which at least two Plaintiff providers are currently conducting via telemedicine.  Hill Suppl. Decl. ¶ 19; Burkhart Suppl. Decl. ¶ 8.  The PPE used at the in-person visit is primarily limited

to non-sterile gloves and surgical masks.  *See* Schivone Decl. ¶ 35; Burns Decl. ¶¶ 23-24 (testifying that for medication abortions the only protective equipment used is non-sterile gloves and surgical masks); Hill Suppl. Decl. ¶¶ 17-18 (same); Burkhart Decl. ¶¶ 33, 25 (testifying that staff is using one N95 mask per week, until existing supply runs out, and for medication abortions uses non-sterile gloves and surgical masks).

22.     While the parties dispute the opposing experts' interpretation of the medical literature, the evidence in the record reflects that the occurrence of serious complications associated with medication abortions is quite low overall.  *See, e.g.*, Nichols Decl. ¶ 67 & n.49 (discussing FDA warning label for mifepristone, which informs patients that in 10 studies of approximately 31,000 women "[s]erious adverse reactions were reported in <0.5%" (Doc. No. 84-1, at 138-39)); Pls.' Reply Ex. 1, Grossman Decl. ¶ 6 (Doc. No. 84-1) (citing three studies of medication abortions as finding: (i) "0.16% of patients experienced a significant adverse event"; (ii) "0.26% of patients experienced a clinically significant adverse event"; and (iii) "a major complication rate of 0.31%"); Defs.' Resp. Ex. 7, Harrison Decl. ¶ 16 (Doc. No. 54-7) (noting a study finding that 3.3% of first-trimester mifepristone patients required emergency treatment); *see also* National Academies of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States* 77 (2018) ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.  Serious complications are rare; in the vast majority of studies, they occur in fewer than 1 percent of abortions, and they do not exceed 5 percent in any of the studies the committee identified." (Doc. No. 84-1, at 124)).

23.     A pregnant person eligible for abortion but who continues the pregnancy likewise will require medical care that involves in-person contact and the use of PPE, even if later pregnancy and childbirth are not considered.  Dr. Stone, an obstetrician-gynecologist practicing in Oklahoma City, has testified that although she has made some changes to her practice and increased the amount of PPE she wears as a result of the COVID-19 pandemic, she is continuing to provide in-person prenatal care to pregnant persons, such that "even during COVID-19, before a patient has reached 28 weeks gestation, she will have met with me in-person at least 3 times, had 2-3 ultrasounds in-person, and visited the laboratory at least twice for testing, 3 times if she chooses to have a first trimester screen."  Pls.' Reply Ex. 4, Stone Decl. ¶¶ 23-25 (Doc. No. 84-4).  Dr. Stone states that she has knowledge that "other Oklahoma prenatal care providers" are similarly treating their pregnant patients.  *Id.* ¶ 24.

## II.

As explained by the Tenth Circuit,

> Ordinarily, a movant seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest.  Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal.

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001) (citation omitted).[11]

---

[11] Defendants contend that Plaintiffs must "satisfy a heightened standard" because they are seeking relief that is "disfavored" due to "afford[ing] [Plaintiffs] all the relief that [they] could recover at the conclusion of a full trial on the merits."  *Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016) (internal quotation marks omitted); *see* Defs.' Resp. at 22.

### A.  Substantial Likelihood of Success on the Merits

The Court has considered the potential for success of Plaintiff's claims under both *Jacobson*'s standard for permissible state action during a public health emergency and *Casey*'s standard for permissible state regulation of access to abortion.  *See Robinson v. Marshall*, No. 2:19cv365-MHT, 2020 WL 1847128, at *8 (M.D. Ala. Apr. 12, 2020) (assuming that both legal frameworks should be applied and granting preliminary injunction), *appeal docketed*, No. 20-11401 (11th Cir. Apr. 13, 2020).  Plaintiffs have established a substantial likelihood of success on the merits.

### 1.  Surgical Abortions Where Delay Renders Abortion Unavailable

In some instances, the effect of the Executive Orders is to prevent access to surgical abortion altogether.  In Oklahoma nonemergency abortions are prohibited when "the probable postfertilization age of the woman's unborn child is twenty (20) or more weeks." Okla. Stat. tit. 63, § 1-745.5(A).  As detailed above, the current effect of the Executive Orders is to prevent abortion providers statewide from lawfully performing an elective surgical abortion until at least April 24, 2020 (based on probable postfertilization age on April 30, 2020).  This delay would make surgical abortion unavailable to a patient under section 1-745.5(A) if the probable postfertilization age of the unborn child reaches 20 or more weeks prior to or on April 24, 2020.  This effective denial of a constitutional right represents the type of "plain, palpable invasion of rights" identified in *Jacobson* as beyond the reach of even the considerable powers allotted to a state in a public health emergency.

---

Assuming the heightened standard applies, Plaintiffs meet that standard for the reasons outlined below.

*Jacobson*, 197 U.S. at 31.  As such, the Executive Orders are, in this respect, invalid as an "unreasonable," "arbitrary," and "oppressive" use of the State's emergency powers.  *Cf. Adams & Boyle, P.C. v. Slatery*, No. 3:15-cv-00705, 2020 WL 1905147, at *5-7 (M.D. Tenn. Apr. 17, 2020) (order granting preliminary injunction against enforcement of state executive order preventing procedural abortions until at least April 30, 2020), *appeal docketed*, No. 20-5408 (6th Cir. Apr. 20, 2020).  Moreover, whether viewed as a ban or as a restriction subject to the undue burden standard, this effective denial of the right of access to abortion is impermissible under *Casey*.  *See Casey*, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effect right to elect the procedure.").

### 2. *Other Surgical Abortions*

In other instances, where the probable postfertilization age of the unborn child will not reach 20 or more weeks until after April 24, 2020, the effect of the Executive Orders is to require a pregnant patient to temporarily delay receipt of a surgical abortion until: (i) April 24, 2020 (for pregnant patients for whom "delay after April 30 would make elective abortion unavailable under Oklahoma law," Defs.' Suppl. Br. at 2)[12] or (ii) April 30, 2020 (for pregnant patients for whom delay beyond that date would not make elective abortion unavailable under Oklahoma law, *id.* at 3).

---

[12] This would include patients whose unborn children reach probable postfertilization age of 20 weeks from April 25 through April 30, 2020.

a.  Procedures Performed Prior to April 24, 2020

Giving deference to the state executive as the primary arbiter of what steps are necessary in that area to stop the spread of COVID-19, and to ration resources needed to treat patients infected with that virus, the Court concluded in its Temporary Restraining Order of April 6, 2020, that a temporary delay of surgical abortions is a permissible use of state power in the current public health emergency—so long as the pregnant patient would remain able to lawfully obtain an abortion upon the cessation of the Executive Orders. Further, upon "consider[ing] the burdens a law imposes on abortion access together with the benefits those laws confer," *Hellerstedt*, 136 S. Ct. at 2309, the Court concluded in the Temporary Restraining Order that the benefit of emergency action during this great public health crisis justifies such a temporary delay of access to abortion services.[13]  Those remain the conclusions of the Court as to the current situation, based on a full examination of the evidence presented by the parties.

---

[13] In applying these principles to the facts established in this case, the Court accepts and assumes that the holdings in *Casey* and its progeny do not foreclose application of a *Jacobson* analysis of whether a postponement of abortion procedures may be ordered as part of a State's effort to protect public health during a pandemic.  Absent this assumption, it is even more plain that Plaintiffs are likely to succeed on the merits.  The Supreme Court in *Casey* explained that "a statute which, while furthering . . . [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice," is invalid. *Casey*, 505 U.S. at 877.  Further, though the state "may enact regulations to further the health or safety of a woman seeking an abortion," the state may not impose "[u]necessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion."  *Id.* at 878.  If *Casey* is read to speak to any exercise of state interest, including emergency action to avert a public health crisis, it would be clear that restrictions on abortion services of the kind reflected in the Executive Orders constitute a substantial obstacle to abortion access and, therefore, are invalid.

b.  Procedures Performed On or After April 24, 2020

Since the issuance of the TRO, the State's position and directives have changed. Based upon a stated "confiden[ce] in the State's "hospital numbers & PPE," the State is now permitting certain elective surgeries to resume six days sooner, on April 24, 2020.  Governor J. Kevin Stitt (@GovStitt), Twitter (Apr. 15, 2020); *see also id.* (Apr. 17, 2020) ("[W]e currently have more than enough hospital beds, ICU beds, & ventilators statewide but . . . we remain prepared for a surge."); *see* EO 2020-07, ¶ 22; EM 2020-02, at 2; *cf.* Defs.' Suppl. Ex. 1, Blankenship Suppl. Decl. ¶ 2 (Doc. No. 96-1) (stating that Oklahoma hospitals are reporting an average stockpile of a 12-day supply of PPE although some hospitals would more typically have a month's or more supply on hand with a lower use rate).

Consistent with *Jacobson*, the Court defers to the State's judgment that April 24, 2020, is the earliest date upon which its restrictions on medical procedures can be safely loosened. In light of the diminished need for rationing after April 23rd, however, the record does not reflect any reasonable basis to continue, beyond that date, the significant intrusion upon a constitutional right represented by the State's postponement of the relevant surgical abortions. Absent such justification, the post-April 23, 2020 prohibition on surgical abortions reflected in the Executive Orders is invalid as an "unreasonable," "arbitrary," and "oppressive" use of the State's emergency powers and as an "undue burden" on the right of Plaintiffs' patients to access abortion services.

*3.  Medication Abortions*

With respect to medication abortion, the Court likewise concludes that it is substantially likely that Plaintiffs will establish that the prohibition reflected in the Executive

Orders is invalid as an "unreasonable," "arbitrary," and "oppressive" use of the State's emergency powers and as an "undue burden" on the right of Plaintiffs' patients to access abortion services.  The evidence reflects that this procedure is reasonably safe and requires similar interpersonal contact and PPE as regular prenatal care and less interpersonal contact and PPE than surgical abortion.  It follows that the purpose and benefit that Defendants state the government is trying to achieve through the Executive Orders—preventing "(1) close interpersonal contact, (2) depletion of medical PPE, and (3) activities that will increase the use of hospital beds, staff, and other resources," Defs.' Resp. at 26-27—are not advanced by prohibiting medication abortion, especially in light of the State's early revocation of a portion of the elective-surgery and minor-medical-procedure ban as described above.  As an example, delay of medication abortion for a patient with an unborn child nearing nine weeks postfertilization (the latest date when Plaintiff medical providers will administer drugs for a medication abortion) will limit that person's ability to access abortion within the State of Oklahoma to the surgical option, a procedure that will divert more medical resources and PPE than medication abortion.[14]  For a patient for whom surgical abortion is contraindicated, such a delay would constitute a complete denial of access to abortion services.  And, while administration of medication abortion will require some amount of close interpersonal

---

[14] Defendants argued at the April 20, 2020 hearing that the State's interests would be advanced by a ban on medication abortions because—up to a certain point in time, at least— a surgical abortion would not be an option for an affected patient pursuant to the Executive Orders.  The Court does not find this persuasive in light of (a) the imminent restoration of surgical abortions ordered herein, and (b) the PPE and in-person contact demands attendant to prenatal care that would be necessary for the patient during any extended wait for a surgical abortion.

contact, as outlined above that amount will be small and not dissimilar from the close interpersonal contact the State has allowed in other contexts. This disconnect between the means employed and the benefits achieved indicates that the prohibition on medication abortion is improper under both the *Jacobson* and *Casey* standards of review. *See Jacobson*, 197 U.S. at 31 (explaining that police power is improperly used when "the means prescribed by the state . . . has no real or substantial relation to the protection of the public health and the public safety"); *Hellerstedt*, 136 S. Ct. at 2309 (requiring balancing of "burdens a law imposes on abortion access together with the benefits those laws confer').

In sum, Plaintiffs have established a substantial likelihood of success on the merits of their claim that the Executive Orders violate Plaintiffs' patients' constitutional rights under the Fourteenth Amendment.

### B. Irreparable Injury Absent Injunctive Relief

Plaintiffs here have demonstrated imminent, irreparable harm absent entry of injunctive relief, as their patients will be substantially delayed in or prevented from exercising their right to abortion access. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); Pls.' Mot. Prelim. Inj. at 30-32; *id.* Ex. 4, Schivone Decl. ¶¶ 28-33, 37. Further, "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite*, 269 F.3d at 1156; *cf. Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) ("A disruption or denial of

these patients' health care cannot be undone after a trial on the merits." (internal quotation marks omitted)).

## C. The Balance of Hardships and the Effect of an Injunction on the Public

Given the nature of the State's interest in issuing the Executive Orders, namely the protection of public health, the final two considerations for injunctive relief are merged. As detailed above, Plaintiffs have demonstrated that the injury that will be suffered as a result of delaying abortion access to a pregnant patient nearing 20 weeks postfertilization is a complete denial, to that patient, of the Fourteenth Amendment right to access abortion. That plain and palpable deprivation of a fundamental right outweighs the injury the public may suffer if those procedures are allowed to occur. As for other pregnant patients, the State's own guidance indicates that the need for the disputed restrictions will be at least partly eliminated by April 24, 2020. A delay may result in fewer and more invasive abortion options being available, and supplying prenatal care for these patients in the meantime would indisputably require interpersonal contact and use of PPE and other hospital supplies. The current record reflects that the public health benefit achieved by delaying access to abortions "do[es] not outweigh the lasting harm imposed by the denial of an individual's right to terminate her pregnancy" or "by an undue burden or increase in risk on patients imposed by a delayed procedure." *Robinson*, 2020 WL 1847128, at *15; *see also Adams & Boyle*, 2020 WL 1905147, at *6 ("[I]t is always in the public interest to prevent violation of a party's constitutional rights." (internal quotation marks omitted)); *accord Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D.

Okla. 2012) ("The public has an interest in constitutional rights being upheld and in unconstitutional decisions by the government being remedied.").

CONCLUSION

As outlined above, Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 16) is GRANTED IN PART and DENIED IN PART.

Specifically, it is hereby ORDERED, ADJUDGED, AND DECREED that Defendants and their employees, agents, attorneys, successors, and all others acting in concert or participating with them are PRELIMINARILY ENJOINED from enforcing Governor J. Kevin Stitt's Seventh Amended Executive Order No. 2020-07 of April 1, 2020, the March 27, 2020 Press Release, and the April 16, 2020 Second Amended Executive Order No. 2020-13 and Executive Memorandum No. 2020-02, against Oklahoma abortion providers, clinics, and their staff, to the following extent:

1. Effectively immediately, the prohibition on surgical abortions may not be enforced with respect to any patient for whom a delay in receipt of the surgical abortion to April 24, 2020, would render elective abortion unavailable to that patient under Oklahoma law; and

2. Effective Friday, April 24, 2020, the prohibition on surgical abortions may not be enforced as to any patient; and

3. Effectively immediately, the prohibition on medication abortions may not be enforced as to any patient.

The Temporary Restraining Order previously entered by the Court (Doc. No. 70) shall expire as outlined therein.  The terms of this Preliminary Injunction shall remain in place until further order of the Court.

IT IS FURTHER ORDERED that the security requirement of Federal Rule of Civil Procedure 65(c) is waived.

IT IS SO ORDERED this 20th day of April, 2020.

CHARLES B. GOODWIN
United States District Judge